No. 25-4278

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

NW ENERGY COALITION, *et al.*,
*Petitioners*,

v.

BONNEVILLE POWER ADMINISTRATION,
*Respondent*,

and

PUBLIC POWER COUNCIL, *et al.*,
*Intervenors.*

On Petition for Review Under the Northwest Power Act

---

**RESPONDENT'S ANSWERING BRIEF**

---

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
SARAH M. KUTIL
ANNE E. SENTERS
*Asst. General Counsels*

ERIKA A. DOOT
ASHLEY L. MOREY
ANGAD S. NAGRA
*Attorneys*

Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208
503-230-5085

SCOTT E. BRADFORD
*U.S. Attorney*
*District of Oregon*

SEAN E. MARTIN
*Asst. U.S. Attorney*

1000 SW Third Ave.
Suite 600
Portland, OR 97201-2902
503-727-1000

J. COURTNEY OLIVE
*Special Asst. U.S. Attorney*
*Attorneys for Respondent*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iv

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ......................viii

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7 ....................... 4

STATEMENT OF THE CASE .................................................................. 4

    A.    BPA's role in the Pacific Northwest. ..................................... 4

    B.    The decision at issue. .......................................................... 6

    C.    Creation of EDAM, and its oversight provisions................... 7

    D.    Creation of Markets+, and its oversight provisions. ............. 9

    E.    BPA's Business Analysis...................................................... 11

        1.    Economic projections supported either market, but Markets+ presented less risk in meeting BPA's primary statutory objective............................. 12

        2.    Governance and authority over the market was a key deciding factor, and Markets+ proved superior. ................................................................. 15

        3.    Reliable electrical service was a key deciding factor, and BPA found Markets+ was better in this regard. ................................................................ 17

        4.    Market design and greenhouse gas accounting were key deciding factors, and BPA found Markets+ was better in these areas. .......................... 18

    F.    BPA's environmental analysis. ........................................... 20

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW ...................................................................... 23

    A.    Standard of review for statutory interpretation: De novo.................................................................................. 23

B. Standard of review for application of law to facts: BPA must consider relevant factors and articulate a rational connection between the facts found and the choice made. ...................................................................25

ARGUMENT ...........................................................................27

I. PETITIONERS LACK STANDING FOR THEIR NWPA CLAIMS; ALTERNATIVELY, THE CLAIMS ARE UNRIPE. ...................................................................27

A. NWPA standing. .......................................................27

1. No injury in fact. ...............................................27

2. Not "fairly traceable" to the decision challenged. .........................................................31

3. Alternatively, Petitioners' NWPA claims are not ripe. ...............................................................32

II. BPA DID NOT VIOLATE THE NWPA. ...............................33

A. The standards that Petitioners allege BPA violated do not apply to this Policy because it is not a "resource acquisition." ........................................35

1. This Court has already decided the statutory interpretation question at hand, holding that an exchange is not a "resource acquisition." ..........................................................35

2. Statutory interpretation confirms that an exchange is not a resource acquisition and the standards that Petitioners invoke do not apply. ...............................................................39

B. BPA considered the relevant factors and articulated a rational connection between the facts found and the choice made. .............................43

1. BPA rationally considered economic impacts. ..............................................................44

2. BPA rationally considered market governance. .........................................................47

3.   BPA rationally considered environmental obligations. .......................................................... 50

4.   BPA did not arbitrarily fail to consider whether its decision was consistent with the priorities and purposes of the NWPA. ................ 51

C.   Miscellaneous Amicus arguments are unpersuasive. ............................................................... 52

1.   BPA adequately considered "the region" in its decision—BPA found Markets+ reflected regional public interest better than EDAM. ...... 52

2.   BPA rationally explained its conclusions regarding "seams" issues. .................................. 57

3.   Seattle's arguments were not raised by Petitioners and have been waived; they are nevertheless unconvincing. ............................... 59

D.   BPA's decision was a factual determination of what is in the agency's sound business interest. ........ 60

III.   BPA DID NOT VIOLATE NEPA. .......................................... 61

A.   BPA's decision was not a "point of commitment" requiring NEPA. ....................................................... 62

B.   BPA's decision did not change the status quo and therefore was not a "major federal action" triggering NEPA. ..................................................... 64

1.   Supreme Court precedent confirms that BPA is not responsible for analyzing attenuated third-party effects. .......................... 65

C.   BPA adequately documented and explained its fulfillment of applicable NEPA obligations. ................ 68

D.   BPA's $40 million in funding was not an "irreversible commitment of resources." ...................... 70

IV.   VACATUR AND ORDERING AN EIS WOULD BE PREMATURE .................................................................. 72

CONCLUSION ................................................................................. 74

ADDENDUM

iii

# TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of Am. v. Cent. Lincoln People's Util. Dist.,* 467 U.S. 380 (1984) (*ALCOA*) ............................................24, 25, 39, 55

*Alcoa v. Bonneville Power Admin.,* 698 F.3d 774 (9th Cir. 2012) .......................................................26, 30, 32, 46, 54, 61

*Arizona Health Care Cost Containment Sys. v. McClellan,* 508 F.3d 1243 (9th Cir. 2007) ......................................................... 42

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,* 126 F.3d 1158 (9th Cir. 1997) (*APAC*) ................................................. 5, 26

*Bob Marshall Alliance v.* Hodel, 852 F.2d 1223 (9th Cir. 1988) ..63, 64

*Bonneville Power Admin. v. Fed. Energy Regulatory Comm'n.,* 422 F.3d 908 (9th Cir. 2005) .......................................................... 8, 15

*Cal. Energy Res. Conservation and Dev. Comm'n v. Johnson,* 807 F.2d 1456 (9th Cir. 1986) (*Johnson*) ................................................. 33

*Camp v. Pitts,* 411 U.S. 138 (1973) .................................................... 49

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013) ......................... 31

*Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.,* 342 F.3d 924 (9th Cir. 2003)................. 24

*Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988)............................ 71

*Coons v. Lew,* 762 F.3d 891 (9th Cir. 2014) ...................................... 32

*Ctr. for Biological Diversity v. Ilano,* 928 F.3d 774 (9th Cir. 2019) .................................................................................69, 70

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006)....................... 27

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review,* 959 F.2d 742 (9th Cir. 1991) ........................................................ 43

*Friends of Southeast's Future v. Morrison,* 153 F.3d 1059 (9th Cir. 1998) .................................................................................62, 63, 72

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552 (9th Cir. 2000) ........................................................................................ 49

iv

*Grand Canyon University v. Cardona*, 121 F.4th 717 (9th Cir. 2024) .......................................................................... 25

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017).......... 51

*Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173 (9th Cir. 2016) ....................................................64, 65

*Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182 (9th Cir. 2023) ............................................................ 55

*Idaho Conservation League v Bonneville Power Admin.*, 142 F.4th 636 (9th Cir. 2025) ......................................................... 4, 52

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 767 F.3d 912 (9th Cir. 2014) (*ICNU*)....................................25, 43, 54, 61

*Kaiser Aluminum and Chemical Corp. v. Bonneville Power Admin.*, 261 F.3d 843 (9th Cir. 2001) ....................................5, 24, 25

*Klickitat Cnty. v. Columbia River Gorge Comm'n*, 770 F.Supp. 1419 (E.D. Wash. 1991)................................................... 63

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................................................23, 24, 25, 26, 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (*Lujan*)............. 27

*Michigan v. EPA*, 576 U.S. 743 (2015)............................................ 26

*North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008) ............................................................ 71

*Nw. Envtl. Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997) (*NEDC 1997*) .......................................36, 37, 65

*Nw. Res. Info. Ctr., Inc. v. Nw. Power and Conservation Council*, 730 F.3d 1008 (9th Cir. 2013) (*Northwest Resource*)............34, 37, 51

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023)......................... 32

*Pres. Coal., Inc. v. Pierce*, 667 F.2d 851 (9th Cir. 1982) ................... 59

*Pub. Power Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982).......... 55

*Pub. Util. Dist. No. 1 of Douglas Cnty. v. Bonneville Power Admin.*, 947 F.2d 386 (9th Cir. 1991) (*Douglas Cnty.*)...............24, 25

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025) (*Seven County*) ...............................................65, 66, 67, 73

*Texas v. United States*, 523 U.S. 296 (1998) ...................................... 32

*Texas v. U.S. Envtl. Prot. Agency*, 156 F.4th 523 (5th Cir. 2025) ..... 26

*United States v. Gementera*, 379 F.3d 596 (9th Cir. 2004) ............... 59

*Upper Snake River Chapter of Trout Unlimited v. Hodel,* 921 F.2d 232 (9th Cir. 1990) ....................................................................... 65

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18 (1994) ...................................................................................... 73

*Weinberger v. Romero-Barcelo,* 456 U.S. 305 (1982) ........................ 73

*WildWest Institute v. Bull*, 547 F.3d 1162 (9th Cir. 2008) ...........71, 72

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ... 59

## Federal Energy Regulatory Commission Decisions

*SPP,* 191 FERC ¶ 61,071 (Apr. 22, 2025) .......................................... 28

## Statutes

5 U.S.C. § 706 .................................................................................. 23

16 U.S.C. §§ 832-832l ........................................................................ 4

16 U.S.C. § 832a ............................................................................. 56

16 U.S.C. § 832c.........................................................................4, 5, 56

16 U.S.C. § 832d.........................................................................39, 40

16 U.S.C. § 832e ............................................................................. 56

16 U.S.C. § 832f.......................................................................... 5, 33

16 U.S.C. § 837a ......................................................................... 8, 56

16 U.S.C. § 838b ............................................................................. 56

16 U.S.C. § 838f............................................................................. 33

16 U.S.C. § 838g .............................................................5, 13, 33, 46, 56

16 U.S.C. § 839 ...........................................................5, 6, 13, 55, 56

16 U.S.C. § 839a .......................................................................38, 40

16 U.S.C. § 839b ............................................................................. 56

16 U.S.C. § 839c ............................................................13, 46

16 U.S.C. § 839d ............................... 35, 36, 37, 38, 40, 41, 42

16 U.S.C. § 839e ................................................................ 5, 6

16 U.S.C. § 839f ................................................................ 3, 23

Cal. Pub. Util. Code § 345.5 ....................................9, 49, 50

42 U.S.C. § 4332 .............................................................63, 66

42 U.S.C. § 16431 .............................................................. 33

## Legislative History

125 Cong. Rec. S11585 (daily ed. Aug. 3, 1979)............................... 42

H.R. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. (1980) ................. 39

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| BPA | Bonneville Power Administration |
| CAISO | California Independent System Operator |
| Council | Northwest Power and Conservation Council |
| Northwest Power Plan | The Northwest Power Plan adopted by the Council |
| EDAM | Extended Day-Ahead Market, operated by CAISO |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse Gas |
| Markets+ | Proposed day-ahead market, operated by SPP |
| NEPA | National Environmental Policy Act |
| NWPA | Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("Northwest Power Act"), 16 U.S.C. § 839 *et seq.* |
| Policy | BPA's Day-Ahead Market Policy, May 9, 2025 |
| ROD | Record of Decision for BPA's Day-Ahead Market Policy, May 9, 2025 |
| Seattle | Amicus Seattle City Light |
| SPP | Southwest Power Pool |
| WA/OR | Amici State of Washington and State of Oregon |

viii

# INTRODUCTION

This case seeks review of a Bonneville Power Administration (BPA) business decision, in which the agency charted a direction to pursue an emerging energy market. After a two-year evaluation, BPA found that pursuing entry into "Markets+" best met BPA's criteria and would be in BPA's sound business interests.

Petitioners seek to overturn that judgment. However they lack standing because their injuries would, in their telling, arise from the operation of the market and BPA's decision to join it—neither of which has happened yet.

Even if Petitioners had standing, this Court's existing precedent dispenses with their claims under the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act, or "NWPA"). Those claims depend upon characterizing BPA's decision as a "resource acquisition" under the NWPA and, according to Petitioners, the market here is a "resource" because it is akin to an exchange. But this Court has held that "exchanges" are *not* "resources." Accordingly, the NWPA resource acquisition provisions do not apply here, and all of Petitioners' NWPA claims therefore fail.

1

Their NWPA claims also fail because BPA's Policy direction was eminently businesslike. BPA took the relevant factors into account and articulated a rational connection between the facts found and its choice to pursue entry into Markets+. Petitioners second-guess BPA's judgment, single-mindedly focusing on economic projections despite BPA's explanation that there were economic tradeoffs to be had with either Markets+, or the competing market known as EDAM. BPA rationally opted for Markets+. It presented less risk in meeting BPA's core statutory function of economical service to its customers. Moreover, Markets+ proved superior in several important evaluation criteria, which, from early in the process, BPA emphasized would be important considerations.

Petitioners also charge that BPA violated the National Environmental Policy Act (NEPA), but the nature of the decision—a policy that aimed to facilitate BPA's participation in Markets+ in the event of a *future* decision to join—demonstrates that no point of commitment has been reached that would require NEPA. In addition, the decision did not impact hydrosystem operations and management— the dams would operate within already-established environmental

bounds—so there was no change in the status quo and thus no major federal action invoking NEPA.

## JURISDICTIONAL STATEMENT

Section 9(e)(5) of the NWPA vests this Court with original jurisdiction to review challenges to BPA final actions. 16 U.S.C. § 839f(e)(5). This Court lacks jurisdiction to review Petitioners' NWPA claims because Petitioners lack standing.

## STATEMENT OF THE ISSUES

1. Do Petitioners lack standing for their NWPA claims when their asserted injury has yet to occur and has no fairly traceable connection to the decision they challenge?

2. Should Petitioners' NWPA claims—which seek to apply the NWPA's "resource acquisition" provisions to an "exchange"—be denied because this Court's precedent and statutory interpretation demonstrate that an "exchange" is not a "resource" under the NWPA?

3. Did BPA properly exercise its sound business discretion, to pursue Markets+, by considering the relevant factors and articulating a rational connection between the facts found and the choice made?

4. Given this Policy did not make a decision to join Markets+, and does not alter the status quo of existing hydrosystem operations, did BPA properly conclude that NEPA procedures and analysis were not required?

## STATEMENT PURSUANT TO CIRCUIT RULE 28-2.7

The full NWPA and pertinent excerpts of its legislative history are included in the addendum.

## STATEMENT OF THE CASE

### A.  BPA's role in the Pacific Northwest.

BPA is a federal power-marketing agency created by Congress in 1937 to market electric power from the Federal Columbia River Power System. 16 U.S.C. § 832c(a); *see generally* 16 U.S.C. §§ 832–832*l*; *Idaho Conservation League v. Bonneville Power Admin.*, 142 F.4th 636, 638-39 (9th Cir. 2025). BPA sells power and transmission services throughout the Pacific Northwest, accounting for about a third of the power generated in the region. 1-ER-7. BPA's "first and primary group" of customers are "public utilities and other public entities who purchase

4

power for resale to the ultimate consumer."[1] *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1164 (9th Cir. 1997) (*APAC*). These entities are often called BPA's "preference customers" because they have a statutory first right of access to sales from BPA. *See* 16 U.S.C. § 832c(a) (requiring BPA to "give preference and priority to public bodies and cooperatives").

BPA sells its power and transmission at cost, with no profit. 16 U.S.C. §§ 832f, 838g, 839e(a)(1)-(2). BPA is a self-funding agency, meaning it must recover its costs through rates it charges its customers. 16 U.S.C. § 839(4); *see generally APAC*, 126 F.3d at 1163-66 (discussing BPA's history, customers, its self-funding mandate, and various statutory directives).

BPA is subject "to a variety of detailed and potentially conflicting statutory directives." *Kaiser Aluminum and Chemical Corp. v. Bonneville Power Admin.*, 261 F.3d 843, 845 (9th Cir. 2001) (quoting *APAC*, 126 F.3d at 1164). These directives include assuring the Pacific

---

[1] BPA has over 130 such customers. Their interests are often collectively represented by Respondent-Intervenors Public Power Council, Northwest Requirements Utilities, and Pacific Northwest Generating Cooperative.

Northwest of an adequate, efficient, economical and reliable power supply; promoting conservation, energy efficiency and the use of renewable resources; protecting fish and wildlife in the Columbia River basin; and acting consistently with sound business principles. 16 U.S.C. §§ 839(1)-(2), 839(6), 839e(a).

**B.  The decision at issue.**

Petitioners seek review of BPA's final Day-Ahead Market Policy (Policy) and the Day-Ahead Market Policy Record of Decision (ROD), both issued on May 9, 2025. Petition at 1. The Policy and ROD are companion documents: the Policy setting forth BPA's decision and rationale, and the ROD providing further rationale with analysis of comments and the record.

The subject of the Policy and ROD is BPA's potential participation in a centrally organized "day-ahead market," which is a clearinghouse for utilities to buy and sell electric power. 1-ER-8–9. The goal of a day-ahead market is to achieve the most efficient operation of generation and transmission facilities to deliver energy at the lowest cost to reliably serve consumers. *Id*. at 9.

Day-ahead markets are administered by a "market operator." *Id*.

BPA engaged in an extensive public process, SER-8, in which it

analyzed whether to participate in a day-ahead market and, if so, which

of two emerging markets to pursue: "Markets+" operated by the

Southwest Power Pool (SPP), or the "Extended Day-Ahead Market

(EDAM)" operated by the California Independent System Operator

(CAISO). 1-ER-6.

Neither market exists yet. SER-52–53 (EDAM targeting

operations on May 1, 2026); 16-ER-4500 (Markets+ targeting second

quarter 2027). Thus, as BPA explained in its Record of Decision, the

Policy decision on review in this case is a step, moving in "a direction

towards participation" in Markets+. 1-ER-104. The Policy would make

it possible to move on to "scoping future processes . . . and other steps

towards participation . . . if BPA joins the day-ahead market . . . ." *Id*.

## C. Creation of EDAM, and its oversight provisions.

Since the late 1990s CAISO has operated an organized day-ahead

market, but solely within CAISO's footprint which is generally the

geographic border of California. 1-ER-9. BPA has extensive experience

participating in that market and its predecessor iterations for over 25

7

years. *See generally Bonneville Power Admin. v. Fed. Energy Regulatory Comm'n*, 422 F.3d 908, 911-12 (9th Cir. 2005) (discussing creation of the CAISO, and problems with California's "aggressive market experiment" in the early 2000s).

Today, BPA serves as an out-of-state seller (and occasional purchaser) of energy in that market, but only when BPA has energy available that is surplus to the needs of its Northwest customers. *See generally* 16 U.S.C.§ 837a (allowing only surplus energy to be sold outside the Pacific Northwest). BPA also participates in CAISO's Western Energy Imbalance Market, which operates during the within-hour timeframe to manage differences in energy needs between what was scheduled ahead of time and what materializes in real-time. 1-ER-9.

Building on its existing day-ahead market design, in 2019 CAISO began developing its proposed "extended" day-ahead market, *i.e.* EDAM, to broaden its market into other states. 1-ER-10. CAISO created the EDAM market offering and held stakeholder meetings to obtain input. *Id.* BPA participated in stakeholder meetings, reviewed all of CAISO's proposals, and provided extensive written comments. *Id.*; SER-

8

39. CAISO determined which stakeholder suggestions to incorporate into the final EDAM design; certain key issues that BPA raised were either rejected or not addressed. 1-ER-10.

The CAISO Board of Governors has authority over all of CAISO's markets. 1-ER-9. CAISO Board members are appointed by the Governor of California, with the consent of the California State Senate. *Id*. Under California law, CAISO must conduct its operations "consistent with the interests of the people of [California]." Cal. Pub. Util. Code § 345.5(a).

BPA concluded that "[w]hile these governance elements were reasonable for the original CAISO market that only operated within California, they are significant flaws in the governance of a regional market [such as EDAM] that includes participants in other states." 1-ER-45. BPA also explained that its concerns with governance were longstanding and, although BPA was participating in CAISO's Western Energy Imbalance Market, the governance ramifications for a day-ahead market would be much larger. 1-ER-152–53.

**D.** **Creation of Markets+, and its oversight provisions.**

In 2022, SPP developed a conceptual framework for Markets+. 1-ER-10. Markets+ was then designed "from the ground up" through

stakeholder workgroups, 1-ER-149, with SPP acting as a facilitator and all design elements determined by stakeholder voting. 1-ER-10; 1-ER-178. BPA participated in the committees, work groups, and task forces that developed Markets+. 1-ER-10. In its Policy, BPA concluded that "[t]he collaborative design framework of Markets+ better addressed the many issues raised by Bonneville and other stakeholders." *Id.*

Governance authority over Markets+ will be entrusted to the Markets+ Independent Panel. 1-ER-45. The Panel's members, save one representative of the SPP Board, are selected by the Markets+ participants and are subject to standards of independence approved by the Federal Energy Regulatory Commission (FERC). *Id.* SPP is a nonprofit with no statutory obligations to any state, and solely acts as a market operator. *Id.*; 1-ER-180. BPA concluded the SPP/Markets+ decision-making body "is superior to that of the EDAM and is more likely to result in decisions that create a fair and equitable market that allows Bonneville to meet its load service, power marketing, and transmission obligations." 1-ER-45–46.

10

## E.    BPA's Business Analysis.

BPA undertook a two-year evaluation of the business case for participating in a day-ahead market, and which market to pursue. 1-ER-14–15. With public input a high priority, 1-ER-13, the agency twice delayed its Policy decision in order to provide additional time for comment and fact development. 7-ER-1802; 6-ER-1718. BPA ultimately concluded it was necessary to formalize its Policy for strategic reasons, including coordination with other BPA efforts, obtaining an "early seat at the table" for designing the market, matching other entities' market-entry speed, and responding to significant preference customer support. 1-ER-155; 1-ER-111–15.

Throughout its evaluation process, BPA relied on eight evaluation principles, developed with BPA stakeholder input. 1-ER-15–16. BPA explained that "a decision about day-ahead market participation encompasses many considerations beyond just economic value." 1-ER-17; 1-ER-39; 1-ER-111–15 (commenters expressing same). BPA evaluated quantitative factors, such as economic cost/benefit projections, and qualitative factors such as how a market would be governed or if the market framework would ensure electrical reliability.

11

1-ER-15–16. From the beginning, BPA explained that its business case "may primarily focus on" the qualitative benefits, and less on revenue. SER-49.

> **1. Economic projections supported either market, but Markets+ presented less risk in meeting BPA's primary statutory objective.**

Overall, BPA found that day-ahead market participation offered a "wide range of economic benefits," would allow continued access to trading partners, and "the forecasted benefits justify participation in either EDAM or Markets+." 1-ER-11; 1-ER-19.

BPA's economic models indicated that "[p]articipation in the EDAM market produces the highest net cost benefit," while "Markets+ offers the lowest cost to serve load but also forecasts reduced generation revenue." 1-ER-19. The models presented a "[r]ange of possible outcomes depending on various factors" such as the area the market would cover (footprint), and other assumptions about weather, transmission, and transactional costs from "seams" (inefficiencies in trading and moving energy between markets). 1-ER-32.

BPA drew several key conclusions from the models. 1-ER-37–38.

*First*, EDAM represented a tradeoff. Its projected benefits were based on a higher cost to serve BPA's long-term firm power customers,[2] which would only be offset by revenues from the sale of surplus power. 1-ER-38; 1-ER-73; 1-ER-128–30. Although BPA aims to maximize revenue when it has surplus power to sell, its primary statutory directive (as relevant here) is to serve the load (demand) of its long-term firm power customers at the lowest possible rates. *Id.*; 16 U.S.C. §§ 839(2), 839c(b)(1), 838g. Therefore EDAM presented risk, because the models assumed high load service prices would be offset by surplus power sales. 1-ER-38; 1-ER-73; 1-ER-128–30.

This risk is significant because there is no guarantee BPA will continue to have surplus available to sell, and BPA has been projecting a lack of surplus in the future. 1-ER-128–30; 12-ER-3429. Thus, BPA concluded the risk of higher costs to serve load in EDAM may not always be offset. 1-ER-38; 1-ER-73; 1-ER-128–30.

---

[2] "Firm power" is electric power guaranteed to be available to the customer at all times during the period covered by a contract. BPA's preference customers are the primary group of customers that hold such contracts with BPA. *See generally* 16 U.S.C. § 839c(b) (requiring BPA to offer to sell firm power to certain customers "[w]henever requested").

13

*Second*, Markets+ also represented a tradeoff. It offered lower cost to serve load than EDAM, but the forecasts for revenue were also lower. *Id.* BPA determined that Markets+ represented a lower risk choice than EDAM because it would allow the agency to meet its primary obligation (load service to its customers) at a lower cost, without depending on revenues from uncertain surplus power sales to offset high load service costs. *Id.*

*Finally*, BPA provided information to put the models' results in context. 1-ER-38. The range of potential day-ahead market costs or benefits was generally +/- $150 million, roughly 3% of BPA's annual $5 billion in costs. *Id.* BPA's annual revenue uncertainty currently ranges from $250 million to $2.2 billion. *Id.* Given this already expected range of uncertainty, and the tradeoffs reflected in the modeling results, other principles and considerations were key to BPA's decision. 1-ER-39. These included governance (authority) over the market, electrical reliability considerations, and market design considerations like pricing and greenhouse gas accounting.

14

### 2. Governance and authority over the market was a key deciding factor, and Markets+ proved superior.

BPA determined it was critically important to have a "durable, effective, and independent governance structure which provides fair representation to all market participants and stakeholders," and which ensures that "decision-making and stakeholder engagement occurs in a transparent and inclusive manner." 1-ER-17–18; 1-ER-44. BPA specified that the decision-making body must be "free of disproportionate obligation to the policies of a single state, entity, or customer class to ensure that market design is on an equal footing for all . . . ." 1-ER-18; 1-ER-44–46. BPA noted that, based on its extensive experience in CAISO markets, BPA "has observed disadvantages for market participants outside of California . . . ." 1-ER-18; *see generally Bonneville Power Admin.,* 422 F.3d at 910-12 (discussing California energy markets in the early 2000s, in which BPA participated).

BPA further explained that independent market governance was critical because "[t]here is unmeasurable uncertainty regarding what issues will confront day-ahead markets in the future. In addition to past disputes and known current challenges, there will surely be issues that arise that no one has yet fully contemplated, and governance will surely

15

impact market decisions that impact financial outcomes." 1-ER-150–51.
Hence, by its very nature, market governance will affect the economics
of the market.

Governance is also critical in the market creation and design
process. BPA participated extensively in both design processes, and
found the Markets+ process to be superior in setting agendas,
collaboration, and reaching decisions as a group. 1-ER-46–47; 1-ER-
177–78. BPA also found the Markets+ design considered "different state
[policies] to arrive at a high degree of consensus on designs that serve
the goals of multiple states and the utilities that serve them," whereas
EDAM's design "rests on a foundation of California state policies." 1-
ER-47.

Further, BPA explained that governance is critical over the life of
the market because it impacts market policies, day-to-day management,
and actions during unexpected events. 1-ER-44–45. Since BPA serves
customers in seven states, BPA found the CAISO's legal obligations to
the State of California to be a "significant flaw[] in the governance of a
regional market that includes participants in other states." 1-ER-45.

16

Ultimately, BPA concluded that although both markets were approved by FERC, "the equivalent consideration of [multiple] state policies by the Markets+ governance design is superior to that of the EDAM" and "Markets+[ ]is superior with respect to stakeholder engagement, decision-making, and overall market governance." 1-ER-47.

### 3. Reliable electrical service was a key deciding factor, and BPA found Markets+ was better in this regard.

Another of the "most important aspects" of BPA's business analysis was how the market dealt with reliability of the electrical system. 1-ER-16. Specifically, BPA analyzed how a market design would hold participants accountable for having enough resources to meet their own needs, both in the short term and long term. 1-ER-16–17. Markets+ better met this criterion because it included a "Resource Adequacy" requirement to assure utilities would have enough resources over the long-term. 1-ER-17; 1-ER-48. EDAM had no comparable program; its Resource Adequacy framework lacked common metrics, and it applied only to utilities in California. 1-ER-17; 1-ER-48–49.

17

Hence, in EDAM some market participants could "lean on" others as a substitute for effective long-term planning to meet their own obligations. 1-ER-49. BPA prioritizes reliable electric service and, given concerns across the West about having enough power plants to meet demand, BPA found "the Markets+ design is objectively superior to EDAM because it combines a common long-term [resource adequacy] metric with short-term resource sufficiency obligations, ensuring adequate supply, reliability, and fair compensation." *Id.*

### 4. Market design and greenhouse gas accounting were key deciding factors, and BPA found Markets+ was better in these areas.

The design of the market was a critical business consideration. In this regard, BPA determined that Markets+ had key features in fast-start and scarcity pricing, market power mitigation, congestion rent, and greenhouse gas accounting frameworks that would better ensure appropriate compensation for market participants. 1-ER-50–61.

*First*, EDAM lacked two pricing components, fast-start and scarcity pricing, which are crucial valuation drivers for hydropower sellers like BPA. 1-ER-51–52. Markets+ included these components,

which BPA found will "ensure accurate, fair compensation for all suppliers of flexible and reliable generation." 1-ER-52.

*Second*, the two markets differed in how they will mitigate market power (an entity's ability to unduly influence economic outcomes). EDAM's market power mitigation framework is based on potential exercise of market power, which BPA found could result in undue mitigation and could "prevent appropriate market outcomes," particularly during times of scarcity. 1-ER-50. The Markets+ approach instead focuses on actual exercise of market power, resulting in more targeted mitigation actions. *Id.*

*Third*, BPA found that Markets+ provides a more transparent framework for "congestion rent." 1-ER-52. The compensation structure is consistent throughout the entire market footprint, rather than determined in individual utility areas like in EDAM. 1-ER-53–55.

*Fourth*, BPA's firm power customers prioritize a greenhouse gas (GHG) accounting design that enables them to receive credit for the low-carbon attributes of the power they purchase from BPA. 1-ER-55. Some states within BPA's service area have programs regulating GHG emissions and putting a price on them, while others do not. *Id.*

19

Therefore, BPA sought a market that could "meet the needs of states and utilities subject to the [GHG] pricing program without negatively impacting states and utilities without such a program." 1-ER-56. BPA found that the EDAM design would continue problems already occurring in CAISO's other markets by allowing "California customers [to] obtain[] disproportionate credits for out-of-state low-carbon generation," and would impede BPA's Washington and Oregon customers from meeting their state GHG requirements. 1-ER-60. In contrast, Markets+ would "support[] states with carbon pricing programs while not unfairly impacting states and entities not subject to carbon pricing." 1-ER-56.

## F. BPA's environmental analysis.

Petitioners urged BPA to analyze potential environmental impacts of day-ahead market participation. 1-ER-250–51. BPA explained it was "important to note that subsequent phases remain" before BPA may join or participate in Markets+. 1-ER-3. From an environmental compliance perspective, "[i]n contrast to a final agency decision to join Markets+, this policy establishes the scope for future implementation decisions, and sets a direction" to enable further agency proceedings

that would be necessary before joining. 1-ER-251. These steps would "precede a final agency decision to join Markets+" and BPA committed to "conduct and document any appropriate NEPA analysis prior to taking additional steps towards—or making any final agency decisions with respect to—joining and participating in Markets+." 1-ER-251–52.

Because BPA is not obligated to join or participate in Markets+, and would conduct appropriate additional NEPA analysis before making that decision, BPA concluded that the proper scope of environmental review "extends only to the administrative and procedural actions" related to the Policy itself. 1-ER-252. Adopting a Policy direction to facilitate potential entrance into Markets+ would not have any environmental effects because it would not impact hydrosystem "operations or management actions." 1-ER-219–22; 1-ER-252. In addition, those operational decisions would continue to be subject to applicable NEPA analysis and documentation, and the Policy "would not alter the boundaries" for such operations. 1-ER-252.

## SUMMARY OF ARGUMENT

The Court should dismiss Petitioners' NWPA claims. These claims do not present a concrete injury that is actual or imminent, and their

21

claimed injuries are not fairly traceable to the Policy decision on review. Because Petitioners lack both these elements, they cannot establish standing. Alternatively, the claims are unripe since they rest on contingent future events. Either way, the Court should dismiss the NWPA claims for lack of jurisdiction.

If the Court does not dismiss the NWPA claims, it should deny them on the merits. Those claims would have the NWPA's "resource acquisition" standards apply to BPA's Policy decision, based on a statutory interpretation theory that an "exchange" is a "resource" under the NWPA. But the Court has already rejected that reading of the statute. And the Court's conclusion is bolstered by statutory interpretation. Therefore the statutory resource acquisition standards, which are the basis for all Petitioners' NWPA claims, do not apply.

To the degree Petitioners are asserting a more general claim that BPA acted arbitrarily, the Court should deny that claim too. BPA considered the relevant factors and articulated a rational connection between the facts found and the choice made. BPA made a factual assessment that moving toward participation in Markets+ is in BPA's sound business interest; the Court is "particularly deferential" in

22

reviewing whether a BPA decision is in the agency's sound business interests.

Lastly, the Court should deny Petitioners' NEPA claims because the Policy was not *itself* a decision to join the market, rather it aimed to facilitate BPA's participation in Markets+ in the event of a *future* decision to join. Accordingly, the Policy was not a point of commitment requiring NEPA procedures and analysis. Further, there was no "major federal action" triggering NEPA because the Policy did not change the status quo: it did not modify any of BPA's existing hydrosystem operations or management actions.

## STANDARD OF REVIEW

This Court's review is governed by the NWPA's judicial review provision, which incorporates § 706 of the APA, 5 U.S.C. § 706. *See* 16 U.S.C. § 839f(e)(2). Under the APA, BPA's decision is upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A.  Standard of review for statutory interpretation: De novo.

Courts review matters of statutory interpretation de novo. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386, 391-94 (2024);

23

*Pub. Util. Dist. No. 1 of Douglas Cnty. v. Bonneville Power Admin.*, 947 F.2d 386, 390 (9th Cir. 1991) (*Douglas Cnty.*). However, in exercising its independent judgment the judiciary has "often included according due respect to Executive Branch interpretations of federal statutes." *Loper Bright*, 603 U.S. at 385. The "most respectful consideration" has been justified where agency officers were "masters of the subject, who were not unfrequently the draftsmen of the laws they were afterwards called upon to interpret." *Id.* at 386 (internal quotations omitted).

To that end, the Supreme Court has concluded that "the [BPA] Administrator's interpretation [of the NWPA] is to be given great weight" because BPA was "intimately involved in the drafting and consideration" of the NWPA, the Act is "technical and complex," and BPA has "longstanding expertise in the area . . . ." *Aluminum Co. of Am. v. Cent. Lincoln People's Util. Dist.*, 467 U.S. 380, 389-90 (1984) (*ALCOA*); *see also Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 928 (9th Cir. 2003) (noting "BPA's factual and legal expertise" with respect to the NWPA); *Kaiser Aluminum*, 261 F.3d at 850.

24

The "great weight" given to BPA's interpretation is not binding.[3] *See, e.g.*, *Douglas Cnty.*, 947 F.2d at 390 ("In the final analysis, however, it is the obligation of the court to construe the statute."); *Kaiser*, 261 F.3d at 848-49. Rather, it is an example of "the most respectful consideration" that is warranted. *Loper Bright*, 603 U.S. at 386.

### B. Standard of review for application of law to facts: BPA must consider relevant factors and articulate a rational connection between the facts found and the choice made.

In reviewing BPA's application of law to facts, this Court does "not second-guess [BPA's] policy judgments," but asks only "whether [BPA] considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 767 F.3d 912, 922 (9th Cir. 2014) (*ICNU*); *see also Grand Canyon University v. Cardona*, 121 F.4th 717, 723 (9th Cir. 2024) (reviewing agency's "application of the law to the facts . . . under the APA's deferential standards.").

---

[3] *ALCOA* was decided before *Chevron* and was based on "established administrative law principles." *ALCOA*, 467 U.S. at 389.

"Where a statutory delegation of authority 'leaves the agency with flexibility,' . . . the reviewing court must 'independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.'" *Texas v. U.S. Envtl. Prot. Agency*, 156 F.4th 523, 536 (5th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 394, 404; *Michigan v. EPA*, 576 U.S. 743, 752 (2015)).

Because BPA's statutes are "permeated" with references to "sound business principles," this Court has determined that Congress delegated to BPA "an unusually expansive mandate to operate with a business-oriented philosophy," so it is "particularly wise to defer to the agency's actions in furthering its business interests . . . ." *APAC*, 126 F.3d at 1171; *Alcoa v. Bonneville Power Admin.*, 698 F.3d 774, 789 (9th Cir. 2012) ("Congress has delegated to BPA the discretion to determine how best to further BPA's business interests . . . ." (internal quotations and citations omitted)).

26

## ARGUMENT

### I. PETITIONERS LACK STANDING FOR THEIR NWPA CLAIMS; ALTERNATIVELY, THE CLAIMS ARE UNRIPE.

#### A. NWPA standing.

Petitioners lack standing for their NWPA claims.[4] Petitioners' NWPA claims fail to establish Article III standing because (1) they have no "injury in fact" that is "concrete," and "actual or imminent;" and (2) they have not shown that their injury is "fairly traceable" to BPA's Policy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (*Lujan*). Their claims are classically "conjectural or hypothetical," presenting no case or controversy for this Court to adjudicate. *Id.*

#### 1. No injury in fact.

Petitioners allege that "[u]nder the Power Act, a *decision to participate* in an interregional exchange of power must be consistent with the Northwest Power Plan, which requires Bonneville to prioritize the most cost-effective resource, and give 'due consideration' to environmental quality . . . ." Br. at 22 (emphasis added). They assert

---

[4] Standing is evaluated on a claim-specific basis. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 350-53 (2006). BPA does not concede that Petitioners have standing for their NEPA claims, but opts to address those claims on the merits.

BPA did not meet these requirements, alleging two injuries as a result: that choosing Markets+ (1) "will increase Bonneville's power costs and power costs for the region . . . ;" and (2) "will have adverse environmental effects . . . ." Br. at 1-2. Accepting, for standing purposes, Petitioners' legal theory that these NWPA requirements apply, the question is whether the two injuries are concrete, and actual or imminent. They are not.

Petitioners base their injuries on the premise that the Policy is a "decision to join," or "decision to participate," in Markets+. Br. at 1, 22. It is not. BPA has been clear—and FERC has confirmed—that this Policy is not a decision to join Markets+ and nothing requires BPA to do so.[5] 1-ER-3; 1-ER-6; 1-ER-219–20; 1-ER-251–52. Markets+ does not exist yet; it's still developing. 16-ER-4500. Thus, by Petitioners' own logic, the only event that would create a concrete and actual injury

_____

[5] Petitioners also suggest BPA's decision to provide $40 million under the "Phase 2 Funding Agreement" to help develop Markets+, requires Bonneville to participate and only breaching that Agreement could stop participation. Br. at 12. BPA and FERC have explained that is an incorrect reading of the Agreement. 1-ER-145 ("the Phase 2 Funding Agreement is not a commitment to joining Markets+ . . . ."); *SPP,* 191 FERC ¶ 61,071, at P 34 (Apr. 22, 2025) ("the Funding Agreement does not obligate any Funding Participant to proceed with Markets+ participation").

28

would be joining or participating in Markets+—which has not occurred. Petitioners concede that BPA "has not yet actually joined Markets+." Br. at 64.

Nor is joining Markets+ imminent. The BPA Administrator emphasized that "subsequent phases remain prior to Bonneville's participation in Markets+ . . . ." 1-ER-3. BPA repeatedly discussed the various proceedings that would have to occur prior to such a decision point. 1-ER-6; 1-ER-219–20; 1-ER-251–52.

Further, the injuries that Petitioners foreshadow from BPA participating in Markets+—eventual higher costs and environmental impacts—are conjectural and hypothetical. Regarding costs, Petitioners rely exclusively on economic projections, which are *inherently* hypothetical because they present a "[r]ange of possible outcomes depending on various factors." 1-ER-32.

But even if those projections could constitute a concrete injury, what Petitioners characterize as a "cost" is simply that the numbers suggest BPA could make more surplus revenue in EDAM. 1-ER-73. That does not make Markets+ more "costly." It just means BPA might forego surplus revenue opportunities. This Court has ruled that

29

foregoing revenue opportunities does not create an "injury." *Alcoa v. Bonneville Power Admin.*, 698 F.3d at 789 ("We disagree that BPA is required to maximize its profits . . . . Congress has delegated to BPA the discretion to determine how best to further BPA's business interests consistent with its public mission . . . ." (quotation and citation omitted)). Thus, Petitioners' "cost" injuries are both conjectural and hypothetical.

The same is true of the environmental injuries they allege. BPA specified that this Policy direction does not change operations of the hydrosystem, and "joining" or "participating" in Markets+ would not either. 1-ER-219–20. Beyond that, Petitioners are left with pure speculation about what other entities (besides BPA) may do in terms of generating more with higher-emitting plants, or building such plants in the future. Br. at 14-15. It is highly conjectural to suggest that BPA's decision has created a "concrete" injury from the effects of what others *may* do in this *yet-to-be-formed* market.[6]

---

[6] Amici Washington/Oregon (WA/OR) aptly demonstrate the speculation, discussing perceived environmental effects of what will "tend to" happen in a day-ahead market, "depending on" market design and footprint, and what that "could lead" utilities to do. WA/OR Amicus Br. at 29.

### 2. Not "fairly traceable" to the decision challenged.

Petitioners also fail *Lujan*'s causation/traceability prong. The connection between their injuries and BPA's decision relies on a "highly attenuated chain of possibilities . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

As explained above, the Policy on review is the Agency's "direction towards participation in Markets+." 1-ER-44; 1-ER-104. Moving toward participation does not *cause* the injuries Petitioners are concerned with; if anything, such injuries could only be caused by the act of joining and *participating* in the market. Petitioners seem to understand this, given their desire to mischaracterize BPA's action as a decision "to join" or "to participate" in Markets+. Br. at 1-3, 22. Elsewhere though, they concede the reality that BPA "has not yet actually joined Markets+." *Id*. at 64. Thus, the injuries that Petitioners predict are not fairly traceable to *this* decision.

There are countless unknowns regarding the costs or environmental consequences that might result from the operation of Markets+. This goes far beyond "several links" in the chain, or the

31

intervening actions of "a single third party . . . ." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023). Petitioners contend the market itself is the problem, so their injuries are necessarily based on predicting the overall market dynamics, resulting from the collective actions of all the participants, in this yet-to-be-formed market. Such hypothetical results are not fairly traceable to BPA's action.

### 3. Alternatively, Petitioners' NWPA claims are not ripe.

This Court has explained that "[w]hen addressing the sufficiency of a showing of injury-in-fact grounded in potential future harms, Article III standing and ripeness issues often boil down to the same question. In that context, ripeness can be characterized as standing on a timeline, and the analysis for both standing and ripeness is essentially the same." *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014) (quotations and citations omitted); *accord Alcoa v. Bonneville Power Admin.*, 698 F.3d at 793.

Petitioners' NWPA claims are not ripe for adjudication because they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all . . . ." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted). Thus "it is best for the

32

judiciary to stay its hand until the provision in fact *does* result in the consequences appellants predict." *Cal. Energy Res. Conservation and Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1464 (9th Cir. 1986) (*Johnson*) (quotation omitted) (emphasis in original).

Petitioners suffer the same problem as in *Johnson*: "[t]he elaborate arguments presented by [Petitioners] are of no more than academic interest," because "[t]he question raised is what the effect *would* be . . . ." *Id.* at 1466 (emphasis in original). Petitioners raise the same type of question. They assert that BPA's decision "*would* cause Bonneville substantial losses and *would* increase power costs for the entire Pacific Northwest," "*will* change how power is generated," "*will* increase coal[ ]generation," and "*will* change how and when its hydroelectric dams generate power, harming endangered salmon." Br. at 22-23 (emphasis added). Just as in *Johnson*, "[v]erbs are telling. Courts do not decide questions that can only be phrased in the subjunctive." 807 F.2d at 1466.

## II.    BPA DID NOT VIOLATE THE NWPA.

Petitioners do not challenge BPA's authority to enter a day-ahead market. *E.g.*, 16 U.S.C. §§ 832f, 838f, 838g; 42 U.S.C. § 16431. Instead,

33

they allege BPA violated NWPA standards which apply when BPA is making a "resource acquisition." *See generally Nw. Res. Info. Ctr., Inc. v. Nw. Power and Conservation Council*, 730 F.3d 1008, 1013 (9th Cir. 2013) (*Northwest Resource*) (describing resource acquisitions, and the role of BPA and the Northwest Power and Conservation Council therein). As both a factual and legal matter, the decision on review is not a "resource acquisition"—so the standards Petitioners invoke do not apply. All of Petitioners' NWPA claims fail on that basis.

Nor was BPA's decision unsound on the merits. BPA engaged in a thorough business analysis, conducted an extensive public process with numerous opportunities for comment, and articulated a rational connection between the facts found and the choice made. There is simply no basis to set aside BPA's expertise and factual determination of how best to further its sound business interests.

**A.    The standards that Petitioners allege BPA violated do not apply to this Policy because it is not a "resource acquisition."**

**1.    This Court has already decided the statutory interpretation question at hand, holding that an exchange is not a "resource acquisition."**

Petitioners' fundamental premise underlying their NWPA claims is that Markets+ can be considered an interregional exchange and *therefore* is a "resource" that BPA should have analyzed under the NWPA provisions governing resource acquisition. Br. at 27-28 ("Since Markets+ is considered an 'interregional exchange[] of power,' it is also a 'resource' under the Act and must comply with the requirements of 16 U.S.C. § 839d [*i.e.* NWPA section 6].").

This Court has already rejected Petitioners' statutory interpretation, making clear that an interregional exchange is not a "resource acquisition" under the NWPA and that the provisions of section 6 do not apply.

In *Nw. Envtl. Defense Center v. Bonneville Power Admin.* (*NEDC 1997*), the petitioners "acknowledge[d] that the [agreement at issue] is an interregional exchange, . . . yet argue[d] that the clear language of the Act compels finding that such an exchange constitutes a major

35

resource acquisition." *NEDC 1997*, 117 F.3d 1520, 1535 (9th Cir. 1997). Just like Petitioners here, the *NEDC* petitioners "reason[ed] that since section 839d(l) mentions 'mutually beneficial interregional exchanges of electric power,' and since section 6(c) review procedures apply to proposals to acquire a major resource under section 839d(l), then a mutually beneficial exchange must constitute a major resource acquisition . . . ." *Id.*; *see* Br. at 27 (same reasoning).

The Court rejected this rationale, explaining that "[t]he problem with this argument is that section 839d(l) does not explicitly define an interregional exchange as a resource acquisition. Rather, it merely authorizes the Administrator to investigate such exchanges. 16 U.S.C. § 839d(l)(2)." *NEDC 1997*, 117 F.3d at 1535. Thus, the Court agreed with BPA's interpretation that an exchange is "not a major resource acquisition." *Id.*

*NEDC 1997* is fatal to Petitioners' NWPA claims. Each of them depends on the presumption that Markets+ is an interregional exchange and BPA's decision was therefore a "resource acquisition" that

36

should have been analyzed under the requirements of NWPA section 6.[7]

*NEDC 1997* makes clear interregional exchanges are not resource

acquisition, and are not subject to NWPA section 6. *See also Northwest*

*Resource*, 730 F.3d at 1017 ("Section 839d [NWPA section 6] governs the

BPA's conservation measures and resource *acquisitions*." (emphasis in

original)).

Nor can Petitioners distinguish *NEDC 1997* on the basis that it

looked only at whether *portions* of section 6 were implicated (those

portions concerning "major" resource acquisition), whereas here

Petitioners contend that *all* of section 6 applies. That is irrelevant

because the *NEDC 1997* reasoning hinges simply on whether an

interregional exchange is a resource acquisition, not whether it meets

---

[7] *See* Br. at 28 ("When Bonneville acquires resources—including joining a regional power exchange—the Power Act requires it to ensure its actions are consistent with the [Council's] Power Plan."), 29-32 (discussing provisions that require resources in Council's Northwest Power Plan (which BPA may acquire) to be cost effective), 33-40 (contending BPA's decision is a resource acquisition that will not be cost effective), 40-42 (arguing that "any decision to acquire new resources" must give due consideration to environmental consequences), 43 (arguing "[f]or the same reasons" that BPA's decision is inconsistent with NWPA purposes and NWPA priorities "for new resource acquisition" and summarizing that "Bonneville chose the most expensive resource . . . .").

37

the additional requirements to qualify as a "major" resource acquisition (*i.e.*, over 50 average megawatts and a period longer than five years, *see* 16 U.S.C. §§ 839a(12), 839d(c)). *NEDC 1997*'s reasoning is directly applicable here.

Lastly, as a factual matter, participation in a day-ahead market does not result in a utility acquiring resources. Instead, a prerequisite of both Markets+ and EDAM is that any utility participating in the market must *already be* "resource adequate," meaning it has enough of its own resources to serve its load. 1-ER-16–17 ("In a day-ahead market, market participants . . . are obligated to bring a resource portfolio . . . able to meet their expected load . . . ."); 1-ER-280 ("Bonneville like any other participant in a market must come prepared, i.e., it must show that it is resource adequate before it can either bid in its electric power to sell or to buy power from the market."). Thus, *by definition*, BPA would not be making any resource acquisitions or adding to its power supply by participating in Markets+.

38

## 2. Statutory interpretation confirms that an exchange is not a resource acquisition and the standards that Petitioners invoke do not apply.[8]

If, for any reason, the Court needs to look beyond *NEDC 1997* to construe the statute, then statutory interpretation easily confirms BPA's reading.

*First*, when BPA was created in 1937 Congress granted it authority for exchanges, *see* 16 U.S.C. § 832d(b): "The administrator is authorized to enter into contracts with public or private power systems for the mutual exchange of excess power . . . ." But it was not until the NWPA of 1980 that "[f]or the first time . . . BPA was authorized to acquire resources . . . ." *ALCOA*, 467 U.S. at 386; *see also* H.R. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. at 32 (1980) (explaining NWPA "expands the authority of BPA" to permit it to acquire resources). The fact that BPA's authority to conduct exchanges pre-dates, and *is*

---

[8] Standard of Review: De novo. Petitioners imprecisely suggest *Loper Bright* means BPA's interpretation of statute is "not entitled to deference." Br. at 5. What BPA (or any agency) is not entitled to is *binding* deference. *Loper Bright*, 603 U.S. at 372-73, 399. But the Supreme Court and this Court's precedent acknowledge several reasons that justify giving "great weight" to BPA's view of the NWPA, which are undisturbed (or even reaffirmed) by *Loper Bright*. *See supra* Standard of Review.

*separate from*, its authority to acquire resources illustrates that an exchange is not a resource acquisition. 16 U.S.C. § 832d(b) (exchange authority); 16 U.S.C. § 839d(b)-(d) (resource acquisition authority).

*Second*, the NWPA specifically defines "Resource," and the definition does not include exchanges. 16 U.S.C. § 839a(19). It includes only "electric power, including the actual or planned electric power capability of generating facilities, or actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure." *Id*.

*Third*, BPA has been consistently clear on the distinction between resource acquisition and an exchange agreement. Since at least 1993 BPA has defined them separately:

> A "resource acquisition" is "The process by which BPA purchases electric power from generating resources and/or the reduction in load through BPA conservation programs."[9]

---

[9] Bonneville Power Administration, BPA Definitions, at 75 (issued Dec. 1993), *available at* https://bonpow2.ent.sirsi.net/custom/web/content/1993_BPA%20Definitions.pdf.

An "exchange agreement" is "A contract BPA has with a utility that establishes an exchange of energy rather than a direct sale of energy."[10]

*Fourth,* even the provision that Petitioners rely on, 16 U.S.C. § 839d(l), confirms that exchanges are not resources. *See* Br. at 27. Section 839d(l) treats them separately, as different tools for the Administrator to investigate:

Section 839d(l)(**1**). Opportunities for "adding to the region's *resources*" using renewables *resources.* 16 U.S.C. § 839d(l)(1) (emphasis added).

Section 839d(l)(**2**). Opportunities for "interregional *exchanges.*" 16 U.S.C. § 839d(l)(2) (emphasis added).

Section 839d(l)(**5**) confirms the dichotomy, referring to "prospects for obtaining additional *resources*" and, separately, "for reductions in generation . . . through *exchanges.*" 16 U.S.C. § 839d(l)(5) (emphasis added). When Congress uses different words ("resource" vs. "exchange") in connection with the same subject (investigating opportunities), we

---

[10] *Id*. at 31.

must presume it intends a different meaning. *Arizona Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1250 (9th Cir. 2007).

In the face of all this, Petitioners offer only a one-sentence rationale regarding why market participation should be considered a resource: a strained reading of section 839d(l)(3), claiming it "describes these exchanges as a 'resource' . . . ." Br. at 27. Not so. The "resources" 839d(l)(3) is referring to are the renewable resources discussed in 839d(l)(1). The legislative history squarely confirms this. 125 Cong. Rec. S11585, 11598 (daily ed. Aug. 3, 1979) (discussing the amendment that became section 839d(l), and explaining that it authorized the Administrator to "investigate opportunities for adding to the region's power resources . . . [through] renewable resources" and "would also authorize the administrator to acquire resources *of the type that I have just discussed*," *i.e.*, renewable resources (emphasis added)).

To summarize, *NEDC 1997*, as well as principles of statutory interpretation, demonstrate that the Policy does not constitute acquisition of a resource and the NWPA section 6 resource acquisition standards do not apply. The Court should deny Petitioners' NWPA claims.

42

### B. BPA considered the relevant factors and articulated a rational connection between the facts found and the choice made.[11]

BPA's decision is an assessment of what will further its business interests. Interwoven with their claims about resource acquisition standards, Petitioners raise generalized arguments that BPA acted arbitrarily by not applying those standards. Br. at 31-44. Fundamentally, these arguments fail because those standards are inapplicable—thus BPA was not arbitrary in deciding not to apply them. "There is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the legal basis for the complaint." *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) (quotation omitted).

But to the degree Petitioners are asserting a more general challenge that BPA did not consider the relevant factors and articulate a rational connection between the facts found and the choice made, the Court should deny the Petition on that basis too.

---

[11] Standard of Review: This Court does "not second-guess BPA's policy judgments," but asks only "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *ICNU*, 767 F.3d at 922.

43

### 1. BPA rationally considered economic impacts.

Petitioners state that BPA "arbitrarily declined to consider the financial impact[s] . . . ," Br. at 31, but in reality, their claim is that "EDAM is the most cost-effective" market. Br. at 29 (heading). Petitioners thus acknowledge BPA studied economic impacts; they simply prefer their own conclusions about the results. The same goes for Amici WA/OR Br. at 17-19 and Seattle Amicus Br. at 12-26. But second-guessing is not the test. In evaluating economic impacts, BPA met the standard of articulating a rational connection between the facts found and the choice made.

*First,* Petitioners and Amici overemphasize the economic models, and downplay other key considerations. BPA explained that the models were projections, which were inherently limited, and "do not represent an exact expected outcome." 1-ER-21. BPA also explained, and numerous of BPA's customers and stakeholders agreed, that "a decision about day-ahead market participation encompasses many considerations beyond just economic value." 1-ER-17; 1-ER-39; 1-ER-111–15 (commenters).

44

Thus, from the beginning of its two-year public process, BPA made clear that its business case "may primarily focus on" qualitative benefits, and less on revenue. SER-49. Specifically, BPA stressed that a market's governance structure was a key consideration. 1-ER-16–18; 1-ER-44. Likewise, it was vital for a market to hold participants accountable for reliability metrics. 1-ER-16–17. Another "must have" was appropriate market design, such as pricing features and greenhouse gas accounting frameworks. 1-ER-18–19. BPA thoroughly explained its findings on each of these considerations. *Supra* at 15-20; 1-ER-44–52; 1-ER-55–61. In all categories, Markets+ proved superior. *Id.* It was rational for BPA to take these findings into account and weigh them alongside the economic impacts.

*Second*, Petitioners fundamentally mischaracterize the models as depicting "increased costs" to BPA. Br. at 30-32. What the models primarily show is that BPA might *forego revenue opportunities* by pursuing Markets+ over EDAM.[12] 1-ER-73. Foregone revenue is not an "increased cost." This is particularly true for BPA, an entity which "is

---

[12] *See* Seattle Amicus Br. at 15 ("choosing Markets+ would . . . result in foregone benefits" and "EDAM would maximize BPA's revenues . . . .").

45

[not] required to maximize its profits." *Alcoa v. Bonneville Power Admin.*, 698 F.3d at 789.

*Third*, Petitioners and Amici ignore a crucial consideration: the models showed Markets+ offered the lowest cost to meet the Administrator's contractual load obligation. 1-ER-19. One of BPA's most basic statutory duties (and by far its primary source of revenue) is serving its long-term firm power customer load at the lowest possible rates consistent with sound business principles. 16 U.S.C. §§ 838g, 839c(b)(1). In fulfilling that duty, Markets+ represented a lower risk choice for BPA than EDAM. *See supra* at 13-14. In contrast, in EDAM BPA would have to depend on making enough revenue from uncertain secondary sources (surplus power sales) to offset EDAM's higher load service costs. *See id*. Thus, both markets involved tradeoffs; BPA rationally chose to pursue the market with lower risk.

*Fourth*, Petitioners fail to put the models in context. BPA explained that the range between potential costs or benefits in the models was roughly $150 million, which is well within BPA's typical metric for measuring revenue uncertainty. 1-ER-38. In other words, the costs/benefits depicted by the models presented no greater risk than the

46

typical revenue uncertainty BPA faces in any given year. Thus it was rational for BPA to treat the models as a guide, rather than the command that Petitioners make them out to be.

In short, BPA did not arbitrarily fail to consider economic impacts. There is no valid reason the Court should substitute Petitioners' preferences for BPA's informed factual determinations.

### 2. BPA rationally considered market governance.

Petitioners and Amicus Seattle argue "Bonneville arbitrarily elevated its concerns about EDAM governance over the substantial cost-savings that joining EDAM could provide its customers and the region." Br. at 37 (heading); Seattle Amicus Br. at 26-28. Not so.

*First*, as discussed *supra* at 11-20, governance was not the only factor that BPA considered alongside economic considerations. It was one of *several* key factors where Markets+ proved superior. *Id.*

*Second*, BPA has explained that the EDAM "cost savings" Petitioners refer to are speculative because they are entirely dependent on revenue, which in turn is dependent on whether BPA has surplus power to sell (a low possibility over time). *See supra* at 13-14; 1-ER-73; 1-ER-128–30; 12-ER-3429. Given that, it was not arbitrary to consider

47

governance to be of greater importance than speculative profits, which also came with higher cost and risk. *See id.*

*Third*, BPA rationally explained that governance was *inherently* a financial consideration. 1-ER-150–51. It would have far-reaching, and long-lasting impacts on the overall value of a market. *Id.*; 1-ER-45–46. This comes into play through the role of the market operator in dealing with scarcity events, mitigating market power, and allocating charges for congestion on transmission lines. 1-ER-49–55; 1-ER-149–51.

Governance also greatly impacts financial value during the market's creation, influencing the market design and how policies are set. In this regard, BPA participated in both SPP's Markets+ design process and CAISO's EDAM design process and found significant differences between EDAM's staff-determined and the Markets+ stakeholder-determined decisions. 1-ER-46. The EDAM process was led by CAISO, which issued proposals, took stakeholder input, then decided market design and policy on its own, sometimes without addressing stakeholder comments. 1-ER-177–78. In contrast, while facilitated by SPP, the Markets+ process was led by the stakeholders—market

48

participants, state regulators, environmental groups, etc.—and decisions were made by them. *Supra* at 7-10, 15-16.

*Fourth,* BPA rationally explained that its experience in CAISO's (the EDAM operator) other markets had demonstrated that CAISO—as it must under California law—places the best interests of California over other market participants, regions, and citizens. Cal. Pub. Util. Code § 345.5(a); 1-ER-18; 1-ER-45; 1-ER-155–56. BPA serves utility customers in seven states, so it was entirely rational to seek a market that would have a more neutral governance structure—without a legal obligation to favor any state, market participant, or interest group.[13] 1-ER-47; SER-75.

---

[13] Amicus Green Energy Institute relies extensively on extra-record material, and its own characterizations, regarding a California law that was enacted four months after BPA's decision, which the Institute feels fixed all governance concerns. Institute Amicus Br. at 12-22. Presumably, the Court will disregard this extra-record and post-decisional information, and the Institute's lengthy characterizations thereof. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (stating agency must "justify its final action by reference to the reasons it considered *at the time it acted*" (emphasis added)).

Regardless, however, the new law did not alter the prior provisions of California law requiring the CAISO (and thus EDAM) to be operated in

49

*Finally*, contrary to Petitioners' and Amici's assertions, BPA was rational in its governance comparison between EDAM and Markets+, and did not disregard FERC's findings regarding EDAM's governance. *See* Br. at 37-38; WA/OR Amicus Br. at 32-35; Seattle Amicus Br. at 28-31. BPA acknowledged FERC's findings that either market appeared to meet the legal threshold of being "just and reasonable." 1-ER-171. But legality is a *minimum* qualification. *Of course* a market would need to be legal for BPA to consider it. Beyond that, Petitioners' and Amici's arguments center on comparing the CAISO Board of Governors with the SPP Board of Directors—BPA extensively evaluated both, explained the differences, and provided at least five rational reasons for why it preferred the SPP approach. 1-ER-168–75.

### 3. BPA rationally considered environmental obligations.

Petitioners and Amici WA/OR argue that BPA did not give due consideration to the environmental impacts of its Policy and therefore was arbitrary and violated the NWPA. Br. at 40-42; WA/OR Amici Br.

_____

the interest of California. Cal. Pub. Util. Code § 345.5(a);1-ER-175. The new law is largely based on the "Pathways Initiative" and reflects the same governance shortcomings that BPA identified with that effort. 1-ER-47; 1-ER-86–88; 1-ER-155–56.

at 30-32. As explained *supra*, the NWPA "due consideration" standard that Petitioners rely on "is aimed specifically at new power-resource acquisitions"—this Policy is not that. *Northwest Resource*, 730 F.3d at 1017. But even if that standard applied, BPA gave appropriate, rational consideration to the environment as explained *infra* at 61-72. This Policy, a move towards participation in a market, would not alter the existing boundaries within which the hydrosystem operates. 1-ER-219–22; 1-ER-250–53.

> ### 4. BPA did not arbitrarily fail to consider whether its decision was consistent with the priorities and purposes of the NWPA.

Petitioners and others argue that "[f]or the same reasons that Bonneville's decision is inconsistent with the Northwest Power Plan, it is also inconsistent with the purposes of the Power Act . . . ." Br. at 43; WA/OR Amicus Br. at 27-32 (same theory). This "for the same reasons" argument adds nothing. BPA's two-year process was deeply rooted in the purposes of the NWPA. 1-ER-7; 1-ER-76; SER-8. It is irrelevant that Petitioners feel another market or course of action may have better promoted those purposes. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) ("[W]e will not presume with petitioners that any

51

result consistent with their account of the statute's overarching goal must be the law . . . ."); *accord Idaho Conservation League v. Bonneville Power Admin.*, 142 F.4th at 645.

## C. Miscellaneous Amicus arguments are unpersuasive.

The Amici try to shore up Petitioners' case with various expanded or new arguments. None are convincing.

### 1. BPA adequately considered "the region" in its decision—BPA found Markets+ reflected regional public interest better than EDAM.

Amici WA/OR argue that BPA "disregarded its statutory directive to assure the Pacific Northwest of an efficient, economical, and reliable power supply." WA/OR Amicus Br. at 13-17 (heading). Their gist is that BPA inadequately considered "regional" economic impacts and focused too narrowly on impacts to itself and its customers. *Id*. at 17-18; *see also* Petitioners' Opening Br. at 13, 32 (similar).

To begin with, a fundamental problem with Amici WA/OR's position is it focuses exclusively on economics as the determining factor of what is in the best interest of "the region," or, "the public." BPA's inquiry was more comprehensive, and found that Markets+ was better at incorporating the public interest. For example, WA/OR tout that "the

52

Pathways proposal, which is now California law, requires consideration of the views of state regulators, requires respect for the policies of all participating states, and funds a role for consumer advocates." WA/OR Amicus Br. at 33 (discussing a California law that post-dates BPA's decision). But Markets+ already did that and more, at the time BPA made its decision. Specifically, BPA found "Markets+ provides more [substantive,] extensive and complete opportunities for state involvement," compared to EDAM where the role for state regulators was "primarily informational." 1-ER-182; 1-ER-165–67. Likewise, when it came to designing the market and taking public input to guide that process, Markets+ had been superior. *Supra* at 7-10, 15-16.

Another of BPA's most fundamental conclusions regarding "the region" or "the public" was that CAISO (the EDAM operator) would have legal duties to the State of California, which BPA found to be a "significant flaw[] in the governance of a regional market that includes participants in other states." 1-ER-45. In this important regional-interest consideration, BPA determined that Markets+ was superior because its design and governance incorporated "equivalent consideration of [multiple] state policies . . . ." 1-ER-47.

Even accepting, for the sake of argument, Amici WA/OR's theory that economics are *the* determining factor of "regional" or "public interest," their description of economic impacts goes far beyond BPA's purview. Inevitably, any utility's choice of a market will impact costs and benefits for neighboring utilities and trading partners. What Amici WA/OR seek is for BPA to evaluate how its decision could affect the balance sheets of all utilities in the region, regardless of whether they are supplied with electric power pursuant to a firm power sales contract with BPA.

But BPA must do what is in its own sound business interest. *Pac. Nw. Generating Coop. v. Bonneville Power Admin.,* 596 F.3d 1065, 1080 (9th Cir. 2010) ("[W]e are particularly deferential to the agency's assessment of whether its actions further BPA's business interests consistent with its public mission." (internal quotation marks omitted)); *accord ICNU*, 767 F.3d at 919. And BPA is not "to engage in regional economic planning." *Alcoa v Bonneville Power Admin.,* 698 F.3d at 799 (Bea, J., concurring in part and dissenting in part). The Court should reject Amici WA/OR's premise that general statutory references to 'the region' or the 'public interest' create some sort of super-standard. *Cf.*

54

*Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1193 (9th Cir. 2023) (stating that generalized statutory direction "hardly establishes the stable connection . . . on which petitioners' argument depends" and concluding "we do not think Congress meant to usher in potentially massive additional requirements . . . through a generalized reference . . . .").

Notwithstanding the foregoing, BPA took the NWPA purposes into consideration when setting its Policy direction. Amici WA/OR contend BPA must "assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply." WA/OR Amicus Br. at 13 (quoting 16 U.S.C. § 839(2)) (emphasis omitted). BPA meets this NWPA purpose, and will continue to do so if it participates in any day-ahead market, by selling to its three statutory customer groups that have executed firm power sales contracts offered by the Administrator. 1-ER-276; *see ALCOA*, 467 U.S. at 384 (describing BPA's three statutory customer groups); *Pub. Power Council v. Johnson*, 674 F.2d 791, 792 (9th Cir. 1982) (describing this primary purpose and how the NWPA directed BPA to sell to its customer groups).

55

Next, Amici WA/OR argue BPA must involve and consult with "the public at large within the region . . . ." WA/OR Amicus Br. at 13 (quoting 16 U.S.C. § 839(3)). BPA conducted its market evaluation through a broad regional process consistent with section 4(g) of the NWPA, which ensures BPA considers "public views concerning major regional power issues . . . ." 16 U.S.C. § 839b(g); 1-ER-273.

Amici WA/OR next cite various provisions regarding transmitting power—to BPA's *customers*—and interconnecting facilities in the region. WA/OR Amicus Br. at 13-14 (citing 16 U.S.C. §§ 832a(b), 832e, 837a, 838g, 838b). BPA meets these directives by selling power under its long-term power sales contracts and through its continued construction, operation, maintenance, and improvement of its transmission system. 1-ER-281. Again, BPA's customers are the statutes' focus. If BPA participates in Markets+, it will continue meeting these directives by marketing power consistent with its statutory obligations, and making transmission sales under its open-access tariff. *Id.*

Lastly, they cite BPA's organic statute, the Bonneville Project Act at 16 U.S.C. § 832c(a), which provides "for the benefit of the general

public" by giving public bodies and cooperative customers preferential access to BPA's power. WA/OR Amicus Br. at 13. This, too, is directed squarely at BPA's *customers*—which is the broad "regional" group BPA considered. 12-ER-3399–400 (BPA Facts, describing BPA's diverse and geographically-varied customer groups).

### 2. BPA rationally explained its conclusions regarding "seams" issues.

Amici WA/OR argue that BPA ensured two day-ahead markets will emerge in the West, so BPA should have weighed the "seams" that may result and reliability issues. WA/OR Amicus Br. at 19-26.

*First*, this argument implies it was wrong of BPA to have considered *any* market other than EDAM. To the contrary, BPA and others concluded that competition between Markets+ and EDAM had resulted in better market offerings from both. 1-ER-74; SER-39; SER-16. Moreover, many experts considered the possibility of a single west-wide market to be unlikely. 1-ER-3; 4-ER-1119; 5-ER-1387. Thus it was eminently businesslike of BPA to explore both markets and weigh its options.

*Second*, BPA thoroughly explored the "seams" issues. Contrary to Amici WA/OR's contention that BPA merely asserted "confidence" that

seams would be mitigated, WA/OR Amicus Br. at 24, BPA devoted a full Appendix in the Policy to evaluating seams, 1-ER-90–95, explored it at a workshop, SER-22–38, and has been continually participating in the seams work group that Markets+ established. SER-54–71. BPA also discussed its extensive experience navigating seams issues in the past. 1-ER-65–66; 1-ER-90–95; 1-ER-232–33.

*Finally*, BPA considered reliability at length. Indeed, that was one of BPA's *primary reasons* for favoring Markets+—it has more rigorous and uniform reliability requirements than EDAM. *Supra* at 17-18; 1-ER-15–16; 1-ER-48–49. BPA also considered reliability from a seams perspective, acknowledging possible challenges but finding they could be mitigated through agreements and market design. 1-ER-66. Ultimately, BPA concluded that seams did not outweigh the other factors contributing to its Policy direction towards Markets+. 1-ER-74; 1-ER-95; *see also* SER-20 (Public Power Council commenting: "For some time, 'market seams' have been used as an abstract threat to undermine the potential benefits of a market designed and governed independent of the CAISO.").

58

### 3. Seattle's arguments were not raised by Petitioners and have been waived; they are nevertheless unconvincing.

"Generally, we do not consider on appeal an issue raised only by an amicus." *United States v. Gementera*, 379 F.3d 596, 607 (9th Cir. 2004); *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009).

Seattle advances a lengthy argument that BPA did not "comply with its statutory directive to protect consumers by ensuring that power is sold at the lowest possible rates . . . consistent with sound business principles." Seattle Amicus Br. at 11-20 (quotations and citations omitted). Petitioners make no such argument. The phrases "lowest possible rates" and "sound business principles" do not appear in their Opening Brief. The Court should decline to consider Seattle's argument. Seattle was an active participant in BPA's administrative process, and "[h]ad [it] wished to raise the issue properly in this case, it could have intervened instead of appearing as amicus." *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 862 (9th Cir. 1982).

59

If the Court considers this argument, BPA has demonstrated that its decision is consistent with sound business principles. *See supra* at 11-20 and the record cites therein.

Seattle also raises an argument regarding "hurdle rates," alleging BPA was irrational and arbitrary for incorporating them into its economic analysis. Seattle Amicus Br. at 21-26. Petitioners refer to hurdle rates only in passing, in one paragraph. Br. at 33. They do not raise them as an issue. Accordingly, the Court should decline to consider this issue. Regardless, BPA rationally explained its factual findings and choices regarding hurdle rates. 1-ER-132–37.

### D. BPA's decision was a factual determination of what is in the agency's sound business interest.

BPA's decision in this case is a quintessential example of the agency evaluating what is in its sound business interest. Petitioners and Amici invite the Court to second-guess that determination. Although they disagree with BPA's conclusions, BPA considered the relevant factors and articulated a rational connection between the facts found and the choice made.

In evaluating BPA's business decisions, the Court is "particularly deferential to the agency's assessment of whether its actions further

BPA's business interests consistent with its public mission." *ICNU*, 767 F.3d at 922 (internal quotes omitted). That is because "Congress has delegated to BPA the discretion to determine how best to further BPA's business interests . . . ." *Alcoa v. Bonneville Power Admin.*, 698 F.3d at 789 (internal quotations omitted). The Court should apply this standard and uphold BPA's business decision.

## III. BPA DID NOT VIOLATE NEPA.

Petitioners' NEPA claim fails for two reasons. *First*, it is based on the false premise that BPA's Policy—which aimed to facilitate BPA's participation in Markets+ in the event of a *future* decision to join—was *itself* a decision to join the market. It was not, and thus, the Policy was not a point of commitment requiring NEPA procedures and analysis.

*Second*, there was no "major federal action" nor did adopting the Policy result in significant environmental impacts which would have triggered NEPA—because there was no change in the status quo. BPA's ROD was clear that adoption of the Policy would not entail modifying any of BPA's existing hydrosystem operations or management actions. This precludes any possibility of associated environmental impacts that

61

might necessitate an Environmental Impact Statement (EIS) or other NEPA documentation.

## A. BPA's decision was not a "point of commitment" requiring NEPA.

NEPA requires an agency to fulfill applicable environmental review obligations at the "go/no go point of commitment" for its proposed action. *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

In this case, BPA's decision was "to adopt [a] policy direction to participate in a day ahead market," in order to obtain an "early seat at the table" for designing the market and matching other entities' market-entry speed in the event of a decision to join. 1-ER-155. BPA thus explained that, rather than "obligat[ing] Bonneville to join the market," the Policy merely "establishes the scope for future implementation decisions, and sets a direction to enable Bonneville's participation by determining cost allocation in rate proceedings and updating tariff terms and conditions in a tariff proceeding." 1-ER-251. BPA maintained its "authority and discretion over any future decision to join or participate in a market," and reiterated that it would "conduct and document any appropriate NEPA analysis prior to taking

62

additional steps towards—or making any final agency decisions with respect to—joining and participating in Markets+." 1-ER-252. NEPA accordingly did not require a review of day-ahead market participation as part of BPA's decision to adopt the Policy.

The same logic applies against Petitioner's claim that BPA was required to consider "appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Br. at 47 (citing 42 U.S.C. § 4332(H)); *id.* at 58. Because there was no "point of commitment"—and, accordingly, no obligation to prepare an EIS or other NEPA-analysis document—this requirement does not apply. *Friends of Southeast's Future*, 153 F.3d at 1063; *Klickitat Cnty. v. Columbia River Gorge Comm'n*, 770 F.Supp. 1419, 1430-32 (E.D. Wash. 1991) (holding that obligation to consider alternatives was not applicable in the absence of an obligation to prepare a NEPA-analysis document).

Further, in adopting the Policy, BPA did not make any proposals to change the status quo that could give rise to "unresolved conflicts." Nor does BPA's action implicate any "unresolved conflicts" as to natural resource use. *Cf. Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229

(9th Cir. 1988) (holding that sale of oil and gas leases involved "conflicts as to the present and future uses" of a creek, and thus constituted an unresolved conflict as to natural resource use).

**B.     BPA's decision did not change the status quo and therefore was not a "major federal action" triggering NEPA.**

A second reason why Petitioners' NEPA claim fails is because "NEPA only requires the preparation of an EIS when a proposed federal action is major." *Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1175 (9th Cir. 2016). As such, "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.* (internal quotations and citations omitted).

In its ROD, BPA made clear that adoption of the Policy "does not implement [hydrosystem] operations or management actions . . . ," and that BPA's operations would thus continue to be performed within the "boundaries" described in existing applicable NEPA documents. 1-ER-219–22; 1-ER-252. As this Court has repeatedly recognized, an agency's mere continuation of activity "within the range originally available"— which BPA's ROD stipulated would be the case—"does not constitute a major Federal action" and an EIS is therefore not required. *Upper*

*Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990) (quotations and citations omitted); *Idaho Conservation League*, 826 F.3d at 1177 (finding no major action where BPA "did not change the operational status quo"); *cf. NEDC 1997*, 117 F.3d at 1526, 1535-36 (finding BPA took a major action when it entered an interregional exchange resulting in an operational change that "expanded the amount of [water] storage capacity . . ." in the hydrosystem). Because BPA has made no operational change—and nor could it because Markets+ is still theoretical—Petitioners' NEPA claim should be rejected.

**1.    Supreme Court precedent confirms that BPA is not responsible for analyzing attenuated third-party effects.**

Petitioners fail to acknowledge that the remaining environmental impacts they attribute to BPA's Policy are precisely the types of third-party actions that the Supreme Court, in its recent decision in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025) (*Seven County*), found to lie outside the required scope of an agency's NEPA review.

The Supreme Court explained that "NEPA [does not] require the [agency] to consider the environmental effects of upstream and downstream projects that are separate in time or place" from the proposed action the agency is considering. *Id.* at 179. Notably, such effects "fall outside the [agency]'s authority and would be initiated, if at all, by third parties." *Id.* at 186. As the Supreme Court explained, "the textually mandated focus of NEPA is the 'proposed action' – that is, the project at hand . . . ." *Id.* at 186-87 (quoting 42 U.S.C. § 4332(2)(C) (2018)).

Petitioners contend that, prior to adopting the Policy, BPA was required to prepare an EIS considering the environmental impacts of third-party actions spurred by its decision, however indirectly, including: (1) "an increase in fossil-fuel generated power, with its attendant air, water, and other forms of pollution;" and (2) "the deployment of renewable energy throughout the West." Br. at 14, 16.

These arguments mirror those rejected by *Seven County*. There, environmental groups urged the agency to speculate about future decisions by third parties on matters beyond the agency's regulatory authority. *Seven County*, 605 U.S. at 188-89. The Supreme Court found

66

the agency was "[a]bsolutely correct" to reject that approach. *Id*. at 191. The agency's regulatory authority was limited to "approv[ing] railroad lines." *Id*. at 188. Upstream oil drilling and downstream oil refining, by contrast, "f[e]ll outside the [agency's] authority and would be initiated, if at all, by third parties." *Id*. at 186. Hence, the agency was not required to evaluate those potential environmental effects. *Id*. at 191.

So too here. BPA "is a federal power marketing administration" that "makes power sales and provides transmission service within its . . . service territory . . . ." 1-ER-7. Given the "discretion . . . and broad latitude" afforded under NEPA, BPA drew a "manageable line" by committing to undertake NEPA review in the event of any modifications to hydrosystem operations and management actions within its purview. *Seven County*, 605 U.S. at 182. As in *Seven County*, BPA would be overstepping to extend the scope of its review to third-party actions that would be separate in time and place, and over which it would have no regulatory authority. *Seven County* bars Petitioners' attempts to reorient the relevant NEPA analysis toward those third-party actions instead of BPA's decision at hand.

## C. BPA adequately documented and explained its fulfillment of applicable NEPA obligations.

Petitioners also argue that BPA violated NEPA by "summarily" concluding "that there are no environmental impacts" instead of undertaking the process of preparing a formal NEPA analysis in an EIS or Environmental Assessment ("EA"). Br. at 51-52. They further contend that BPA should at least have invoked a NEPA categorical exclusion. *Id.*

As discussed above, the purported actions that Petitioners argue necessitated formal NEPA procedures and analyses consist entirely of those that BPA either: (1) expressly stated it was not contemplating as part of its decision (*i.e.*, changes to operations and management actions that could affect hydropower generation); or (2) simply had no regulatory authority or control over in the first place (*i.e.*, increases in fossil fuel generation). Br. at 14-17, 53. As to the first, there was no change to the status quo and hence no "major federal action" requiring further NEPA analysis. As to the second, *Seven County* makes clear that such actions were outside the scope of any NEPA-mandated review. Either way, BPA appropriately and lawfully exercised its

68

agency discretion to omit consideration of such actions and associated impacts from its decision adopting the Policy.

Petitioners are also incorrect that BPA was "at least" required to conduct an EA or invoke a categorical exclusion. Br. at 51-52. This Court has previously upheld agency compliance with NEPA under analogous circumstances (*i.e.*, where there was no EIS, EA, or categorical exclusion determination). *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 780 (9th Cir. 2019). In *Ilano*, the United States Forest Service opted to make certain land-use designations[14] to federal land in California without undertaking NEPA review in an EIS or EA— or invoking a NEPA categorical exclusion—because the Forest Service found that the designations in question "d[id] not directly or indirectly affect the environment" or present any "effects that can be meaningfully evaluated . . . ." *Id.* at 778.

---

[14] *Ilano* involved a NEPA challenge to two distinct Forest Service decisions: (1) the land-use designation, for which the Forest Service determined no NEPA analysis was required, including a categorical exclusion determination; and (2) a subsequent decision to approve a site-specific project, for which the Forest Service invoked a categorical exclusion. The latter decision is not relevant here.

The Court upheld the Forest Service's decision, and explained that no NEPA analysis was triggered because, rather than "chang[ing] the status quo," authorizing a "particular project," or "foreseeably impact[ing] the environment," the decision itself had no environmental impact but merely identified forest areas suffering from threats like insect infestation and disease. *Id.* at 780-81. As the Court further recognized, and as the Supreme Court has since reiterated in *Seven County*, "NEPA does not require" agencies to "consider the environmental effects that speculative or hypothetical projects might have." *Ilano*, 928 F.3d at 780 (quotation omitted).

Like the agency action at issue in *Ilano*, BPA's decision to adopt the Policy did not "change the status quo," authorize a "particular project," or "foreseeably impact the environment." By adopting the Policy, BPA did not (1) commit to Markets+ participation; (2) modify any hydrosystem operation or management actions; or (3) authorize any construction or other physical activity. BPA did not run afoul of NEPA.

## D. BPA's $40 million in funding was not an "irreversible commitment of resources."

Petitioners contend BPA made "an irreversible financial commitment to Markets+" that "limit[ed] [BPA's] choice of reasonable

70

alternatives . . . ." Br. at 58-59. NEPA's requirement to consider "reasonable alternatives" arises when an agency is undertaking an EA or EIS. *North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). Petitioners' argument therefore fails because it presumes BPA was required to undertake an EA or EIS, which, as explained above, BPA was not required to do.

Petitioners' argument regarding the financial commitment also fails because it relies entirely on cases that are "focused on the commitment of *natural resources*, not . . . the agency's financial resources." *WildWest Institute v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008) (emphasis in original). This distinction is critical.

A commitment of natural resources prior to NEPA review would *categorically* violate the statute, since it directly impacts the environmental and natural resources that NEPA's review process exists to conserve and protect. *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (finding NEPA violation based on sale of gas and oil leases without any reservation of rights to prevent subsequent surface-disturbing activity). In contrast, money expended in preparation for a potential future action (that has not yet undergone NEPA review)

71

would only violate the statute if the expenditure would later limit the agency's choice of reasonable alternatives to that action.[15] *See WildWest*, 547 F.3d at 1168; *Friends of Southeast's Future*, 153 F.3d at 1070-71 (finding no NEPA violation where a schedule for designating forest areas for harvest retained governmental authority to permit/reject future logging activity). Petitioners' cases regarding natural resources thus have limited relevance here, where a purely financial resource is at issue.

## IV. VACATUR AND ORDERING AN EIS WOULD BE PREMATURE

The reasons above demonstrate BPA has not violated the NWPA or NEPA. However, if the Court rules in any respect for Petitioners, it

---

[15] Nor is the $40 million a "penalty" (as Petitioners put it) that would limit BPA's *future* choices. To run afoul of NEPA in this way, a financial expenditure must be "so substantial" that it "actually has '[l]imit[ed] the choice of reasonable alternatives.'" *WildWest Institute v. Bull*, 547 F.3d 1162, 1168-69 (9th Cir. 2008) (alteration in original) (quoting *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005), quoting 40 C.F.R. § 1506.1(a)(2)). This Court has described that magnitude as akin to "an agency spen[ding] most or all of its limited budget" on preparations for its preferred alternative. *Id.* at 1169. The $40 million at issue is 0.008% of BPA's annual $5 billion in operating costs. Moreover, this Court upholds preparatory expenditures where the agency "retain[s] the authority to change course or to alter the plan it was considering implementing," *Id.*, which BPA has clearly done here. 1-ER-145; 1-ER-252.

should order further briefing regarding an appropriate remedy. The Court's equitable inquiry into remedy would be informed by the scope of its ruling on the merits, so the Court should decline Petitioners' premature request for vacatur and an EIS. *See* Br. at 61-66.

A party seeking vacatur must demonstrate "equitable entitlement to the extraordinary remedy of vacatur." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18, 26 (1994). Any remedy here would involve an exercise of the Court's equity jurisdiction and must be carefully tailored to the circumstances. *See Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312-13 (1982). The same is true of Petitioners' request that the Court order BPA to prepare an EIS. *See Seven County,* 605 U.S. at 169 (emphasizing that a deficiency in a NEPA review may not require a court to vacate the agency's project approval).

## CONCLUSION

For the foregoing reasons, the Court should dismiss or deny the petition.

DATE:  December 19, 2025

Respectfully submitted,

MARCUS H. CHONG TIM
*General Counsel*

TIMOTHY A. JOHNSON
SARAH M. KUTIL
ANNE E. SENTERS
*Asst. General Counsels*

ERIKA A. DOOT
ASHLEY L. MOREY
ANGAD S. NAGRA
*Attorneys*

Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208
503-230-5085

SCOTT E. BRADFORD
*U.S. Attorney*
*District of Oregon*

SEAN E. MARTIN
*Asst. U.S. Attorney*

1000 SW Third Ave.
Suite 600
Portland, OR 97201-2902
503-727-1000

*/s/ J. Courtney Olive*
J. COURTNEY OLIVE
Special Asst. U.S. Attorney
Attorney for Respondent

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** <u>25-4278</u>

I am the attorney or self-represented party.

**This brief contains** <u>13,452</u> **words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [X] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ J. Courtney Olive*_____ **Date** _____12/19/2025_____

75

# ADDENDUM

## Addendum

Pacific Northwest Electric Power Planning and Conservation Act,

16 U.S.C. § 839 *et seq*................................................................................ A-1

H.R. Rep. No. 96-976, pt. II, 96th Cong., 2d Sess. (1980) (excerpt),

pages 1, 32 ................................................................................................ A-63

125 Cong. Rec. S11585, S11598 (daily ed. Aug. 3, 1979) ........................... A-65

# Pacific Northwest Electric Power Planning and Conservation Act

**16 United States Code** Chapter 12H (2006).
Act of Dec. 5, 1980, 94 Stat. 2697.
Public Law No. 96-501, S. 885.

Purposes

**839. Congressional declaration of purpose**
The purposes of this chapter, together with the provisions of other laws applicable to the Federal Columbia River Power System, are all intended to be construed in a consistent manner. Such purposes are also intended to be construed in a manner consistent with applicable environmental laws. Such purposes are:

**839(1)**. to encourage, through the unique opportunity provided by the Federal Columbia River Power System—

**839(1)(A)**. Conservation and efficiency in the use of electric power, and
[Pacific Northwest Electric Power Planning and Conservation Act, (Northwest Power Act), §2(1)(A), Dec. 5, 1980, 94 Stat. 2697.]

**839(1)(B)**. the development of renewable resources within the Pacific Northwest;
[Northwest Power Act, §2(1)(B), 94 Stat. 2697.]

**839(2)**. to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply;
[Northwest Power Act, §2(2), 94 Stat. 2697.]

**839(3)**. to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the Columbia River System (including Federal and State fish and wildlife agencies and appropriate Indian tribes), and the public at large within the region in—

**839(3)(A)**. the development of regional plans and programs related to energy conservation, renewable resources, other resources, and protecting, mitigating, and enhancing fish and wildlife resources.
[Northwest Power Act, §2(3)(A), 94 Stat. 2697.]

**839(3)(B)**. facilitating the orderly planning of the region's power system, and
[Northwest Power Act, §2(3)(B), 94 Stat. 2698.]

**839(3)(C)**. providing environmental quality;
[Northwest Power Act, §2(3)(C), 94 Stat. 2698.]

**839(4)**. to provide that the customers of the Bonneville Power Administration and their consumers continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements,

Addendum
A-1

including the amortization on a current basis of the Federal investment in the Federal Columbia River Power System;

[Northwest Power Act, §2(4), 94 Stat. 2698.]

**839(5)**. to insure, subject to the provisions of this chapter—

**839(5)(A)**. that the authorities and responsibilities of State and local governments, electric utility systems, water management agencies, and other non-Federal entities for the regulation, planning, conservation, supply, distribution, and use of electric power shall be construed to be maintained, and

[Northwest Power Act, §2(5)(A), 94 Stat. 2698.]

**839(5)(B)**. that Congress intends that this chapter not be construed to limit or restrict the ability of customers to take actions in accordance with other applicable provisions of Federal or State law, including, but not limited to, actions to plan, develop, and operate resources and to achieve conservation, without regard to this chapter; and

[Northwest Power Act, §2(5)(B), 94 Stat. 2698.]

**839(6)**. to protect, mitigate and enhance the fish and wildlife, including related spawning grounds and habitat, of the Columbia River and its tributaries, particularly anadromous fish which are of significant importance to the social and economic well-being of the Pacific Northwest and the Nation and which are dependent on suitable environmental conditions substantially obtainable from the management and operation of Federal Columbia River Power System and other power generating facilities on the Columbia River and its tributaries.

[Northwest Power Act, §2(6), 94 Stat. 2698.]

### 839a. Definitions
As used in this chapter, the term—

**839a(1)**. "Acquire" and "acquisition" shall not be construed as authorizing the Administrator to construct, or have ownership of, under this chapter or any other law, any electric generating facility.

[Northwest Power Act, §3(1), 94 Stat. 2698.]

**839a(2)**. "Administrator" means the Administrator of the Bonneville Power Administration.

[Northwest Power Act, §3(2), 94 Stat. 2698.]

**839a(3)**. "Conservation" means any reduction in electric power consumption as a result of increases in the efficiency of energy use, production, or distribution.

[Northwest Power Act, §3(3), 94 Stat. 2698.]

## Pacific NW Power Act (continued)

Cost-effective

**839a(4)(A)**. "Cost-effective", when applied to any measure or resource referred to in this chapter, means that such measure or resource must be forecast—

Reliable

**839a(4)(A)(i)**. to be reliable and available within the time it is needed, and
[Northwest Power Act, §3(4)(A)(i), 94 Stat. 2698.]

Meet or reduce electric power demand

**839a(4)(A)(ii)**. to meet or reduce the electric power demand, as determined by the Council or the Administrator, as appropriate, of the consumers of the customers at an estimated incremental system cost no greater than that of the least-cost similarly reliable and available alternative measure or resource, or any combination thereof.
[Northwest Power Act, §3(4)(A)(ii), 94 Stat. 2698.]

System cost

**839a(4)(B)**. For purposes of this paragraph, the term "system cost" means an estimate of all direct costs of a measure or resource over its effective life, including, if applicable, the cost of distribution and transmission to the consumer and, among other factors, waste disposal costs, end-of-cycle costs, and fuel costs (including projected increases), and such quantifiable environmental costs and benefits as the Administrator determines, on the basis of a methodology developed by the Council as part of the plan, or in the absence of the plan by the Administrator, are directly attributable to such measure or resource.
[Northwest Power Act, §3(4)(B), 94 Stat. 2698-9.]

**839a(4)(C)**. In determining the amount of power that a conservation measure or other resource may be expected to save or to produce, the Council or the Administrator, as the case may be, shall take into account projected realization factors and plant factors, including appropriate historical experience with similar measures or resources.
[Northwest Power Act, §3(4)(C), 94 Stat. 2699.]

Conservation favored

**839a(4)(D)**. For purposes of this paragraph, the "estimated incremental system cost" of any conservation measure or resource shall not be treated as greater than that of any non-conservation measure or resource unless the incremental system cost of such conservation measure or resource is in excess of 110 per centum of the incremental system cost of the nonconservation measure or resource.
[Northwest Power Act, §3(4)(D), 94 Stat. 2699.]

**839a(5)**. "Consumer" means any end user of electric power.
[Northwest Power Act, §3(5), 94 Stat. 2699.]

**839a(6)**. "Council" means, unless otherwise specifically provided, the members appointed to the Pacific Northwest Electric Power and Conservation Planning Council established pursuant to section 839b of this title.
[Northwest Power Act, §3(6), 94 Stat. 2699.]

Addendum
A-3

## Pacific NW Power Act (continued)

**839a(7)**. "Customer" means anyone who contracts for the purchase of power from the Administrator pursuant to this chapter.
[Northwest Power Act, §3(7), 94 Stat. 2699.]

**839a(8)**. "Direct service industrial customer" means an industrial customer that contracts for the purchase of power from the Administrator for direct consumption.
[Northwest Power Act, §3(8), 94 Stat. 2699.]

**839a(9)**. "Electric power" means electric peaking capacity, or electric energy, or both.
[Northwest Power Act, §3(9), 94 Stat. 2699.]

**839a(10)**. "Federal base system resources" means—

**839a(10)(A)**. the Federal Columbia River Power System hydroelectric projects;
[Northwest Power Act, §3(10)(A), 94 Stat. 2699.]

**839a(10)(B)**. resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and
[Northwest Power Act, §3(10)(B), 94 Stat. 2699.]

**839a(10)(C)**. resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.
[Northwest Power Act, §3(10)(C), 94 Stat. 2699.]

**839a(11)**. "Indian tribe" means any Indian tribe or band which is located in whole or in part in the region and which has a governing body which is recognized by the Secretary of the Interior.
[Northwest Power Act, §3(11), 94 Stat. 2699.]

**839a(12)**. "Major resource" means any resource that—    Major resource

**839a(12)(A)**. has a planned capability greater than fifty average megawatts, and
[Northwest Power Act, §3(12)(A), 94 Stat. 2699.]

**839a(12)(B)**. if acquired by the Administrator, is acquired for a period of more than five years.
[Northwest Power Act, §3(12)(B), 94 Stat. 2699.]

**839a(12) [cont.]**. Such term does not include any resource acquired pursuant to section 838i(b)(6) of this title.
[Northwest Power Act, §3(12), 94 Stat. 2699.]

**839a(13)**. "New large single load" means any load associated with a new facility, an existing facility, or an expansion of an existing facility—

Addendum
A-4

## Pacific NW Power Act (continued)

**839a(13)(A)**. which is not contracted for, or committed to, as determined by the Administrator, by a public body, cooperative, investor-owned utility, or Federal agency customer prior to September 1, 1979, and
[Northwest Power Act, §3(13)(A), 94 Stat. 2699-2700.]

**839a(13)(B)**. which will result in an increase in power requirements of such customer of ten average megawatts or more in any consecutive twelve-month period.
[Northwest Power Act, §3(13)(B), 94 Stat. 2700.]

Region

**839a(14)**. "Pacific Northwest", "region", or "regional" means—

**839a(14)(A)**. the area consisting of the States of Oregon, Washington, and Idaho, the portion of the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming as are within the Columbia River drainage basin; and
[Northwest Power Act, §3(14)(A), 94 Stat. 2700.]

**839a(14)(B)**. any contiguous areas, not in excess of seventy-five air miles from the area referred to in subparagraph (A), which are a part of the service area of a rural electric cooperative customer served by the Administrator on December 5, 1980, which has a distribution system from which it serves both within and without such region.
[Northwest Power Act, §3(14)(B), 94 Stat. 2700.]

**839a(15)**. "Plan" means the Regional Electric Power and Conservation plan (including any amendments thereto) adopted pursuant to this chapter and such plan shall apply to actions of the Administrator as specified in this chapter.
[Northwest Power Act, §3(15), 94 Stat. 2700.]

**839a(16)**. "Renewable resource" means a resource which utilizes solar, wind, hydro, geothermal, biomass, or similar sources of energy and which either is used for electric power generation or will reduce the electric power requirements of a consumer, including by direct application.
[Northwest Power Act, §3(16), 94 Stat. 2700.]

**839a(17)**. "Reserves" means the electric power needed to avert particular planning or operating shortages for the benefit of firm power customers of the Administrator and available to the Administrator (A) from resources or (B) from rights to interrupt, curtail, or otherwise withdraw, as provided by specific contract provisions, portions of the electric power supplied to customers.
[Northwest Power Act, §3(17), 94 Stat. 2700.]

**839a(18)**. "Residential use" or "residential load" means all usual residential, apartment, seasonal dwelling and farm electrical loads or uses, but only the first four hundred horsepower during any monthly billing period of farm irrigation and pumping for any farm.
[Northwest Power Act, §3(18), 94 Stat. 2700.]

## Pacific NW Power Act (continued)

**839a(19)**. "Resource" means—

**839a(19)(A)**. electric power, including the actual or planned electric power capability of generating facilities, or
[Northwest Power Act, §3(19)(A), 94 Stat. 2700.]

**839a(19)(B)**. actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure.
[Northwest Power Act, §3(19)(B), 94 Stat. 2700.]

**839a(20)**. "Secretary" means the Secretary of Energy.
[Northwest Power Act, §3(20), 94 Stat. 2700.]

**839b. Regional planning and participation**

**839b(a). Pacific Northwest Electric Power and Conservation Planning Council; establishment and operation as regional agency**

Establishment of Pacific Northwest Electric Power and Conservation Planning Council

**839b(a)(1)**. The purposes of this section are to provide for the prompt establishment and effective operation of the Pacific Northwest Electric Power and Conservation Planning Council, to further the purposes of this chapter by the Council promptly preparing and adopting (A) a regional conservation and electric power plan and (B) a program to protect, mitigate, and enhance fish and wildlife, and to otherwise expeditiously and effectively carry out the Council's responsibilities and functions under this chapter.
[Northwest Power Act, §4(a)(1), 94 Stat. 2700.]

**839b(a)(2)**. To achieve such purposes and facilitate cooperation among the States of Idaho, Montana, Oregon, and Washington, and with the Bonneville Power Administration, the consent of Congress is given for an agreement described in this paragraph and not in conflict with this chapter, pursuant to which—

**839b(a)(2)(A)**. there shall be established a regional agency known as the "Pacific Northwest Electric Power and Conservation Planning Council" which (i) shall have its offices in the Pacific Northwest, (ii) shall carry out its functions and responsibilities in accordance with the provisions of this chapter, (iii) shall continue in force and effect in accordance with the provisions of this chapter, and (iv) except as otherwise provided in this chapter, shall not be considered an agency or instrumentality of the United States for the purpose of any Federal law; and
[Northwest Power Act, §4(a)(2)(A), 94 Stat. 2701.]

**839b(a)(2)(B)**. two persons from each State may be appointed, subject to the applicable laws of each such State, to undertake the functions and duties of members of the Council.
[Northwest Power Act, §4(a)(2)(B), 94 Stat. 2701.]

Member appointment

**839b(a)(2)**. The State may fill any vacancy occurring prior to the expiration of the term of any member. The appointment of six initial members, subject to applicable State law, by June 30, 1981, by at least three of such States shall constitute an agreement by the States establishing the Council and such agreement is hereby consented to by the Congress. Upon request of the Governors of two of the States, the Secretary shall extend the June 30, 1981, date for six additional months to provide more time for the States to make such appointments.
[Northwest Power Act, §4(a)(2), 94 Stat. 2701.]

Term

Compensation

**839b(a)(3)**. Except as otherwise provided by State law, each member appointed to the Council shall serve for a term of three years, except that, with respect to members initially appointed, each Governor shall designate one member to serve a term of two years and one member to serve a term of three years. The members of the Council shall select from among themselves a chairman. The members and officers and employees of the Council shall not be deemed to be officers or employees of the United States for any purpose. The Council shall appoint, fix compensation, and assign and delegate duties to such executive and additional personnel as the Council deems necessary to fulfill its functions under this chapter, taking into account such information and analyses as are, or are likely to be, available from other sources pursuant to provisions of this chapter. The compensation of the members shall be fixed by State law. The compensation of the members and officers shall not exceed the rate prescribed for Federal officers and positions at step 1 of level GS-18 of the General Schedule.
[Northwest Power Act, §4(a)(3), 94 Stat. 2701.]

**839b(a)(4)**. For the purpose of providing a uniform system of laws, in addition to this chapter, applicable to the Council relating to the making of contracts, conflicts-of-interest, financial disclosure, open meetings of the Council, advisory committees, disclosure of information, judicial review of Council functions and actions under this chapter, and related matters, the Federal laws applicable to such matters in the case of the Bonneville Power Administration shall apply to the Council to the extent appropriate, except that with respect to open meetings, the Federal laws applicable to open meetings in the case of the Federal Energy Regulatory Commission shall apply to the Council to the extent appropriate. In applying the Federal laws applicable to financial disclosure under the preceding sentence, such laws shall be applied to members of the Council without regard to the duration of their service on the Council or the amount of compensation received for such service. No contract, obligation, or other action of the Council shall be construed as an obligation of the United States or an obligation secured by the full faith and credit of the United States. For the purpose of judicial review of any action of the Council or challenging any provision of this chapter relating to functions and responsibilities of the Council, notwithstanding any other provision of law, the courts of the United States shall have exclusive jurisdiction of any such review.
[Northwest Power Act, §4(a)(4), 94 Stat. 2701-2.]

**839b(b). Alternative establishment of Council as Federal agency**

**839b(b)(1)**. If the Council is not established and its members are not timely appointed in accordance with subsection (a) of this section, or if, at any time after such Council is established and its members are appointed in accordance with subsection (a)—

**839b(b)(1)(A)**. any provision of this chapter relating to the establishment of the Council or to any substantial function or responsibility of the Council (including any function or responsibility under subsection (d) or (h) of this section or under section 839d(c) of this title) is held to be unlawful by a final determination of any Federal court, or

[Northwest Power Act, §4(b)(1)(A), 94 Stat. 2702.]

**839b(b)(1)(B)**. the plan or any program adopted by such Council under this section is held by a final determination of such a court to be ineffective by reason of subsection (a)(2)(B) of this section,

[Northwest Power Act, §4(b)(1)(B), 94 Stat. 2702.]

**839b(b)(1) [cont.]**. the Secretary shall establish the Council pursuant to this subsection as a Federal agency. The Secretary shall promptly publish a notice thereof in the Federal Register and notify the Governors of each of the States referred to in subsection (a) of this section.

[Northwest Power Act, §4(b)(1), 94 Stat. 2702.]

**839b(b)(2)**. As soon as practicable, but not more than thirty days after the publication of the notice referred to in paragraph (1) of this subsection, and thereafter within forty-five days after a vacancy occurs, the Governors of the States of Washington, Oregon, Idaho, and Montana may each (under applicable State laws, if any) provide to the Secretary a list of nominations from such State for each of the State's positions to be selected for such Council. The Secretary may extend this time an additional thirty days. The list shall include at least two persons for each such position. The list shall include such information about such nominees as the Secretary may request. The Secretary shall appoint the Council members from each Governor's list of nominations for each State's positions, except that the Secretary may decline to appoint for any reason any of a Governor's nominees for a position and shall so notify the Governor. The Governor may thereafter make successive nominations within forty-five days of receipt of such notice until nominees acceptable to the Secretary are appointed for each position. In the event the Governor of any such State fails to make the required nominations for any State position on such Council within the time specified for such nominations, the Secretary shall select from such State and appoint the Council member or members for such position. The members of the Council shall select from among themselves one member of the Council as Chairman.

[Northwest Power Act, §4(b)(2), 94 Stat. 2702.]

**839b(b)(3)**. The members of the Council established by this subsection who are not employed by the United States or a State shall receive compensation

**Pacific NW Power Act (continued)**

at a rate equal to the rate prescribed for offices and positions at level GS-18 of the General Schedule for each day such members are engaged in the actual performance of duties as members of such Council, except that no such member may be paid more in any calendar year than an officer or employee at step 1 of level GS-18 is paid during such year. Members of such Council shall be considered officers or employees of the United States for purposes of title II of the Ethics in Government Act of 1978 (5 U.S.C. app.) and shall also be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in Government service are allowed expenses under section 5703 of title 5. Such Council may appoint, and assign duties to, an executive director who shall serve at the pleasure of such Council and who shall be compensated at the rate established for GS-18 of the General Schedule. The executive director shall exercise the powers and duties delegated to such director by such Council, including the power to appoint and fix compensation of additional personnel in accordance with applicable Federal law to carry out the functions and responsibilities of such Council.
[Northwest Power Act, §4(b)(3), 94 Stat. 2702-3.]

**839b(b)(4)**. When a Council is established under this subsection after a Council was established pursuant to subsection (a) of this section, the Secretary shall provide, to the greatest extent feasible, for the transfer to the Council established by this subsection of all funds, books, papers, documents, equipment, and other matters in order to facilitate the Council's capability to achieve the requirements of subsections (d) and (h) of this section. In order to carry out its functions and responsibilities under this chapter expeditiously, the Council shall take into consideration any actions of the Council under subsection (a) and may review, modify, or confirm such actions without further proceedings.
[Northwest Power Act, §4(b)(4), 94 Stat. 2703.]

**839b(b)(5)(A)**. At any time beginning one year after the plan referred to in such subsection (d) of this section and the program referred to in such subsection (h) of this section are both finally adopted in accordance with this chapter, the Council established pursuant to this subsection shall be terminated by the Secretary 90 days after the Governors of three of the States referred to in this subsection jointly provide for any reason to the Secretary a written request for such termination. Except as provided in subparagraph (B), upon such termination all functions and responsibilities of the Council under this chapter shall also terminate.
[Northwest Power Act, §4(b)(5)(A), 94 Stat. 2703.]

**839b(b)(5)(B)**. Upon such termination of the Council, the functions and responsibilities of the Council set forth in subsection (h) of this section shall be transferred to, and continue to be funded and carried out, jointly, by the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service, in the same manner and to the same extent as required by such subsection and in cooperation with the Federal and the region's State fish and wildlife agencies and Indian tribes referred

**Pacific NW Power Act (continued)**

to in subsection (h) of this section and the Secretary shall provide for the transfer to them of all records, books, documents, funds, and personnel of such Council that relate to subsection (h) matters. In order to carry out such functions and responsibilities expeditiously, the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service shall take into consideration any actions of the Council under this subsection, and may review, modify, or confirm such actions without further proceedings. In the event the Council is terminated pursuant to this paragraph, whenever any action of the Administrator requires any approval or other action by the Council, the Administrator may take such action without such approval or action, except that the Administrator may not implement any proposal to acquire a major generating resource or to grant billing credits involving a major generating resource until the expenditure of funds for that purpose is specifically authorized by Act of Congress enacted after such termination.

[Northwest Power Act, §4(b)(5)(B), 94 Stat. 2703.]

**839b(c). Organization and operation of Council**

**839b(c)(1)**. The provisions of this subsection shall, except as specifically provided in this subsection, apply to the Council established pursuant to either subsection (a) or (b) of this section.

[Northwest Power Act, §4(c)(1), 94 Stat. 2703.]

**839b(c)(2)**. A majority of the members of the Council shall constitute a quorum. Except as otherwise provided specifically in this chapter, all actions and decisions of the Council shall be by majority vote of the members present and voting. The plan or any part thereof and any amendment thereto shall not be approved unless such plan or amendment receives the votes of—

**839b(c)(2)(A)**. a majority of the members appointed to the Council, including the vote of at least one member from each State with members on the Council; or

Quorum

[Northwest Power Act, §4(c)(2)(A), 94 Stat. 2704.]

**839b(c)(2)(B)**. at least six members of the Council.

[Northwest Power Act, §4(c)(2)(B), 94 Stat. 2704.]

**839b(c)(3)**. The Council shall meet at the call of the Chairman or upon the request of any three members of the Council. If any member of the Council disagrees with respect to any matter transmitted to any Federal or State official or any other person or wishes to express additional views concerning such matter, such member may submit a statement to accompany such matter setting forth the reasons for such disagreement or views.

[Northwest Power Act, §4(c)(3), 94 Stat. 2704.]

**839b(c)(4)**. The Council shall determine its organization and prescribe its practices and procedures for carrying out its functions and responsibilities under this chapter. The Council shall make available to the public a statement of its organization, practices, and procedures, and make available to the

**Pacific NW Power Act (continued)**

public its annual work program budget at the time the President submits his annual budget to Congress.
[Northwest Power Act, §4(c)(4), 94 Stat. 2704.]

**839b(c)(5)**. Upon request of the Council established pursuant to subsection (b) of this section, the head of any Federal agency is authorized to detail or assign to the Council, on a reimbursable basis, any of the personnel of such agency to assist the Council in the performance of its functions under this chapter.
[Northwest Power Act, §4(c)(5), 94 Stat. 2704.]

**839b(c)(6)**. At the Council's request, the Administrator of the General Services Administration shall furnish the Council established pursuant to subsection (b) of this section with such offices, equipment, supplies, and services in the same manner and to the same extent as such Administrator is authorized to furnish to any other Federal agency or instrumentality such offices, supplies, equipment, and services.
[Northwest Power Act, §4(c)(6), 94 Stat. 2704.]

Report to Congress

**839b(c)(7)**. Upon the request of the Congress or any committee thereof, the Council shall promptly provide to the Congress, or to such committee, any record, report, document, material, and other information which is in the possession of the Council.
[Northwest Power Act, §4(c)(7), 94 Stat. 2704.]

**839b(c)(8)**. To obtain such information and advice as the Council determines to be necessary or appropriate to carry out its functions and responsibilities pursuant to this chapter, the Council shall, to the greatest extent practicable, solicit engineering, economic, social, environmental, and other technical studies from customers of the Administrator and from other bodies or organizations in the region with particular expertise.
[Northwest Power Act, §4(c)(8), 94 Stat. 2704.]

**839b(c)(9)**. The Administrator and other Federal agencies, to the extent authorized by other provisions of law, shall furnish the Council all information requested by the Council as necessary for performance of its functions, subject to such requirements of law concerning trade secrets and proprietary data as may be applicable.
[Northwest Power Act, §4(c)(9), 94 Stat. 2704.]

**839b(c)(10)(A)**. At the request of the Council, the Administrator shall pay from funds available to the Administrator the compensation and other expenses of the Council as are authorized by this chapter, including the reimbursement of those States with members on the Council for services and personnel to assist in preparing a plan pursuant to subsection (d) of this section and a program pursuant to subsection (h) of this section, as the Council determines are necessary or appropriate for the performance of its functions and responsibilities. Such payments shall be included by the Administrator in his annual budgets submitted to Congress pursuant to the Federal Columbia

Addendum
A-11

River Transmission System Act [16 U.S.C. 838 et seq.] and shall be subject to the requirements of that Act, including the audit requirements of section 11(d) of such Act [16 U.S.C. 838i(d)]. The records, reports, and other documents of the Council shall be available to the Comptroller General for review in connection with such audit or other review and examination by the Comptroller General pursuant to other provisions of law applicable to the Comptroller General. Funds provided by the Administrator for such payments shall not exceed annually an amount equal to 0.02 mill. multiplied by the kilowatthours of firm power forecast to be sold by the Administrator during the year to be funded. In order to assist the Council's initial organization, the Administrator after Dec. 5 1980, shall promptly prepare and propose an amended annual budget to expedite payment for Council activities.
[Northwest Power Act, §4(c)(10)(A), 94 Stat. 2704-5.]

**839b(c)(10)(B)**. Notwithstanding the limitation contained in the fourth sentence of subparagraph (A) of this paragraph, upon an annual showing by the Council that such limitation will not permit the Council to carry out its functions and responsibilities under this chapter the Administrator may raise such limit up to any amount not in excess of 0.10 mill. multiplied by the kilowatt hours of firm power forecast to be sold by the Administrator during the year to be funded.
[Northwest Power Act, §4(c)(10)(B), 94 Stat. 2705.]

**839b(c)(11)**. The Council shall establish a voluntary scientific and statistical advisory committee to assist in the development, collection, and evaluation of such statistical, biological, economic, social, environmental, and other scientific information as is relevant to the Council's development and amendment of a regional conservation and electric power plan.
[Northwest Power Act, §4(c)(11), 94 Stat. 2705.]

**839b(c)(12)**. The Council may establish such other voluntary advisory committees as it determines are necessary or appropriate to assist it in carrying out its functions and responsibilities under this chapter.
[Northwest Power Act, §4(c)(12), 94 Stat. 2705.]

**839b(c)(13)**. The Council shall ensure that the membership for any advisory committee established or formed pursuant to this section shall, to the extent feasible, include representatives of, and seek the advice of, the Federal, and the various regional, State, local, and Indian Tribal Governments, consumer groups, and customers.
[Northwest Power Act, §4(c)(13), 94 Stat. 2705.]

**839b(d). Regional conservation and electric power plan**

**839b(d)(1)**. Within two years after the Council is established and the members are appointed pursuant to subsection (a) or (b) of this section, the Council shall prepare, adopt, and promptly transmit to the Administrator a regional conservation and electric power plan. The adopted plan, or any portion thereof, may be amended from time to time, and shall be reviewed

Electric power plan to administrator

**Pacific NW Power Act (continued)**

by the Council not less frequently than once every five years. Prior to such adoption, public hearings shall be held in each Council member's State on the plan or substantial, nontechnical amendments to the plan proposed by the Council for adoption. A public hearing shall also be held in any other State of the region on the plan or amendments thereto, if the Council determines that the plan or amendments would likely have a substantial impact on that State in terms of major resources which may be developed in that State and which the Administrator may seek to acquire. Action of the Council under this subsection concerning such hearings shall be subject to section 553 of title 5, and such procedure as the Council shall adopt.
[Northwest Power Act, §4(d)(1), 94 Stat. 2705.]

**839b(d)(2)**. Following adoption of the plan and any amendment thereto, all actions of the Administrator pursuant to section 839d of this title shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter.
[Northwest Power Act, §4(d)(2), 94 Stat. 2705.]

**839b(e). Plan priorities and requisite features; studies**

Plan priority

**839b(e)(1)**. The plan shall, as provided in this paragraph, give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.
[Northwest Power Act, §4(e)(1), 94 Stat. 2705.]

Conservation measures

**839b(e)(2)**. The plan shall set forth a general scheme for implementing conservation measures and developing resources pursuant to section 839d of this title to reduce or meet the Administrator's obligations with due consideration by the Council for (A) environmental quality, (B) compatibility with the existing regional power system, (C) protection, mitigation, and enhancement of fish and wildlife and related spawning grounds and habitat, including sufficient quantities and qualities of flows for successful migration, survival, and propagation of anadromous fish, and (D) other criteria which may be set forth in the plan.
[Northwest Power Act, §4(e)(2), 94 Stat. 2706.]

**839b(e)(3)**. To accomplish the priorities established by this subsection, the plan shall include the following elements which shall be set forth in such detail as the Council determines to be appropriate:

**839b(e)(3)(A)**. an energy conservation program to be implemented under this chapter, including, but not limited to, model conservation standards;
[Northwest Power Act, §4(e)(3)(A), 94 Stat. 2706.]

**839b(e)(3)(B)**. recommendation for research and development;
[Northwest Power Act, §4(e)(3)(B), 94 Stat. 2706.]

Addendum
A-13

## Pacific NW Power Act (continued)

**839b(e)(3)(C)**. a methodology for determining quantifiable environmental costs and benefits under section 839a(4) of this title;
[Northwest Power Act, §4(e)(3)(C), 94 Stat. 2706.]

**839b(e)(3)(D)**. a demand forecast of at least twenty years (developed in consultation with the Administrator, the customers, the States, including State agencies with ratemaking authority over electric utilities, and the public, in such manner as the Council deems appropriate) and a forecast of power resources estimated by the Council to be required to meet the Administrator's obligations and the portion of such obligations the Council determines can be met by resources in each of the priority categories referred to in paragraph (1) of this subsection which forecast (i) shall include regional reliability and reserve requirements, (ii) shall take into account the effect, if any, of the requirements of subsection (h) of this section on the availability of resources to the Administrator, and (iii) shall include the approximate amounts of power the Council recommends should be acquired by the Administrator on a long-term basis and may include, to the extent practicable, an estimate of the types of resources from which such power should be acquired;
[Northwest Power Act, §4(e)(3)(D), 94 Stat. 2706.]

Twenty-year demand forecast

**839b(e)(3)(E)**. an analysis of reserve and reliability requirements and cost-effective methods of providing reserves designed to insure adequate electric power at the lowest probable cost;
[Northwest Power Act, §4(e)(3)(E), 94 Stat. 2706.]

**839b(e)(3)(F)**. the program adopted pursuant to subsection (h); of this section and
[Northwest Power Act, §4(e)(3)(F), 94 Stat. 2706.]

**839b(e)(3)(G)**. if the Council recommends surcharges pursuant to subsection (f) of this section, a methodology for calculating such surcharges.
[Northwest Power Act, §4(e)(3)(G), 94 Stat. 2706.]

**839b(e)(4)**. The Council, taking into consideration the requirement that it devote its principal efforts to carrying out its responsibilities under subsections (d) and (h) of this section, shall undertake studies of conservation measures reasonably available to direct service industrial customers and other major consumers of electric power within the region and make an analysis of the estimated reduction in energy use which would result from the implementation of such measures as rapidly as possible, consistent with sound business practices. The Council shall consult with such customers and consumers in the conduct of such studies.
[Northwest Power Act, §4(e)(4), 94 Stat. 2706.]

### 839b(f). Model conservation standards; surcharges

**839b(f)(1)**. Model conservation standards to be included in the plan shall include, but not be limited to, standards applicable to (A) new and existing structures, (B) utility, customer, and governmental conservation

Model conservation standards

Addendum
A-14

programs, and (C) other consumer actions for achieving conservation. Model conservation standards shall reflect geographic and climatic differences within the region and other appropriate considerations, and shall be designed to produce all power savings that are cost-effective for the region and economically feasible for consumers, taking into account financial assistance made available to consumers under section 839d(a) of this title. These model conservation standards shall be adopted by the Council and included in the plan after consultation, in such manner as the Council deems appropriate, with the Administrator, States, and political subdivisions, customers of the Administrator, and the public.
[Northwest Power Act, §4(f)(1), 94 Stat. 2706-7.]

**839b(f)(2)**. The Council by a majority vote of the members of the Council is authorized to recommend the Administrator a surcharge and the Administrator may thereafter impose such a surcharge, in accordance with the methodology provided in the plan, on customers for those portions of their loads within the region that are within States or political subdivisions which have not, or on the Administrator's customers which have not, implemented conservation measures that achieve energy savings which the Administrator determines are comparable to those which would be obtained under such standards. Such surcharges shall be established to recover such additional costs as the Administrator determines will be incurred because such projected energy savings attributable to such conservation measures have not been achieved, but in no case may such surcharges be less than 10 per centum or more than 50 per centum of the Administrator's applicable rates for such load or portion thereof.
[Northwest Power Act, §4(f)(2), 94 Stat. 2707.]

**839b(g). Public information; consultation; contracts and technical assistance**

**839b(g)(1)**. To insure widespread public involvement in the formulation of regional power policies, the Council and Administrator shall maintain comprehensive programs to—

**839b(g)(1)(A)**. inform the Pacific Northwest public of major regional power issues,
[Northwest Power Act, §4(g)(1)(A), 94 Stat. 2707.]

**839b(g)(1)(B)**. obtain public views concerning major regional power issues, and
[Northwest Power Act, §4(g)(1)(B), 94 Stat. 2707.]

**839b(g)(1)(C)**. secure advice and consultation from the Administrator's customers and others.
[Northwest Power Act, §4(g)(1)(C), 94 Stat. 2707.]

**839b(g)(2)**. In carrying out the provisions of this section, the Council and the Administrator shall—

**839b(g)(2)(A)**. consult with the Administrator's customers;
[Northwest Power Act, §4(g)(2)(A), 94 Stat. 2707.]

**839b(g)(2)(B)**. include the comments of such customers in the record of the Council's proceedings; and
[Northwest Power Act, §4(g)(2)(B), 94 Stat. 2707.]

**839b(g)(2)(C)**. recognize and not abridge the authorities of State and local governments, electric utility systems, and other non-Federal entities responsible to the people of the Pacific Northwest for the planning, conservation, supply, distribution, and use of electric power and the operation of electric generating facilities.
[Northwest Power Act, §4(g)(2)(C), 94 Stat. 2707.]

**839b(g)(3)**. In the preparation, adoption, and implementation of the plan, the Council and the Administrator shall encourage the cooperation, participation, and assistance of appropriate Federal agencies, State entities, State political subdivisions, and Indian tribes. The Council and the Administrator are authorized to contract, in accordance with applicable law, with such agencies, entities, tribes, and subdivisions individually, in groups, or through associations thereof to (A) investigate possible measures to be included in the plan, (B) provide public involvement and information regarding a proposed plan or amendment thereto, and (C) provide services which will assist in the implementation of the plan. In order to assist in the implementation of the plan, particularly conservation, renewable resource, and fish and wildlife activities, the Administrator, when requested and subject to available funds, may provide technical assistance in establishing conservation, renewable resource, and fish and wildlife objectives by individual States or subdivisions thereof or Indian tribes. Such objectives, if adopted by a State or subdivision thereof or Indian tribes, may be submitted to the Council and the Administrator for review, and upon approval by the Council, may be incorporated as part of the plan.
[Northwest Power Act, §4(g)(3), 94 Stat. 2707-8.]

*Plan preparation*

### 839b(h). Fish and wildlife

*Fish and wildlife program*

**839b(h)(1)(A)**. The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.
[Northwest Power Act, §4(h)(1)(A), 94 Stat. 2708.]

**839b(h)(1)(B)**. This subsection shall be applicable solely to fish and wildlife, including related spawning grounds and habitat, located on the Columbia River and its tributaries. Nothing in this subsection shall alter, modify, or

**Pacific NW Power Act (continued)**

affect in any way the laws applicable to rivers or river systems, including electric power facilities related thereto, other than the Columbia River and its tributaries, or affect the rights and obligations of any agency, entity, or person under such laws.
[Northwest Power Act, §4(h)(1)(B), 94 Stat. 2708.]

**839b(h)(2)**. The Council shall request, in writing, promptly after the Council is established under either subsection (a) or (b) of this section and prior to the development or review of the plan, or any major revision thereto, from the Federal and the region's State fish and wildlife agencies and from the region's appropriate Indian tribes, recommendations for—

**839b(h)(2)(A)**. measures which can be expected to be implemented by the Administrator, using authorities under this chapter and other laws, and other Federal agencies to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries;
[Northwest Power Act, §4(h)(2)(A), 94 Stat. 2708.]

**839b(h)(2)(B)**. establishing objectives for the development and operation of such projects on the Columbia River and its tributaries in a manner designed to protect, mitigate, and enhance fish and wildlife; and
[Northwest Power Act, §4(h)(2)(B), 94 Stat. 2708.]

**839b(h)(2)(C)**. fish and wildlife management coordination and research and development (including funding) which, among other things, will assist protection, mitigation, and enhancement of anadromous fish at, and between, the region's hydroelectric dams.
[Northwest Power Act, §4(h)(2)(C), 94 Stat. 2708.]

**839b(h)(3)**. Such agencies and tribes shall have 90 days to respond to such request, unless the Council extends the time for making such recommendations. The Federal and the region's water management agencies, and the region's electric power producing agencies, customers, and public may submit recommendations of the type referred to in paragraph (2) of this subsection. All recommendations shall be accompanied by detailed information and data in support of the recommendations.
[Northwest Power Act, §4(h)(3), 94 Stat. 2708.]

Notice
**839b(h)(4)(A)**. The Council shall give notice of all recommendations and shall make the recommendations and supporting documents available to the Administrator, to the Federal and the region's, State fish and wildlife agencies, to the appropriate Indian tribes, to Federal agencies responsible for managing, operating, or regulating hydroelectric facilities located on the Columbia River or its tributaries, and to any customer or other electric utility which owns or operates any such facility. Notice shall also be given to the public. Copies of such recommendations and supporting documents shall be

## Pacific NW Power Act (continued)

made available for review at the offices of the Council and shall be available for reproduction at reasonable cost.
[Northwest Power Act, §4(h)(4)(A), 94 Stat. 2708.]

**839b(h)(4)(B)**. The Council shall provide for public participation and comment regarding the recommendations and supporting documents, including an opportunity for written and oral comments, within such reasonable time as the Council deems appropriate.
[Northwest Power Act, §4(h)(4)(B), 94 Stat. 2709.]

Comments

**839b(h)(5)**. The Council shall develop a program on the basis of such recommendations, supporting documents, and views and information obtained through public comment and participation, and consultation with the agencies, tribes, and customers referred to in subparagraph (A) of paragraph (4). The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such facilities while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. Enhancement measures shall be included in the program to the extent such measures are designed to achieve improved protection and mitigation.
[Northwest Power Act, §4(h)(5), 94 Stat. 2709.]

Protect and enhance

**839b(h)(6)**. The Council shall include in the program measures which it determines, on the basis set forth in paragraph (5), will—

Measures

**839b(h)(6)(A)**. complement the existing and future activities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes;
[Northwest Power Act, §4(h)(6)(A), 94 Stat. 2709.]

**839b(h)(6)(B)**. be based on, and supported by, the best available scientific knowledge;
[Northwest Power Act, §4(h)(6)(B), 94 Stat. 2709.]

**839b(h)(6)(C)**. utilize, where equally effective alternative means of achieving the same sound biological objective exist, the alternative with the minimum economic cost;
[Northwest Power Act, §4(h)(6)(C), 94 Stat. 2709.]

**839b(h)(6)(D)**. be consistent with the legal rights of appropriate Indian tribes in the region; and
[Northwest Power Act, §4(h)(6)(D), 94 Stat. 2709.]

**839b(h)(6)(E)**. in the case of anadromous fish—

**839b(h)(6)(E)(i)**. provide for improved survival of such fish at hydroelectric facilities located on the Columbia River system; and
[Northwest Power Act, §4(h)(6)(E)(i), 94 Stat. 2709.]

**Pacific NW Power Act (continued)**

**839b(h)(6)(E)(ii)**. provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish as necessary to meet sound biological objectives.
[Northwest Power Act, §4(h)(6)(E)(ii), 94 Stat. 2709.]

Recommendations

**839b(h)(7)**. The Council shall determine whether each recommendation received is consistent with the purposes of this chapter. In the event such recommendations are inconsistent with each other, the Council, in consultation with appropriate entities, shall resolve such inconsistency in the program giving due weight to the recommendations, expertise, and legal rights and responsibilities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes. If the Council does not adopt any recommendation of the fish and wildlife agencies and Indian tribes as part of the program or any other recommendation, it shall explain in writing, as part of the program, the basis for its finding that the adoption of such recommendation would be—

**839b(h)(7)(A)**. inconsistent with paragraph (5) of this subsection;
[Northwest Power Act, §4(h)(7)(A), 94 Stat. 2709.]

**839b(h)(7)(B)**. inconsistent with paragraph (6) of this subsection; or
[Northwest Power Act, §4(h)(7)(B), 94 Stat. 2709.]

**839b(h)(7)(C)**. less effective than the adopted recommendations for the protection, mitigation, and enhancement of fish and wildlife.
[Northwest Power Act, §4(h)(7)(C), 94 Stat. 2709.]

Principles

**839b(h)(8)**. The Council shall consider, in developing and adopting a program pursuant to this subsection, the following principles:

**839b(h)(8)(A)**. Enhancement measures may be used, in appropriate circumstances, as a means of achieving offsite protection and mitigation with respect to compensation for losses arising from the development and operation of the hydroelectric facilities of the Columbia River and its tributaries as a system.
[Northwest Power Act, §4(h)(8)(A), 94 Stat. 2709.]

**839b(h)(8)(B)**. Consumers of electric power shall bear the cost of measures designed to deal with adverse impacts caused by the development and operation of electric power facilities and programs only.
[Northwest Power Act, §4(h)(8)(B), 94 Stat. 2710.]

**839b(h)(8)(C)**. To the extent the program provides for coordination of its measures with additional measures (including additional enhancement measures to deal with impacts caused by factors other than the development and operation of electric power facilities and programs), such additional measures are to be implemented in accordance with agreements among

the appropriate parties providing for the administration and funding of such additional measures.
[Northwest Power Act, §4(h)(8)(C), 94 Stat. 2710.]

**839b(h)(8)(D)**. Monetary costs and electric power losses resulting from the implementation of the program shall be allocated by the Administrator consistent with individual project impacts and system wide objectives of this subsection.
[Northwest Power Act, §4(h)(8)(D), 94 Stat. 2710.]

**839b(h)(9)**. The Council shall adopt such program or amendments thereto within one year after the time provided for receipt of the recommendations. Such program shall also be included in the plan adopted by the Council under subsection (d) of this section.
[Northwest Power Act, §4(h)(9), 94 Stat. 2710.]

**839b(h)(10)(A)**. The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.
[Northwest Power Act, §4(h)(10)(A), 94 Stat. 2710.]

Expenditures

**839b(h)(10)(B)**. The Administrator may make expenditures from such fund which shall be included in the annual or supplementary budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.]. Any amounts included in such budget for the construction of capital facilities with an estimated life of greater than 15 years and an estimated cost of at least $1,000,000 shall be funded in the same manner and in accordance with the same procedures as major transmission facilities under the Federal Columbia River Transmission System Act.
[Northwest Power Act, §4(h)(10)(B), 94 Stat. 2710.]

**839b(h)(10)(C)**. The amounts expended by the Administrator for each activity pursuant to this subsection shall be allocated as appropriate by the Administrator, in consultation with the Corps of Engineers and the Water and Power Resources Service, among the various hydroelectric projects of the Federal Columbia River Power System. Amounts so allocated shall be allocated to the various project purposes in accordance with existing accounting procedures for the Federal Columbia River Power System.
[Northwest Power Act, §4(h)(10)(C), 94 Stat. 2710.]

## Pacific NW Power Act (continued)

Scientific Review Panel

**839b(h)(10)(D)(i)**. The Northwest Power Planning Council (Council) shall appoint an Independent Scientific Review Panel (Panel), which shall be comprised of eleven members, to review projects proposed to be funded through that portion of Bonneville Power Administration's (BPA) annual fish and wildlife budget that implements the Council's fish and wildlife program. Members shall be appointed from a list of no fewer than 20 scientists submitted by the National Academy of Sciences (Academy), provided that Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Panel. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(i), September 30, 1996, 110 Stat. 3005.]

Peer Review Groups

**839b(h)(10)(D)(ii)**. The Council shall establish Scientific Peer Review Groups (Peer review Groups), which shall be comprised of the appropriate number of scientists, from a list submitted by the Academy to assist the Panel in making its recommendations to the Council for projects to be funded through BPA's annual fish and wildlife budget, provided that the Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Peer Review Groups. The Academy shall provide such nominations within 90 days of the date of this enactment, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(ii), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(iii)**. Panel and Peer Review Group members may be compensated and shall be considered subject to the conflict of interest standards that apply to scientists performing comparable work for the National Academy of Sciences; provided that a Panel or Peer Review Group member with a direct or indirect financial interest in a project, or projects, shall recuse himself or herself from review of, or recommendations associated with, such project or projects. All expenses of the Panel and the Peer Review Groups shall be paid by BPA as provided for under paragraph (vii). Neither the Panel nor the Peer Review Groups shall be deemed advisory committees within the meaning of the Federal Advisory Committee Act.

[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iii), September 30, 1996, 110 Stat. 3005.]

## Pacific NW Power Act (continued)

**839b(h)(10)(D)(iv)**. The Peer Review Groups, in conjunction with the Panel, shall review projects proposed to be funded through BPA's annual fish and wildlife budget and make recommendations on matters related to such projects to the Council no later than June 15 of each year. If the recommendations are not received by the Council by this date, the Council may proceed to make final recommendations on funding to BPA, relying on the best information available. The Panel and Peer Review Groups shall review a sufficient number of projects to adequately ensure that the list of prioritized projects recommended is consistent with the Council's program. Project recommendations shall be based on a determination that projects: are based on sound scientific principles; benefit fish and wildlife; and have a clearly defined objective and outcome with provisions for monitoring and evaluation of results. The Panel, with assistance from the Peer Review Groups, shall review, on an annual basis, the results of prior year expenditures based upon these criteria and submit its findings to the Council for review.
[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(iv), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(v)**. Upon completion of the review of projects to be funded through BPA's annual fish and wildlife budget, the Peer Review Groups shall submit its findings to the Panel. The Panel shall analyze the information submitted by the Peer Review Groups and submit recommendations on project priorities to the Council. The Council shall make the Panel's findings available to the public and subject to public comment.
[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, §512(4)(h)(10)(D)(v), September 30, 1996, 110 Stat. 3005.]

**839b(h)(10)(D)(vi).** The Council shall fully consider the recommendations of the Panel when making its final recommendations of projects to be funded through BPA's annual fish and wildlife budget, and if the Council does not incorporate a recommendation of the Panel, the Council shall explain in writing its reasons for not accepting Panel recommendations. In making its recommendations to BPA, the Council shall consider the impact of ocean conditions on fish and wildlife populations and shall determine whether the projects employ cost-effective measures to achieve program objectives. The Council, after consideration of the recommendations of the Panel and other appropriate entities, shall be responsible for making the final recommendations of projects to be funded through BPA's annual fish and wildlife budget.
[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vi), September 30, 1996, 110 Stat. 3005.]

*Council consideration of Panel recommendations*

**839b(h)(10)(D)(vii)**. Cost limitation. The annual cost of this provision shall not exceed $500,000 in 1997 dollars.
[Northwest Power Act, 94 Stat. 2710, as amended by Pub.L. 104-206, § 512(4)(h)(10)(D)(vii), September 30, 1996, 110 Stat. 3005; Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

**839b(h)(11)(A)**. The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall—

*Managing, operating and regulating facilities*

**Pacific NW Power Act (continued)**

**839b(h)(11)(A)(i)**. exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;

[Northwest Power Act, §4(h)(11)(A)(i), 94 Stat. 2710.]

**839b(h)(11)(A)(ii)**. exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.

[Northwest Power Act, §4(h)(11)(A)(ii), 94 Stat. 2711.]

Consultation between agencies

**839b(h)(11)(B)**. The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.

[Northwest Power Act, §4(h)(11)(A), 94 Stat. 2711.]

Report to congressional committee

**839b(h)(12)(A)**. Beginning on October 1 of the first fiscal year after all members to the Council are appointed initially, the Council shall submit annually a detailed report to the Committee on Energy and Natural Resources of the Senate and to the Committees on Energy and Commerce and on Interior and Insular Affairs of the House of Representatives. The report shall describe the actions taken and to be taken by the Council under this chapter, including this subsection, the effectiveness of the fish and wildlife program, and potential revisions or modifications to the program to be included in the plan when adopted. At least ninety days prior to its submission of such report, the Council shall make available to such fish and wildlife agencies, and tribes, the Administrator and the customers a draft of such report. The Council shall establish procedures for timely comments thereon. The Council shall include as an appendix to such report such comments or a summary thereof.

[Northwest Power Act, §4(h)(12)(A), 94 Stat. 2711, H. Res. 549, March 25, 1980.]

**839b(h)(12)(B)**. The Administrator shall keep such committees fully and currently informed of the actions taken and to be taken by the Administrator under this chapter, including this subsection.

[Northwest Power Act, §4(h)(12)(B), 94 Stat. 2711.]

## Pacific NW Power Act (continued)

**839b(i). Review**
The Council may from time to time review the actions of the Administrator pursuant to this section and section 839d of this title to determine whether such actions are consistent with the plan and programs, the extent to which the plan and programs is being implemented, and to assist the Council in preparing amendments to the plan and programs.
[Northwest Power Act, §4(i), 94 Stat. 2711.]

Council review

**839b(j). Requests by Council for action**

Council requests

**839b(j)(1)**. The Council may request the Administrator to take an action under section 839d of this title to carry out the Administrator's responsibilities under the plan.
[Northwest Power Act, §4(j)(1), 94 Stat. 2711.]

**839b(j)(2)**. To the greatest extent practicable within ninety days after the Council's request, the Administrator shall respond to the Council in writing specifying—

**839b(j)(2)(A)**. the means by which the Administrator will undertake the action or any modification thereof requested by the Council, or
[Northwest Power Act, §4(j)(2)(A), 94 Stat. 2711.]

**839b(j)(2)(B)**. the reasons why such action would not be consistent with the plan, or with the Administrator's legal obligations under this chapter, or other provisions of law, which the Administrator shall specifically identify.
[Northwest Power Act, §4(j)(2)(B), 94 Stat. 2711.]

**839b(j)(3)**. If the Administrator determines not to undertake the requested action, the Council, within sixty days after notice of the Administrator's determination, may request the Administrator to hold an informal hearing and make a final decision.
[Northwest Power Act, §4(j)(3), 94 Stat. 2711.]

**839b(k). Review and analysis of five-year period of Council activities**

**839b(k)(1)**. Not later than October 1, 1987, or six years after the Council is established under this chapter, whichever is later, the Council shall complete a thorough analysis of conservation measures and conservation resources implemented pursuant to this chapter during the five-year period beginning on the date the Council is established under this chapter to determine if such measures or resources:

**839b(k)(1)(A)**. have resulted or are likely to result in costs to consumers in the region greater than the costs of additional generating resources or additional fuel which the Council determines would be necessary in the absence of such measures or resources;
[Northwest Power Act, §4(k)(1)(A), 94 Stat. 2711-2.]

**Pacific NW Power Act (continued)**

**839b(k)(1)(B)**. have not been or are likely not to be generally equitable to all consumers in the region; or
[Northwest Power Act, §4(k)(1)(B), 94 Stat. 2712.]

**839b(k)(1)(C)**. have impaired or are likely to impair the ability of the Administrator to carry out his obligations under this chapter and other laws, consistent with sound business practices.
[Northwest Power Act, §4(k)(1)(C), 94 Stat. 2712.]

**839b(k)(2)**. The Administrator may determine that section 839a(4)(D) of this title shall not apply to any proposed conservation measure or resource if the Administrator finds after receipt of such analysis from the Council that such measure or resource would have any result or effect described in subparagraph (A), (B) or (C) of paragraph (1).
[Northwest Power Act, §4(k)(2), 94 Stat. 2712. as amended Pub.L. 106-60, § 610, Sept. 29, 1999, 113 Stat. 502.]

Sale of power

**839c. Sale of power**

Preferences and priorities

**839c(a). Preferences and priorities**
All power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. 832c and 832d]. Such sales shall be at rates established pursuant to section 839e of this title.
[Northwest Power Act, §5(a), 94 Stat. 2712.]

**839c(b). Sales to public bodies, cooperatives, and Federal agency customers**

Sales to preference customers and investor-owned utilities

**839c(b)(1)**. Whenever requested, the Administrator shall offer to sell to each requesting public body and cooperative entitled to preference and priority under the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and to each requesting investor-owned utility electric power to meet the firm power load of such public body, cooperative or investor-owned utility in the Region to the extent that such firm power load exceeds—

**839c(b)(1)(A)**. the capability of such entity's firm peaking and energy resources used in the year prior to December 5, 1980, to serve its firm load in the region, and
[Northwest Power Act, §5(b)(1)(A), 94 Stat. 2712.]

**839c(b)(1)(B)**. such other resources as such entity determines, pursuant to contracts under this chapter, will be used to serve its firm load in the region.
[Northwest Power Act, §5(b)(1)(B), 94 Stat. 2712.]

User of firm load resources

**839c(b)(1)[cont.]**. In determining the resources which are used to serve a firm load, for purposes of subparagraphs (A) and (B), any resources used to serve a firm load under such subparagraphs shall be treated as continuing

to be so used, unless such use is discontinued with the consent of the Administrator, or unless such use is discontinued because of obsolescence, retirement, loss of resource, or loss of contract rights.
[Northwest Power Act, §5(b)(1), 94 Stat. 2712.]

**839c(b)(2)**. Contracts with investor-owned utilities shall provide that the Administrator may reduce his obligations under such contracts in accordance with section 5(a) of the Bonneville Project Act of 1937 [16 U.S.C. 832d(a)].
[Northwest Power Act, §5(b)(2), 94 Stat. 2712.]

**839c(b)(3)**. In addition to his authorities to sell electric power under paragraph (1), the Administrator is also authorized to sell electric power to Federal agencies in the region.
[Northwest Power Act, §5(b)(3), 94 Stat. 2712.]

Sales to federal agencies

**839c(b)(4)**. Sales under this subsection shall be made only if the public body, cooperative, Federal agency or investor-owned utility complies with the Administrator's standards for service in effect on December 5, 1980, or as subsequently revised.
[Northwest Power Act, §5(b)(4), 94 Stat. 2712.]

**839c(b)(5)**. The Administrator shall include in contracts executed in accordance with this subsection provisions that enable the Administrator to restrict his contractual obligations to meet the loads referred to in this subsection in the future if the Administrator determines, after a reasonable period of experience under this chapter, that the Administrator cannot be assured on a planning basis of acquiring sufficient resources to meet such loads during a specified period of insufficiency. Any such contract with a public body, cooperative, or Federal agency shall specify a reasonable minimum period between a notice of restriction and the earliest date such restriction may be imposed.
[Northwest Power Act, §5(b)(5), 94 Stat. 2712-3.]

Restrictions

**839c(b)(6)**. Contracts executed in accordance with this subsection with public body, cooperative, and Federal agency customers shall—

Contract requirements

**839c(b)(6)(A)**. provide that the restriction referred to in paragraph (5) shall not be applicable to any such customers until the operating year in which the total of such customers' firm loads to be served by the Administrator equals or exceeds the firm capability of the Federal base system resources;
[Northwest Power Act, §5(b)(6)(A), 94 Stat. 2713.]

**839c(b)(6)(B)**. not permit restrictions which would reduce the total contractual entitlement of such customers to an amount less than the firm capability of the Federal base system resources; and
[Northwest Power Act, §5(b)(6)(B), 94 Stat. 2713.]

**839c(b)(6)(C)**. contain a formula for determining annually, on a uniform basis, each such customer's contractual entitlement to firm power during such

## Pacific NW Power Act (continued)

a period of restriction, which formula shall not consider customer resources other than those the customer has determined, as of December 5, 1980, to be used to serve its own firm loads.
[Northwest Power Act, §5(b)(6)(C), 94 Stat. 2713.]

**839c(b)(6)[cont.]**. The formula referred to in subparagraph (C) shall obligate the Administrator to provide on an annual basis only firm power needed to serve the portion of such customer's firm load in excess of the capability of such customer's own firm resources determined by such customer under paragraph (1) of this subsection to be used to serve its firm load.
[Northwest Power Act, §5(b)(6), 94 Stat. 2713.]

**839c(b)(7)**. Required sale—

**839c(b)(7) (A)**. Definition of a Joint Operating Entity—In this section, the term 'joint operating entity' means an entity that is lawfully organized under State law as a public body or cooperative prior to the date of enactment of this paragraph, and is formed by and whose members or participants are two or more public bodies or cooperatives, each of which was a customer of the Bonneville Power Administration on or before January 1, 1999.

**839c(b)(7) (B)**. Sale—Pursuant to paragraph (1), the Administrator shall sell, at wholesale to a joint operating entity, electric power solely for the purpose of meeting the regional firm power consumer loads of regional public bodies and cooperatives that are members of or participants in the joint operating entity.

**839c(b)(7) (C)**. No Resale—A public body or cooperative to which a joint operating entity sells electric power under subparagraph (B) shall not resell that power except to retail customers of the public body or cooperative or to another regional member or participant of the same joint operating entity, or except as otherwise permitted by law.
[As amended Pub. L. 106-273 (2000), § 1, Sept. 22, 2000, 114 Stat. 802.]

Purchase and exchange sales

**839c(c). Purchase and exchange sales**

**839c(c)(1)**. Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.
[Northwest Power Act, §5(c)(1), 94 Stat. 2713.]

**839c(c)(2)**. The purchase and exchange sale referred to in paragraph (1) of this subsection with any electric utility shall be limited to an amount not in excess of 50 per centum of such utility's Regional residential load in the year beginning July 1, 1980, such 50 per centum limit increasing in equal

**Pacific NW Power Act (continued)**

annual increments to 100 per centum of such load in the year beginning July 1, 1985, and each year thereafter.
[Northwest Power Act, §5(c)(2), 94 Stat. 2713.]

**839c(c)(3)**. The cost benefits, as specified in contracts with the Administrator, of any purchase and exchange sale referred to in paragraph (1) of this subsection which are attributable to any electric utility's residential load within a State shall be passed through directly to such utility's residential loads within such State, except that a State which lies partially within and partially without the region may require that such cost benefits be distributed among all of the utility's residential loads in that State.
[Northwest Power Act, §5(c)(3), 94 Stat. 2713.]

**839c(c)(4)**. An electric utility may terminate, upon reasonable terms and conditions agreed to by the Administrator and such utility prior to such termination, its purchase and sale under this subsection if the supplemental rate charge provided for in section 839e(b)(3) of this title is applied and the cost of electric power sold to such utility under this subsection exceeds, after application of such rate charge, the average system cost of power sold by such utility to the Administrator under this subsection. | Termination
[Northwest Power Act, §5(c)(4), 94 Stat. 2713.]

**839c(c)(5)**. Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility. | In lieu acquisition
[Northwest Power Act, §5(c)(5), 94 Stat. 2714.]

**839c(c)(6)**. Exchange sales to a utility pursuant to this subsection shall not be restricted below the amounts of electric power acquired by the Administrator from, or on behalf of, such utility pursuant to this subsection.
[Northwest Power Act, §5(c)(6), 94 Stat. 2714.]

**839c(c)(7)**. The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include— | Average system cost

**839c(c)(7)(A)**. the cost of additional resources in an amount sufficient to serve any new large single load of the utility;
[Northwest Power Act, §5(c)(7)(A), 94 Stat. 2714.]

Addendum
A-28

## Pacific NW Power Act (continued)

**839c(c)(7)(B)**. the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and
[Northwest Power Act, §5(c)(7)(B), 94 Stat. 2714.]

**839c(c)(7)(C)**. any costs of any generating facility which is terminated prior to initial commercial operation.
[Northwest Power Act, §5(c)(7)(C), 94 Stat. 2714.]

**839c(d). Sales to existing direct service industrial customers**

DSIs, reserves

**839c(d)(1)(A)**. The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.
[Northwest Power Act, §5(d)(1)(A), 94 Stat. 2714.]

**839c(d)(1)(B)**. After December 5, 1980, the Administrator shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."
[Northwest Power Act, §5(d)(1)(B), 94 Stat. 2714.]

**839c(d)(2)**. The Administrator shall not sell electric power, including reserves, directly to new direct service industrial customers.
[Northwest Power Act, §5(d)(2), 94 Stat. 2714.]

**839c(d)(3)**. The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under paragraph (1) unless the Administrator determines, after a plan has been adopted pursuant to section 839b of this title, that such proposed sale is consistent with the plan and that—

**839c(d)(3)(A)**. additional power system reserves are required for the region's firm loads,
[Northwest Power Act, §5(d)(3)(A), 94 Stat. 2714.]

**839c(d)(3)(B)**. the proposed sale would provide a cost-effective method of supplying such reserves,
[Northwest Power Act, §5(d)(3)(B), 94 Stat. 2714.]

**839c(d)(3)(C)**. such loads or loads of similar character cannot provide equivalent operating or planning benefits to the region if served by an electric utility under contractual arrangements providing reserves, and
[Northwest Power Act, §5(d)(3)(C), 94 Stat. 2714.]

**839c(d)(3)(D)**. the Administrator has or can acquire sufficient electric power to serve such loads, and
[Northwest Power Act, §5(d)(3)(D), 94 Stat. 2714.]

**839c(d)(3) [cont.]**. unless the Council has determined such sale is consistent with the plan. After such determination by the Administrator and by the Council, the Administrator is authorized to offer to existing direct service industrial customers power in such amounts in excess of the amount permitted under paragraph (1) of this subsection as the Administrator determines to be necessary to provide additional power system reserves to meet the region's firm loads.
[Northwest Power Act, §5(d)(3), 94 Stat. 2714-5.]

**839c(d)(4)(A)**. As used in this section, the term "existing direct service industrial customer" means any direct service industrial customer of the Administrator which has a contract for the purchase of electric power from the Administrator on December 5, 1980.
[Northwest Power Act, §5(d)(4)(A), 94 Stat. 2715.]

**839c(d)(4)(B)**. The term "new direct service industrial customer" means any industrial entity other than an existing direct service industrial customer.
[Northwest Power Act, §5(d)(4)(B), 94 Stat. 2715.]

**839c(d)(4)(C)(i)**. Where a new contract is offered in accordance with subsection (g) of this section to any existing direct service industrial customer which has not received electric power prior to December 5, 1980, from the Administrator pursuant to a contract with the Administrator existing on December 5, 1980, electric power delivered under such new contract shall be conditioned on the Administrator reasonably acquiring, in accordance with this chapter and within such estimated period of time (as specified in the contract) as he deems reasonable, sufficient resources to meet, on a planning basis, the load requirement of such customer. Such contract shall also provide that the obligation of the Administrator to acquire such resources to meet such load requirement shall, except as provided in clause (ii) of this subparagraph, apply only to such customer and shall not be sold or exchanged by such customer to any other person.
[Northwest Power Act, §5(d)(4)(C)(i), 94 Stat. 2715.]

*New contracts*

**839c(d)(4)(C)(ii)**. Rights under a contract described in clause (i) of this subparagraph may be transferred by an existing direct service industrial customer referred to in clause (i) to a successor in interest in connection with a reorganization or other transfer of all major assets of such customer. Following such a transfer, such successor in interest (or any other subsequent successor in interest) may also transfer rights under such a contract only in connection with a reorganization or other transfer of all assets of such successor in interest.
[Northwest Power Act, §5(d)(4)(C)(ii), 94 Stat. 2715.]

*Contract rights*

Addendum
A-30

## Pacific NW Power Act (continued)

**839c(d)(4)(C)(iii)**. The limitations of clause (i) of this subparagraph shall not apply to any customer referred to in clause (i) whenever the Administrator determines that such customer is receiving electric power pursuant to a contract referred to in such clause (ii).
[Northwest Power Act, §5(d)(4)(C)(iii), 94 Stat. 2715.]

**839c(e). Contractual entitlements to firm power**

Firm power entitlement

**839c(e)(1)**. The contractual entitlement to firm power of any customer from whom, or on whose behalf, the Administrator has acquired electric power pursuant to section 839d of this title may not be restricted below the amount of electric power so acquired from, or on behalf of, such customer. If in any year such customer's requirements are less than such entitlement, any excess of such entitlement shall be first made available to increase the entitlement of other customers of the same class before being available for the entitlement of other customers. For purposes of this paragraph, the following entities shall each constitute a class:

**839c(e)(1)(A)**. public bodies and cooperatives;
[Northwest Power Act, §5(e)(1)(A), 94 Stat. 2715.]

**839c(e)(1)(B)**. Federal agencies;
[Northwest Power Act, §5(e)(1)(B), 94 Stat. 2715.]

**839c(e)(1)(C)**. direct service industrial; and
[Northwest Power Act, §5(e)(1)(C), 94 Stat. 2715.]

**839c(e)(1)(D)**. investor owned utilities.
[Northwest Power Act, §5(e)(1)(D), 94 Stat. 2715.]

**839c(e)(2)**. Any contractual entitlement to firm power which is based on electric power acquired from, or on behalf of, a customer pursuant to section 839d of this title shall be in addition to any other contractual entitlement to firm power not subject to restriction that such customer may have under this section. For the purposes of this subsection, references to amounts of power acquired by the Administrator pursuant to section 839d of this title shall be deemed to mean the amounts specified in the resource acquisition contracts exclusive of any amounts recognized in such contracts as replacement for Federal base system resources.
[Northwest Power Act, §5(e)(2), 94 Stat. 2715-6.]

**839c(e)(3)**. The Administrator shall, consistent with the provisions of this chapter, insure that any restrictions upon any particular customer class made pursuant to this subsection and subsection (b) of this section are distributed equitably throughout the region.
[Northwest Power Act, §5(e)(3), 94 Stat. 2716.]

**839c(f). Surplus power** | Surplus power

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), and the Act of August 31, 1964 (16 U.S.C. 837-837h).
[Northwest Power Act, §5(f), 94 Stat. 2716.]

**839c(g). Long-term contracts**

**839c(g)(1)**. As soon as practicable within 9 months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts (within the limitations of the third sentence of section 5(a) of the Bonneville Project Act [16 U.S.C. 832(a)]) simultaneously to— | Administrator shall offer contracts

**839c(g)(1)(A)**. existing public body and cooperative customers and investor-owned utility customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(A), 94 Stat. 2716.]

**839c(g)(1)(B)**. Federal agency customers under subsection (b) of this section;
[Northwest Power Act, §5(g)(1)(B), 94 Stat. 2716.]

**839c(g)(1)(C)**. electric utility customers under subsection (c) of this section; and
[Northwest Power Act, §5(g)(1)(C), 94 Stat. 2716.]

**839c(g)(1)(D)**. direct service industrial customers under subsection (d)(1) of this section.
[Northwest Power Act, §5(g)(1)(D), 94 Stat. 2716.]

**839c(g)(2)**. Each customer offered a contract pursuant to this subsection shall have one year from the date of such offer to accept such contract. Such contract shall be effective as provided in this subsection. | One year to accept
[Northwest Power Act, §5(g)(2), 94 Stat. 2716.]

**839c(g)(3)**. An initial contract with a public body, cooperative or investor-owned electric utility customer or a Federal agency customer pursuant to subsection (b) of this section shall be effective on the date executed by such customer, unless another effective date is otherwise agreed to by the Administrator and the customer. | Effective date of contracts
[Northwest Power Act, §5(g)(3), 94 Stat. 2716.]

**839c(g)(4)**. An initial contract with an electric utility customer pursuant to subsection (c) of this section shall be effective on the date executed by

## Pacific NW Power Act (continued)

such customer, but no earlier than the first day of the tenth month after December 5, 1980.
[Northwest Power Act, §5(g)(4), 94 Stat. 2716.]

**839c(g)(5)**. An initial contract with a direct service industrial customer pursuant to subsection (d)(1) of this section, shall be effective on the date agreed upon by the Administrator and such customer, but no later than the first day of the tenth month after December 5, 1980. When such contract is executed, it may for rate purposes be given retroactive effect to such first day.
[Northwest Power Act, §5(g)(5), 94 Stat. 2716.]

Periods of insufficiency

**839c(g)(6)**. Initial contracts offered public body, cooperative and Federal agency customers in accordance with this subsection shall provide that during a period of insufficiency declared in accordance with subsection (b) of this section each customer's contractual entitlement shall, to the extent of its requirements on the Administrator, be no less than the amount of firm power received from the Administrator in the year immediately preceding the period of insufficiency.
[Northwest Power Act, §5(g)(6), 94 Stat. 2716.]

Sufficient resources

**839c(g)(7)**. The Administrator shall be deemed to have sufficient resources for the purpose of entering into the initial contracts specified in paragraph (1)(A) through (D).
[Northwest Power Act, §5(g)(7), 94 Stat. 2716.]

**839d. Conservation and resource acquisition**

**839d(a). Conservation measures; resources**

Conservation

**839d(a)(1)**. The Administrator shall acquire such resources through conservation, implement all such conservation measures, and acquire such renewable resources which are installed by a residential or small commercial consumer to reduce load, as the Administrator determines are consistent with the plan, or if no plan is in effect with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title and, in the case of major resources, in accordance with subsection (c) of this section. Such conservation measures and such resources may include, but are not limited to—

**839d(a)(1)(A)**. loans and grants to consumers for insulation or weatherization, increased system efficiency, and waste energy recovery by direct application,
[Northwest Power Act, §6(a)(1)(A), 94 Stat. 2717.]

**839d(a)(1)(B)**. technical and financial assistance to, and other cooperation with, the Administrator's customer and governmental authorities to encourage maximum cost-effective voluntary conservation and the attainment of

Addendum
A-33

any cost-effective conservation objectives adopted by individual States or subdivisions thereof,
[Northwest Power Act, §6(a)(1)(B), 94 Stat. 2717.]

**839d(a)(1)(C)**. aiding the Administrator's customers and governmental authorities in implementing model conservation standards adopted pursuant to section 839b(f) of this title, and
[Northwest Power Act, §6(a)(1)(C), 94 Stat. 2717.]

**839d(a)(1)(D)**. conducting demonstration projects to determine the cost effectiveness of conservation measures and direct application of renewable energy resources.
[Northwest Power Act, §6(a)(1)(D), 94 Stat. 2717.]

**839d(a)(2)**. In addition to acquiring electric power pursuant to section 839c(c) of this title, or on a short-term basis pursuant to section 11(b)(6)(i) of the Federal Columbia River Transmission System Act [16 U.S.C. 838i(b)(6)(i)], the Administrator shall acquire, in accordance with this section, sufficient resources—

**839d(a)(2)(A)**. to meet his contractual obligations that remain after taking into account planned savings from measures provided for in paragraph (1) of this subsection, and
[Northwest Power Act, §6(a)(2)(A), 94 Stat. 2717.]

**839d(a)(2)(B)**. to assist in meeting the requirements of section 839b(h) of this title.
[Northwest Power Act, §6(a)(2)(B), 94 Stat. 2717.]

**839d(a)(2) [cont.]**. The Administrator shall acquire such resources without considering restrictions which may apply pursuant to section 839c(b) of this title.
[Northwest Power Act, §6(a)(2), 94 Stat. 2717.]

**839d(b). Acquisition of resources**

**839d(b)(1)**. Except as specifically provided in this section, acquisition of resources under this chapter shall be consistent with the plan, as determined by the Administrator.
[Northwest Power Act, §6(b)(1), 94 Stat. 2717.]

Acquisition of resources

**839d(b)(2)**. The Administrator may acquire resources (other than major resources) under this chapter which are not consistent with the plan, but which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(2), 94 Stat. 2717.]

**Pacific NW Power Act (continued)**

**839d(b)(3)**. If no plan is in effect, the Administrator may acquire resources under this chapter which are determined by the Administrator to be consistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(3), 94 Stat. 2717.]

**839d(b)(4)**. The Administrator shall acquire any non-Federal resources to replace Federal base system resources only in accordance with the provisions of this section. The Administrator shall include in the contracts for the acquisition of any such non-Federal replacement resources provisions which will enable him to ensure that such non-Federal replacement resources are developed and operated in a manner consistent with the considerations specified in section 839b(e)(2) of this title.
[Northwest Power Act, §6(b)(4), 94 Stat. 2717.]

**839d(b)(5)**. Notwithstanding any acquisition of resources pursuant to this section, the Administrator shall not reduce his efforts to achieve conservation and to acquire renewable resources installed by a residential or small commercial consumer to reduce load, pursuant to subsection (a)(1) of this section.
[Northwest Power Act, §6(b)(5), 94 Stat. 2717-8.]

*Procedure for acquiring major resources*

**839d(c). Procedure for acquiring major resources, implementing conservation measures, paying or reimbursing investigation and preconstruction expenses, or granting billing credits**

*Proposals*

**839d(c)(1)**. For each proposal under subsection (a), (b), (f), (h) or (l) of this section to acquire a major resource, to implement a conservation measure which will conserve an amount of electric power equivalent to that of a major resource, to pay or reimburse investigation and preconstruction expenses of the sponsors of a major resource, or to grant billing credits or services involving a major resource, the Administrator shall—

*Notice*

**839d(c)(1)(A)**. publish notice of the proposed action in the Federal Register and provide a copy of such notice to the Council, the Governor of each State in which facilities would be constructed or a conservation measure implemented, and the Administrator's customers;
[Northwest Power Act, §6(c)(1)(A), 94 Stat. 2718.]

*Hearing*

**839d(c)(1)(B)**. not less than sixty days following publication of such notice, conduct one or more public hearings, presided over by a hearing officer, at which testimony and evidence shall be received, with opportunity for such rebuttal and cross-examination as the hearing officer deems appropriate in the development of an adequate hearing record;
[Northwest Power Act, §6(c)(1)(B), 94 Stat. 2718.]

*Record*

**839d(c)(1)(C)**. develop a record to assist in evaluating the proposal which shall include the transcript of the public hearings, together with exhibits, and

Addendum
A-35

such other materials and information as may have been submitted to, or developed by, the Administrator; and
[Northwest Power Act, §6(c)(1)(C), 94 Stat. 2718.]

**839d(c)(1)(D)**. following completion of such hearings, promptly provide to the Council and make public a written decision that includes, in addition to a determination respecting the requirements of subsection (a), (b), (f), (h), (l), or (m) of this section, as appropriate—

Written decision

**839d(c)(1)(D)(i)**. if a plan is in effect, a finding that the proposal is either consistent or inconsistent with the plan or, notwithstanding its inconsistency with the plan, a finding that it is needed to meet the Administrator's obligations under this chapter, or
[Northwest Power Act, §6(c)(1)(D)(i), 94 Stat. 2718.]

**839d(c)(1)(D)(ii)**. if no plan is in effect, a finding that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or notwithstanding its inconsistency, a finding that it is needed to meet the Administrator's obligations under this chapter.
[Northwest Power Act, §6(c)(1)(D)(ii), 94 Stat. 2718.]

**839d(c)(1)(D)[cont.]**. In the case of subsection (f) of this section, such decision shall be treated as satisfying the applicable requirements of this subsection and of subsection (f) of this section, if it includes a finding of probable consistency, based upon the Administrator's evaluation of information available at the time of completion of the hearing under this paragraph. Such decision shall include the reasons for such finding.
[Northwest Power Act, §6(c)(1)(D), 94 Stat. 2718.]

**839d(c)(2)**. Within sixty days of the receipt of the Administrator's decision pursuant to paragraph (1)(D) of this subsection, the Council may determine by a majority vote of all members of the Council, and notify the Administrator—

**839d(c)(2)(A)**. that the proposal is either consistent or inconsistent with the plan, or
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(2)(B)**. if no plan is in effect, that the proposal is either consistent or inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(c)(2)(B), 94 Stat. 2718.]

**839d(c)(3)**. The Administrator may not implement any proposal referred to in paragraph (1) that is determined pursuant to paragraph (1) or (2) by either the Administrator or the Council to be inconsistent with the plan or, if no plan is in effect, with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title—

## Pacific NW Power Act (continued)

**839d(c)(3)(A)**. unless the Administrator finds that, notwithstanding such inconsistency, such resource is needed to meet the Administrator's obligations under this chapter, and
[Northwest Power Act, §6(c)(3)(A), 94 Stat. 2718-9.]

**839d(c)(3)(B)**. until the expenditure of funds for that purpose has been specifically authorized by Act of Congress enacted after December 5, 1980,
[Northwest Power Act, §6(c)(3)(B), 94 Stat. 2719.]

Implementation of proposals

**839d(c)(4)**. Before the Administrator implements any proposal referred to in paragraph (1) of this subsection, the Administrator shall—

**839d(c)(4)(A)**. submit to the appropriate committees of the Congress the administrative record of the decision (including any determination by the Council under paragraph (2)) and a statement of the procedures followed or to be followed for compliance with the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.],
[Northwest Power Act, §6(c)(4)(A), 94 Stat. 2719.]

**839d(c)(4)(B)**. publish notice of the decision in the Federal Register, and
[Northwest Power Act, §6(c)(4)(B), 94 Stat. 2719.]

**839d(c)(4)(C)**. note the proposal in the Administrator's annual or supplementary budget submittal made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following).
[Northwest Power Act, §6(c)(4)(C), 94 Stat. 2719.]

**839d(c)(4) [cont.]**. The Administrator may not implement any such proposal until ninety days after the date on which such proposal has been noted in such budget or after the date on which such decision has been published in the Federal Register, whichever is later.
[Northwest Power Act, §6(c)(4), 94 Stat. 2719.]

**839d(c)(5)**. The authority of the Council to make a determination under paragraph (2)(B) if no plan is in effect shall expire on the date two years after the establishment of the Council.
[Northwest Power Act, §6(c)(5), 94 Stat. 2719.]

Acquisition of other than major resources

**839d(d). Acquisition of resources other than major resources**
The Administrator is authorized to acquire a resource, other than a major resource, whether or not such resource meets the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title but which he determines is an experimental, developmental, demonstration, or pilot project of a type with a potential for providing cost-effective service to the region. The Administrator shall make no obligation for the acquisition of such resource until it is included in the annual budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.].

Addendum
A-37

Pacific NW Power Act (continued)

[Northwest Power Act, §6(d), 94 Stat. 2719.]

**839d(e). Effectuation of priorities; use of customers and local entities**

**839d(e)(1)**. In order to effectuate the priority given to conservation measures and renewable resources under this chapter, the Administrator shall, to the maximum extent practicable, make use of his authorities under this chapter to acquire conservation measures and renewable resources, to implement conservation measures, and to provide credits and technical and financial assistance for the development and implementation of such resources and measures (including the funding of, and the securing of debt for, expenses incurred during the investigation and preconstruction of resources, as authorized in subsection (f) of this section).
[Northwest Power Act, §6(e)(1), 94 Stat. 2719.]

**839d(e)(2)**. To the extent conservation measures or acquisition of resources require direct arrangements with consumers, the Administrator shall make maximum practicable use of customers and local entities capable of administering and carrying out such arrangements.
[Northwest Power Act, §6(e)(2), 94 Stat. 2719.]

**839d(f). Agreements; investigation and initial development of renewable resources other than major resources; reimbursement of investigation and preconstruction expenses**

Acquisition agreements

**839d(f)(1)**. For resources which the Administrator determines may be eligible for acquisition under this section and satisfy the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or, if a plan is in effect, to be consistent with the plan, the Administrator is authorized to enter into agreements with sponsors of—

**839d(f)(1)(A)**. a renewable resource, other than a major resource, to fund or secure debt incurred in the investigation and initial development of such resource, or
[Northwest Power Act, §6(f)(1)(A), 94 Stat. 2719.]

Renewable resources

**839d(f)(1)(B)**. any other resource to provide for the reimbursement of the sponsor's investigation and preconstruction expenses concerning such resource (which expenses shall not include procurement of capital equipment or construction material for such resource).
[Northwest Power Act, §6(f)(1)(B), 94 Stat. 2720.]

**839d(f)(1) [cont.]**. In the case of any resource referred to in subparagraph (B) of this paragraph, such reimbursement is authorized only if—

Reimbursement of expenses

**839d(f)(1)(B)(i)**. such resource is subsequently denied State citing approval or other necessary Federal or State permits, or approvals,
[Northwest Power Act, §6(f)(1)(B)(i), 94 Stat. 2720.]

**839d(f)(1)(B)(ii)**. such investigation subsequently demonstrates, as

Addendum
A-38

## Pacific NW Power Act (continued)

determined by the Administrator, that such resource does not meet the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title or is not acceptable because of environmental impacts, or

[Northwest Power Act, §6(f)(1)(B)(ii), 94 Stat. 2720.]

**839d(f)(1)(B)(iii)**. after such investigation the Administrator determines not to acquire the resource and the sponsor determines not to construct the resource.

[Northwest Power Act, §6(f)(1)(B)(iii), 94 Stat. 2720.]

**839d(f)(2)**. The Administrator may exercise the authority of this subsection only after he determines that the failure to do so would result in inequitable hardship to the consumers of such sponsors. The Administrator may provide reimbursement under this subsection only for expenses incurred after December 5, 1980.

[Northwest Power Act, §6(f)(2), 94 Stat. 2720.]

**839d(f)(3)**. Any agreement under paragraph (1) of this subsection shall provide the Administrator an option to acquire any such resource, including a renewable resource, and shall include such other provisions, as the Administrator deems appropriate, for the Administrator's recovery from such sponsors or any assignee of the sponsors, if such sponsor or assignee continues development of the resource, of any advances made by the Administrator pursuant to such agreement.

[Northwest Power Act, §6(f)(3), 94 Stat. 2720.]

**839d(f)(4)**. The Administrator shall not reimburse any expense incurred by the sponsors (except necessary expenses involved in the liquidation of the resource) after the date of a final denial of application for State citing approval or after the date the Administrator determines that the resource to be inconsistent with the plan or the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.

[Northwest Power Act, §6(f)(4), 94 Stat. 2720.]

**839d(g). Environmental impact statements**
At the request of the appropriate State, any environmental impact statement which may be required with respect to a resource, to the extent determined possible by the Administrator in accordance with applicable law and regulations, may be prepared jointly and in coordination with any required environmental impact statement of the State or any other statement which serves the purpose of an environmental impact statement which is required by State law.

[Northwest Power Act, §6(g), 94 Stat. 2720.]

Billing credits

**839d(h). Billing credits**

**839d(h)(1)**. If a customer so requests, the Administrator shall grant billing credits to such customer, and provide services to such customer at rates established for such services, for—

**839d(h)(1)(A)**. conservation activities independently undertaken or continued after December 5, 1980, by such customer or political subdivision served by such customer which reduce the obligation of the Administrator that would otherwise have existed to acquire other resources under this chapter, or
[Northwest Power Act, §6(h)(1)(A), 94 Stat. 2720.]

**839d(h)(1)(B)**. resources constructed, completed, or acquired after December 5, 1980, by a customer, an entity acting on behalf of such customer, or political subdivision served by the customer which reduce the obligation of the Administrator to acquire resources under this chapter. Such resources shall be renewable resources or multipurpose projects or other resources which are not inconsistent with the plan or, in the absence of a plan, not inconsistent with the criteria of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title.
[Northwest Power Act, §6(h)(1)(B), 94 Stat. 2720-1.]

**839d(h)(2)**. The energy and capacity on which a credit under this subsection to a customer is based shall be the amount by which a conservation activity or resource actually changes the customer's net requirement for supply of electric power or reserves from the Administrator.
[Northwest Power Act, §6(h)(2), 94 Stat. 2721.]

**839d(h)(3)**. The amount of credits for conservation under this subsection shall be set to credit the customer implementing or continuing the conservation activity for which the credit is granted for the savings resulting from such activity. The rate impact on the Administrator's other customers of granting the credit shall be equal to the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually saved by the activity for which the credit is granted.
[Northwest Power Act, §6(h)(3), 94 Stat. 2721.]

**839d(h)(4)**. For resources other than conservation, the customer shall be credited for net costs actually incurred by such customer, an entity acting on behalf of such customer, or political subdivision served by such customer, in acquiring, constructing, or operating the resource for which the credit is granted. The rate impact to the Administrator's other customers of granting the credit shall be no greater than the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually produced by the resource for which the credit is granted.
[Northwest Power Act, §6(h)(4), 94 Stat. 2721.]

## Pacific NW Power Act (continued)

**839d(h)(5)**. Retail rate structures which are voluntarily implemented by the Administrator's customers and which induce conservation or installation of consumer-owned renewable resources shall be considered, for purposes of this subsection, to be (A) conservation activities independently undertaken or carried on by such customers, or (B) customer-owned renewable resources, and shall qualify for billing credits upon the same showing as that required for other conservation or renewable resource activities.
[Northwest Power Act, §6(h)(5), 94 Stat. 2721.]

**839d(h)(6)**. Prior to granting any credit or providing services pursuant to this subsection, the Administrator shall—

**839d(h)(6)(A)**. comply with the notice provisions of subsection (c) of this section, and include in such notice the methodology the Administrator proposes to use in determining the amount of any such credit;
[Northwest Power Act, §6(h)(6)(A), 94 Stat. 2721.]

**839d(h)(6)(B)**. include the cost of such credit in the Administrator's annual or amended budget submittal to the Congress made pursuant to the Federal Columbia River Transmission System Act (16 U.S.C. 838(j))[16 U.S.C. 838 et seq.];
[Northwest Power Act, §6(h)(6)(B), 94 Stat. 2721.]

Excess resources

**839d(h)(6)(C)**. require that resources in excess of customer's reasonable load growth shall have been offered to others for ownership participation or other sponsorship pursuant to subsection (m) of this section, except in the case of conservation, multi-purpose projects uniquely suitable for development by the customer, or renewable resources; and
[Northwest Power Act, §6(h)(6)(C), 94 Stat. 2721.]

**839d(h)(6)(D)**. require that the operators of any generating resource for which a billing credit is to be granted agree to operate such resource in a manner compatible with the planning and operation of the region's power system.
[Northwest Power Act, §6(h)(6)(D), 94 Stat. 2721.]

Contracts

**839d(i). Contracts**
Contracts for the acquisition of resources and for billing credits for major resources, including conservation activities, entered into pursuant to this section shall contain such terms and conditions, applicable after the contract is entered into, as will—

**839d(i)(1)**. insure timely construction, scheduling, completion, and operation of resources.
[Northwest Power Act, §6(i)(1), 94 Stat. 2721.]

**839d(i)(2)**. insure that the costs of any acquisition are as low as reasonably possible, consistent (A) with sound engineering, operating, and safety practices, and (B) the protection, mitigation, and enhancement of fish and

## Pacific NW Power Act (continued)

wildlife, including related spawning grounds and habitat affected by the development of such resources, and
[Northwest Power Act, §6(i)(2), 94 Stat. 2722.]

**839d(i)(3)**. insure that the Administrator exercises effective oversight, inspection, audit, and review of all aspects of such construction and operation.
[Northwest Power Act, §6(i)(3), 94 Stat. 2722.]

**839d(i) [cont.]**. Such contracts shall contain provisions assuring that the Administrator has the authority to approve all costs of, and proposals for, major modifications in construction, scheduling or operations and to assure that the Administrator is provided with such current information as he deems necessary to evaluate such construction and operation.
[Northwest Power Act, §6(i), 94 Stat. 2722.]

**839d(j). Obligations not to be considered general obligations of United States or secured by full faith and credit of United States**

**839d(j)(1)**. All contractual and other obligations required to be carried out by the Administrator pursuant to this chapter and shall be secured solely by the Administrator's revenues received from the sale of electric power and other services. Such obligations are not, nor shall they be construed to be, general obligations of the United States, nor are such obligations intended to be or are they secured by the full faith and credit of the United States.
[Northwest Power Act, §6(j)(1), 94 Stat. 2722.]

Obligations secured by revenues

**839d(j)(2)**. All contracts entered into by the Administrator for the acquisition of resources pursuant to this chapter shall require that, in the sale of any obligations, all offerings and promotional material for the sale of such obligations shall include the language contained in the second sentence of paragraph (1) of this subsection. The Administrator shall monitor and enforce such requirement.
[Northwest Power Act, §6(j)(2), 94 Stat. 2722.]

**839d(k). Equitable distribution of benefits**
In the exercise of his authorities pursuant to this section, the Administrator shall, consistent with the provisions of this chapter and the Administrator's obligations to particular customer classes, insure that benefits under this section, including financial and technical assistance, conduct of conservation demonstrations, and experimental projects, services, and billing credits, are distributed equitably throughout the region.
[Northwest Power Act, §6(k), 94 Stat. 2722.]

Equitable distribution of benefits

**839d(l). Investigations**

**839d(l)(1)**. The Administrator is authorized and directed to investigate opportunities for adding to the region's resources or reducing the region's power costs through the accelerated or cooperative development of resources

Addendum
A-42

**Pacific NW Power Act (continued)**

located outside the States of Idaho, Montana, Oregon, and Washington if such resources are renewable resources, and are now or in the future planned or considered for eventual development by nonregional agencies or authorities that will or would own, sponsor, or otherwise develop them. The Administrator shall keep the Council fully and currently informed of such investigations, and seek the Council's advice as to the desirability of pursuing such investigations.

[Northwest Power Act, §6(l)(1), 94 Stat. 2722.]

Interregional exchanges

**839d(l)(2)**. The Administrator is authorized and directed to investigate periodically opportunities for mutually beneficial interregional exchanges of electric power that reduce the need for additional generation or generating capacity in the Pacific Northwest and the regions with which such exchanges may occur. The Council shall take into consideration in formulating a plan such investigations.

[Northwest Power Act, §6(l)(2), 94 Stat. 2722.]

**839d(l)(3)**. After the Administrator submits a report to Congress pursuant to paragraph (5) of this subsection, the Administrator is authorized to acquire resources consistent with such investigations and consistent with the plan or, if no plan is in effect, with the priorities of section 839b(e)(1) of this title and the considerations of section 839b(e)(2) of this title. Such acquisitions shall be in accordance with the provisions of this subsection.

[Northwest Power Act, §6(l)(3), 94 Stat. 2722.]

**839d(1)(4)**. The Administrator shall conduct the investigations and the acquisitions, if any, authorized under this subsection with the assistance of other Federal agencies as may be appropriate.

[Northwest Power Act, §6(l)(4), 94 Stat. 2723.]

**839d(1)(5)**. No later than July 1, 1981, the Administrator shall submit to the Congress a report of the results of the investigation undertaken pursuant to this subsection, together with the prospects for obtaining additional resources under the authority granted by this subsection and for reductions in generation or generating capacity through exchanges.

[Northwest Power Act, §6(l)(5), 94 Stat. 2723.]

**839d(m). Offering of reasonable shares to each Pacific Northwest electric utility**

Shares offer to utilities

Except as to resources under construction on December 5, 1980, the Administrator shall determine in each case of a major resource acquisition that a reasonable share of the particular resource, or a reasonable equivalent, has been offered to each Pacific Northwest electric utility for ownership, participation, or other sponsorship, but not in excess of the amounts needed to meet such utility's Regional load.

[Northwest Power Act, §6(m), 94 Stat. 2723.]

Improvements funded by Administrator

**839d-1**. Without further appropriation and without fiscal year limitation, the Secretaries of the Interior and Army are authorized to plan, design, construct,

operate and maintain generation additions, improvements and replacements, at their respective Federal projects in the Pacific Northwest Region, and to operate and maintain the respective Secretary's power facilities in the Region, that the respective Secretary determines necessary or appropriate and that the Administrator subsequently determines necessary or appropriate, with any funds that the Administrator determines to make available to the respective Secretary for such purposes. Each Secretary is authorized, without further appropriation, to accept and use such funds for such purposes: **Provided,** That such funds shall continue to be exempt from sequestration pursuant to section 255(g)(1) of the Balanced Budget and Emergency Deficit Control Act of 1985 [2 U.S.C. 901-922]: **Provided further,** That this section not modify or affect the applicability of any provision of this chapter. This provision shall be effective on October 1, 1993.

[Energy Policy Act of 1992, P. L. No. 102-486, Title XXIV, §2406, Oct. 24, 1992, 106 Stat. 3099.]

**839e. Rates**

Rates for sale and distribution of power

**839e(a). Establishment; periodic review and revision; confirmation and approval by Federal Energy Regulatory Commission**

**839e(a)(1)**. The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the cost associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law. Such rates shall be established in accordance with sections 9 and 10 of the Federal Columbia River Transmission System Act (16 U.S.C. 838) [16 U.S.C. 838g and 838h], section 5 of the Flood Control Act of 1944 [16 U.S.C. 825s], and the provisions of this chapter.

[Northwest Power Act, §7(a)(1), 94 Stat. 2723.]

**839e(a)(2)**. Rates established under this section shall become effective only, except in the case of interim rules as provided in subsection (i)(6) of this section, upon confirmation and approval by the Federal Energy Regulatory Commission upon a finding by the Commission, that such rates—

Approval by FERC

**839e(a)(2)(A)**. are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

[Northwest Power Act, §7(a)(2)(A), 94 Stat. 2723.]

**839e(a)(2)(B)**. are based upon the Administrator's total system costs, and

[Northwest Power Act, §7(a)(2)(B), 94 Stat. 2723.]

**Pacific NW Power Act (continued)**

**839e(a)(2)(C)**. insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.
[Northwest Power Act, §7(a)(2)(C), 94 Stat. 2723.]

Application of rates

**839e(b). General application of rates to meet general requirements**

**839e(b)(1)**. The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric utilities under section 839c(c) of this title. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads, first from the electric power acquired by the Administrator under section 839c(c) of this title and then from other resources.
[Northwest Power Act, §7(b)(1), 94 Stat. 2723.]

**839e(b)(2)**. After July 1, 1985, the projected amounts to be charged for firm power for the combined general requirements of public body, cooperative and Federal agency customers, exclusive of amounts charged such customers under subsection (g) of this section for the costs of conservation, resource and conservation credits, experimental resources and uncontrollable events, may not exceed in total, as determined by the Administrator, during any year after July 1, 1985, plus the ensuing four years, an amount equal to the power costs for general requirements of such customers if, the Administrator assumes that—

**839e(b)(2)(A)**. the public body and cooperative customers' general requirements had included during such five-year period the direct service industrial customer loads which are—

**839e(b)(2)(A)(i)**. served by the Administrator, and
[Northwest Power Act, §7(b)(2)(A)(i), 94 Stat. 2724.]

**839e(b)(2)(A)(ii)**. located within or adjacent to the geographic service boundaries of such public bodies and cooperatives;
[Northwest Power Act, §7(b)(1)(A)(ii), 94 Stat. 2724.]

Section 7(b)(2) analysis

**839e(b)(2)(B)**. public body, cooperative, and Federal agency customers were served, during such five-year period, with Federal base system resources not obligated to other entities under contracts existing as of December 5, 1980, (during the remaining term of such contracts) excluding obligations to direct service industrial customer loads included in subparagraph (A) of this paragraph;
[Northwest Power Act, §7(b)(2)(B), 94 Stat. 2724.]

Addendum
A-45

**839e(b)(2)(C)**. no purchases or sales by the Administrator as provided in section 839c(c) of this section were made during such five-year period;
[Northwest Power Act, §7(b)(2)(C), 94 Stat. 2724.]

**839e(b)(2)(D)**. all resources that would have been required, during such five-year period, to meet remaining general requirements of the public body, cooperative and Federal agency customers (other than requirements met by the available Federal base system resources determined under subparagraph (B) of this paragraph) were—

**839e(b)(2)(D)(i)**. purchased from such customers by the Administrator pursuant to section 839d of this title, or
[Northwest Power Act, §7(b)(2)(D)(i), 94 Stat. 2724.]

**839e(b)(2)(D)(ii)**. not committed to load pursuant to section 839c(b), of this section
[Northwest Power Act, §7(b)(2)(D)(ii), 94 Stat. 2724.]

**839e(b)(2)(D) [cont.]**. and were the least expensive resources owned or purchased by public bodies or cooperatives; and any additional needed resources were obtained at the average cost of all other new resources acquired by the Administrator; and
[Northwest Power Act, §7(b)(2)(D), 94 Stat. 2724.]

**839e(b)(2)(E)**. the quantifiable monetary savings, during such five-year period, to public body, cooperative and Federal agency customers resulting from—

**839e(b)(2)(E)(i)**. reduced public body and cooperative financing costs as applied to the total amount of resources, other than Federal base system resources, identified under subparagraph (D) of this paragraph, and
[Northwest Power Act, §7(b)(2)(E)(i), 94 Stat. 2724.]

**839e(b)(2)(E)(ii)**. reserve benefits as a result of the Administrator's actions under this chapter
[Northwest Power Act, §7(b)(2)(E)(ii), 94 Stat. 2724.]

**839e(b)(2)(E)[cont.]**. were not achieved.
[Northwest Power Act, §7(b)(2)(E), 94 Stat. 2724.]

**839e(b)(3)**. Any amounts not charged to public body, cooperative, and Federal agency customers by reason of paragraph (2) of this subsection shall be recovered through supplemental rate charges for all other power sold by the Administrator to all customers. Rates charged public body, cooperative, or Federal agency customers pursuant to this subsection shall not include any costs or benefits of a net revenue surplus or deficiency occurring for the period ending June 30, 1985, to the extent such surplus or deficiency is caused by—

Supplemental rate charges

Addendum
A-46

**Pacific NW Power Act (continued)**

**839e(b)(3)(A)**. a difference between actual power deliveries and power deliveries projected for the purpose of establishing rates to direct service industrial customers under subsection (c)(1) of this subsection, and
[Northwest Power Act, §7(b)(3)(A), 94 Stat. 2724.]

**839e(b)(3)(B)**. an overrecovery or underrecovery of the net costs incurred by the Administrator under section 839c(c) of this title as a result of such difference.
[Northwest Power Act, §7(b)(3)(B), 94 Stat. 2724.]

**839e(b)(3) [cont.]**. Any such revenue surplus or deficiency incurred shall be recovered from, or repaid to, customer over a reasonable period of time after July 1, 1985, through a supplemental rate charge or credit applied proportionately for all other power sold by the Administrator at rates established under other subsections of this section prior to July 1, 1985.
[Northwest Power Act, §7(b)(3), 94 Stat. 2724-5.]

**839e(b)(4)**. The term "general requirements" as used in this section means the public body, cooperative or Federal agency customer's electric power purchased from the Administrator under section 839c(b) of this title, exclusive of any new large single load.
[Northwest Power Act, §7(b)(3), 94 Stat. 2725.]

**839e(c). Rates applicable to direct service industrial customers**

DSI rates

**839e(c)(1)**. The rate or rates applicable to direct service industrial customers shall be established—

**839e(c)(1)(A)**. for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Administrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and
[Northwest Power Act, §7(c)(1)(A), 94 Stat. 2725.]

**839e(c)(1)(B)**. for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.
[Northwest Power Act, §7(c)(1)(B), 94 Stat. 2725.]

**839e(c)(2)**. The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

## Pacific NW Power Act (continued)

**839e(c)(2)(A)**. the comparative size and character of the loads served,
[Northwest Power Act, §7(c)(2)(A), 94 Stat. 2725.]

**839e(c)(2)(B)**. the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and
[Northwest Power Act, §7(c)(2)(B), 94 Stat. 2725.]

**839e(c)(2)(C)**. direct and indirect overhead costs,
[Northwest Power Act, §7(c)(2)(C), 94 Stat. 2725.]

**839e(c)(2) [cont.]**. all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.
[Northwest Power Act, §7(c)(2), 94 Stat. 2725.]

**839e(c)(3)**. The Administrator shall adjust such rates to take into account the value of power system reserves made available to the Administrator through his rights to interrupt or curtail service to such direct service industrial customers.
[Northwest Power Act, §7(c)(3), 94 Stat. 2725.]

### 839e(d). Discount rates; special rates

**839e(d)(1)**. In order to avoid adverse impacts on retail rates of the Administrator's customers with low system densities, the Administrator shall, to the extent appropriate, apply discounts to the rate or rates for such customers.
[Northwest Power Act, §7(d)(1), 94 Stat. 2725.]

Low-density discounts

**839e(d)(2)**. In order to avoid adverse impacts of increased rates pursuant to this chapter on any direct service industrial customer using raw minerals indigenous to the region as its primary resource, the Administrator, upon request of such customer showing such impacts and after considering the effect of such request on his other obligations under this chapter, is authorized, if the Administrator determines that such impacts will be significant, to establish a special rate applicable to such customer if all power sold to such customer may be interrupted, curtailed, or withdrawn to meet firm loads in the region. Such rate shall be established in accordance with this section and shall include such terms and conditions as the Administrator deems appropriate.
[Northwest Power Act, §7(d)(2), 94 Stat. 2725.]

### 839e(e). Uniform rates; rates for sale of peaking capacity; time-of-day, seasonal, and other rates
Nothing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.
[Northwest Power Act, §7(e), 94 Stat. 2726.]

Rate forms

## Pacific NW Power Act (continued)

**839e(f). Basis for rates**

Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be based upon the cost of the portions of Federal base system resources, purchases of power under section 839c(c) of this title and additional resources which, in the determination of the Administrator, are applicable to such sales.

[Northwest Power Act, §7(f), 94 Stat. 2726.]

Allocation of costs

**839e(g). Allocation of costs and benefits**

Except to the extent that the allocation of costs and benefits is governed by provisions of law in effect on December 5, 1980, or by other provisions of this section, the Administrator shall equitably allocate to power rates, in accordance with generally accepted ratemaking principles and the provisions of this chapter, all costs and benefits not otherwise allocated under this section, including, but not limited to, conservation, fish and wildlife measures, uncontrollable events, reserves, the excess costs of experimental resources acquired under section 839d of this title, the cost of credits granted pursuant to section 839d of this title, operating services, and the sale of or inability to sell excess electric power.

[Northwest Power Act, §7(g), 94 Stat. 2726.]

**839e(h). Surcharges**

Notwithstanding any other provision of this section (except the provisions of subsection (a) of this section), the Administrator shall adjust power rates to include any surcharges arising under section 838b(f) of this title, and shall allocate any revenues from such charges in such manner as the Administrator determines will help achieve the purposes of section 838b(f) of this title.

[Northwest Power Act, §7(h), 94 Stat. 2726.]

Rate-making procedures

**839e(i). Procedures**

In establishing rates under this section, the Administrator shall use the following procedures:

**839e(i)(1)**. Notice of the proposed rates shall be published in the Federal Register with a statement of the justification and reasons supporting such rates. Such notice shall include a date for a hearing in accordance with paragraph (2) of this subsection.

[Northwest Power Act, §7(i)(1), 94 Stat. 2726.]

Hearings

**839e(i)(2)**. One or more hearings shall be conducted as expeditiously as practicable by a hearing officer to develop a full and complete record and to receive public comment in the form of written and oral presentation of views, data, questions, and argument related to such proposed rates. In any such hearing—

**839e(i)(2)(A)**. any person shall be provided an adequate opportunity by the hearing officer to offer refutation or rebuttal of any material submitted by any other person or the Administrator, and

[Northwest Power Act, §7(i)(2)(A), 94 Stat. 2726.]

Addendum
A-49

**839e(i)(2)(B)**. the hearing officer, in his discretion, shall allow a reasonable opportunity for cross examination, which, as determined by the hearing officer, is not dilatory, in order to develop information and material relevant to any such proposed rate.
[Northwest Power Act, §7(i)(2)(B), 94 Stat. 2726.]

**839e(i)(3)**. In addition to the opportunity to submit oral and written material at the hearings, any written views, data, questions, and arguments submitted by persons prior to, or before the close of, hearings shall be made a part of the administrative record.
[Northwest Power Act, §7(i)(3), 94 Stat. 2726.]

**839e(i)(4)**. After such a hearing, the Administrator may propose revised rates, publish such proposed rates in the Federal Register, and conduct additional hearings in accordance with this subsection.
[Northwest Power Act, §7(i)(4), 94 Stat. 2726.]

**839e(i)(5)**. The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator. The decision shall include a full and complete justification of the final rates pursuant to this section.
[Northwest Power Act, §7(i)(5), 94 Stat. 2726-7.]

**839e(i)(6)**. The final decision of the Administrator shall become effective on confirmation and approval of such rates by the Federal Energy Regulatory Commission pursuant to subsection (a)(2) of this section. The Commission shall have the authority, in accordance with such procedures, if any, as the Commission shall promptly establish and make effective within one year after December 5, 1980, to approve the final rate submitted by the Administrator on an interim basis, pending the Commission's final decision in accordance with such subsection. Pending the establishment of such procedures by the Commission, if such procedures are required, the Secretary is authorized to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to December 5, 1980,. Such interim rates, at the discretion of the Secretary, shall continue in effect until July 1, 1982.
[Northwest Power Act, §7(i)(6), 94 Stat. 2727.]

Interim rates

**839e(j). Cost figures to be indicated on rates schedules and power billings**
All rate schedules adopted, and all power billings rendered, by the Administrator pursuant to this section shall indicate—

**839e(j)(1)**. the approximate cost contribution of different resource categories to the Administrator's rates for the sale of energy and capacity, and
[Northwest Power Act, §7(j)(1), 94 Stat. 2727.]

## Pacific NW Power Act (continued)

**839e(j)(2)**. the cost of resources acquired to meet load growth within the region and the relation of such cost to the average cost of resources available to the Administrator.

[Northwest Power Act, §7(j)(2), 94 Stat. 2727.]

**839e(k). Statutory basis for procedures used in establishing rates or rate schedules**

Rates for nonfirm

Notwithstanding any other provision of this chapter, all rates or rate schedules for the sale of nonfirm electric power within the United States, but outside the region, shall be established after December 5, 1980, by the Administrator in accordance with the procedures of subsection (i) of this section (other than the first sentence of paragraph (6) thereof) and in accordance with the Bonneville Project Act [16 U.S.C. 832 et seq.], the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.].

Review by FERC

Notwithstanding section 201(f) of the Federal Power Act [16 U.S.C. 824(f)], such rates or rate schedules shall become effective after review by the Federal Energy Regulatory Commission for conformance with the requirements of such Acts and after approval thereof by the Commission. Such review shall be based on the record of proceedings established under subsection (i) of this section. The parties to such proceedings under subsection (i) of this section shall be afforded an opportunity by the Commission for an additional hearing in accordance with the procedures established for ratemaking by the Commission pursuant to the Federal Power Act [16 U.S.C. 791a et seq.].

[Northwest Power Act, §7(k), 94 Stat. 2727.]

**839e(l). Rates for sales outside United States; negotiations**

Negotiated rates outside U.S.

In order to further the purposes of this chapter and to protect the consumers of the region, the Administrator may negotiate, or establish, rates for electric power sold by the Administrator to any entity not located in the United States which shall be equitable in relation to rates for all electric power which is, or may be, purchased by the Administrator or the Administrator's customers from entities outside the United States. In establishing rates other than by negotiation, the provisions of subsection (i) of this section shall apply. In the case of any negotiation with an entity not located in the United States, the Administrator shall provide public notice of any proposal to negotiate such rates. Such negotiated rates shall be not less than rates established under this chapter for nonfirm power sold within the United States but outside the region. The Administrator shall also afford notice of any rates negotiated pursuant to this subsection.

[Northwest Power Act, §7(l), 94 Stat. 2727.]

Payments

**839e(m). Impact aid payments; formula**

**839e(m)(1)**. Beginning the first fiscal year after the plan and program required by section 838b(d) and (h) of this title are finally adopted, the Administrator may, subject to the provisions of this section, make annual impact aid payments to the appropriate local governments within the region with respect to major transmission facilities of the Administrator, as defined

Addendum
A-51

in section 3(c) of the Federal Columbia River Transmission Act [16 U.S.C. 838a(c)]—

**839e(m)(1)(A)**. which are located within the jurisdictional boundaries of such governments,
[Northwest Power Act, §7(m)(1)(A), 94 Stat. 2727-8.]

**839e(m)(1)(B)**. which are determined by the Administrator to have a substantial impact on such governments, and
[Northwest Power Act, §7(m)(1)(B), 94 Stat. 2728.]

**839e(m)(1)(C)**. where the construction of such facilities, or any modification thereof, is completed after December 5, 1980, and, in the case of a modification of an existing facility, such modification substantially increases the capacity of such existing transmission facility.
[Northwest Power Act, §7(m)(1)(C), 94 Stat. 2728.]

**839e(m)(2)**. Payments made under this subsection for any fiscal year shall be determined by the Administrator pursuant to a regionwide, uniform formula to be established by rule in accordance with the procedures set forth in subsection (i) of this section. Such rule shall become effective on its approval, after considering its effect on rates established pursuant to this section, by the Federal Energy Regulatory Commission, In developing such formula, the Administrator shall identify, and take into account, the local governmental services provided to the Administrator concerning such facilities and the associated costs to such governments as the result of such facilities.
[Northwest Power Act, §7(m)(2), 94 Stat. 2728.]

Payment formula

**839e(m)(3)**. Payments made pursuant to this subsection shall be made solely from the fund established by section 11 of the Federal Columbia River Transmission System Act [16 U.S.C. 838i]. The provisions of section 13 of such Act [16 U.S.C. 838k], and any appropriations provided to the Administrator under any law, shall not be available for such payments. The authorization of payments under this subsection shall not be construed as an obligation of the United States.
[Northwest Power Act, §7(m)(3), 94 Stat. 2728.]

**839e(m)(4)**. No payment may be made under this subsection with respect to any land or interests in land owned by the United States within the region and administered by any Federal agency (other than the Administrator), without regard to how the United States obtained ownership thereof, including lands or interests therein acquired or withdrawn by a Federal agency for purposes of such agency and subsequently made available to the Administrator for such facilities.[8]
[Northwest Power Act, §7(m)(4), 94 Stat. 2728.]

---

8 §8 of this Act consists of amendments to existing law and is codified as part of the statutes that it amends. See, e.g., Transmission System Act §11(b)(6) 16 U.S.C. §838i(b)(6) *supra*, page 64.

## Pacific NW Power Act (continued)

**839e(n). Limiting the inclusion of costs of protection of, mitigation of damage to, and enhancement of fish and wildlife, within rates charged by the Bonneville Power Administration, to the rate period in which the costs are incurred**

Notwithstanding any other provision of this section, rates established by the Administrator, under this section shall recover costs for protection, mitigation and enhancement of fish and wildlife, whether under this chapter or any other Act, not to exceed such amounts the Administrator forecasts will be expended during the fiscal year 2002-2006 rate period, while preserving the Administrator's ability to establish appropriate reserves and maintain a high Treasury payment probability for the subsequent rate period.

[As amended Pub.L. 106-60, § 316, Sept. 29, 1999, 113 Stat. 497.]

**839f. Administrative provisions**

**839f(a). Contract authority**

Contracts

Subject to the provisions of this chapter, The Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

[Northwest Power Act, §9(a), 94 Stat. 2729-30.]

**839f(b). Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter**

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), section 7152(a)(2) and (3) of title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and business-like manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, after, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a)(2) and (3) of title 42 or the operations of such officials as they existed prior to December 5, 1980.

[Northwest Power Act, §9(b), 94 Stat. 2730.]

Contracts outside Pacific Northwest

**839f(c). Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest**

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus

Addendum
A-53

peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. 837e and 837f) [16 U.S.C. 837d and 837f] shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.
[Northwest Power Act, §9(c), 94 Stat. 2730.]

**839f(d). Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer**
No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i)(1)(B) and (i)(3) and subject to:

**839f(d)(1)**. any contractual obligations of the Administrator,
[Northwest Power Act, §9(d)(1), 94 Stat. 2730.]

**839f(d)(2)**. any other obligations under existing law, and
[Northwest Power Act, §9(d)(2), 94 Stat. 2730.]

**839f(d)(3)**. the availability of capacity in the Federal transmission system,
[Northwest Power Act, §9(d)(3), 94 Stat. 2731.]

**839f(d) [cont.]**. the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.
[Northwest Power Act, §9(d), 94 Stat. 2730-1.]

## Pacific NW Power Act (continued)

Judicial Review

**839f(e). Judicial review; suits**

**839f(e)(1)**. For purposes of sections 701 through 706 of title 5, the following actions shall be final actions subject to judicial review—

**839f(e)(1)(A)**. adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;
[Northwest Power Act, §9(e)(1)(A), 94 Stat. 2731.]

**839f(e)(1)(B)**. sales, exchanges, and purchases of electric power under section 839c of this title;
[Northwest Power Act, §9(e)(1)(B), 94 Stat. 2731.]

**839f(e)(1)(C)**. the Administrator's acquisition of resources under section 839d of this title;
[Northwest Power Act, §9(e)(1)(C), 94 Stat. 2731.]

**839f(e)(1)(D)**. implementation of conservation measures under section 839d of this title;
[Northwest Power Act, §9(e)(1)(D), 94 Stat. 2731.]

**839f(e)(1)(E)**. execution of contracts for assistance to sponsors under section 839d(f) of this title;
[Northwest Power Act, §9(e)(1)(E), 94 Stat. 2731.]

**839f(e)(1)(F)**. granting of credits under section 839d(h) of this title;
[Northwest Power Act, §9(e)(1)(F), 94 Stat. 2731.]

**839f(e)(1)(G)**. final rate determinations under section 839e of this title; and
[Northwest Power Act, §9(e)(1)(G), 94 Stat. 2731.]

**839f(e)(1)(H)**. any rule prescribed by the Administrator under section 839e(m)(2) of this title.
[Northwest Power Act, §9(e)(1)(H), 94 Stat. 2731.]

Record of final action

**839f(e)(2)**. The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of title 5.
[Northwest Power Act, §9(e)(2), 94 Stat. 2731.]

## Pacific NW Power Act (continued)

**839f(e)(3)**. Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.
[Northwest Power Act, §9(e)(3), 94 Stat. 2731.]

**839f(e)(4)**. For purposes of this subsection—

**839f(e)(4)(A)**. major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c)(4)(B) of this title;
[Northwest Power Act, §9(e)(4)(A), 94 Stat. 2731.]

**839f(e)(4)(B)**. resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;
[Northwest Power Act, §9(e)(4)(B), 94 Stat. 2731.]

**839f(e)(4)(C)**. conservation measures shall be deemed to be implemented upon execution of the contract or grant therefore; and
[Northwest Power Act, §9(e)(4)(C), 94 Stat. 2731.]

**839f(e)(4)(D)**. rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.
[Northwest Power Act, §9(e)(4)(D), 94 Stat. 2731.]

**839f(e)(5)**. Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.
[Northwest Power Act, §9(e)(5), 94 Stat. 2731-2.]

Legal challenges

**839f(f). Tax treatment of interest on governmental obligations**
For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross

**Pacific NW Power Act (continued)**

income of interest on certain governmental obligations provided in section 103(a)(1) of title 26 shall not be affected by the Administrator's acquisition of such resources if—

**839f(f)(1)**. the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of title 26), and
[Northwest Power Act, §9(f)(1), 94 Stat. 2732.]

**839f(f)(2)**. based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of title 26).
[Northwest Power Act, §9(f)(2), 94 Stat. 2732.]

**839f(f) [cont.]**. The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.
[Northwest Power Act, §9(f), 94 Stat. 2732.]

**839f(g). Review of rates for sale of power to Administrator by investor-owned utility customers**

FERC review of investor-owned utility rates

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title—

**839f(g)(1)**. convene a joint State board, and
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(g)(2)**. invest such board with such duties and authority as will assist the Commission in its review of such rates.
[Northwest Power Act, §9(g)(1), 94 Stat. 2732.]

**839f(h). Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator**

**839f(h)(1)**. No "Company" (as defined in section 79b(a)(2) of title 15), which owns or operates facilities for the generation of electricity (together with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a)(3) of the title 15), within the meaning of any provision or provisions of chapter 2C of title 15, if at least

Addendum
A-57

## Pacific NW Power Act (continued)

90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if—

**839f(h)(1)(A)**. the organization of such company is consistent with the policies of section 79a(b) and (c) of title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and
[Northwest Power Act, §9(h)(1)(A), 94 Stat. 2732.]

**839f(h)(1)(B)**. participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.
[Northwest Power Act, §9(h)(1)(B), 94 Stat. 2733.]

**839f(h)(2)**. The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.
[Northwest Power Act, §9(h)(2), 94 Stat. 2733.]

**839f(h)(3)**. In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.
[Northwest Power Act, §9(h)(3), 94 Stat. 2733.]

**839f(h)(4)**. Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of title 15 and in accordance with this subsection, and (B) notify the "company" in writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.
[Northwest Power Act, §9(h)(4), 94 Stat. 2733.]

**839f(i). Electric power acquisition or disposition**

Acquisition and disposition of electric power

## Pacific NW Power Act (continued)

**839f(i)(1)**. At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable—

**839f(i)(1)(A)**. acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and
[Northwest Power Act, §9(i)(1)(A), 94 Stat. 2733.]

**839f(i)(1)(B)**. dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.
[Northwest Power Act, §9(i)(1)(B), 94 Stat. 2733.]

**839f(i)(2)**. In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.
[Northwest Power Act, §9(i)(2), 94 Stat. 2733.]

**839f(i)(3)**. The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot be furnished without substantial interference with his power marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.
[Northwest Power Act, §9(i)(3), 94 Stat. 2734.]

**839f(j). Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development**

Report

**839f(j)(1)**. The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will

Addendum
A-59

encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.
[Northwest Power Act, §9(j)(1), 94 Stat. 2734.]

**839f(j)(2)**. Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.
[Northwest Power Act, §9(j)(2), 94 Stat. 2734.]

**839f(k). Executive position for conservation and renewable resources**

Executive for conservation

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.
[Northwest Power Act, §9(k), 94 Stat. 2734.]

**839g. Savings provisions**

**839g(a). Rights of States and political subdivisions of States**
Nothing in this chapter shall be construed to affect or modify any right of any State or political subdivision thereof or electric utility to—

**839g(a)(1)**. determine retail electric rates, except as provided by section 839c(c)(3) of this title;
[Northwest Power Act, §10(a)(1), 94 Stat. 2734.]

**839g(a)(2)**. develop and implement plans and programs for the conservation, development, and use of resources; or
[Northwest Power Act, §10(a)(2), 94 Stat. 2734.]

**839g(a)(3)**. make energy facility citing decisions, including, but not limited to, determining the need for a particular facility, evaluating alternative sites,

## Pacific NW Power Act (continued)

and considering alternative methods of meeting the determined need.
[Northwest Power Act, §10(a)(3), 94 Stat. 2734.]

### 839g(b). Rights and obligations under existing contracts

Nothing in this chapter shall alter, diminish, or abridge the rights and obligations of the Administrator or any customer under any contract existing as of December 5, 1980.
[Northwest Power Act, §10(b), 94 Stat. 2735.]

### 839g(c). Statutory preferences and priorities of public bodies and cooperatives in sale of federally generated power

Nothing in this chapter shall alter, diminish, abridge, or otherwise affect the provisions of other Federal laws by which public bodies and cooperatives are entitled to preference and priority in the sale of federally generated electric power.
[Northwest Power Act, §10(c), 94 Stat. 2735.]

### 839g(d). Contractual rights under provisions later found to be unconstitutional

If any provision of this chapter is found to be unconstitutional, then any contract entered into by the Administrator, prior to such finding and in accordance with such provisions, to sell power, acquire or credit resources, or to reimburse investigation and preconstruction expenses pursuant to section 839c of this title, and section 839d(a), (f) or (h) of this title shall not be affected by such finding.
[Northwest Power Act, §10(d), 94 Stat. 2735.]

### 839g(e). Treaty and other rights of Indian tribes

Nothing in this chapter shall be construed to affect or modify any treaty or other right of an Indian tribe.
[Northwest Power Act, §10(e), 94 Stat. 2735.]

### 839g(f). Reservation of electric power for Montana; Hungry Horse and Libby Dams and Reservoirs

The reservation under law of electric power primarily for use in the State of Montana by reason of the construction of Hungry Horse and Libby Dams and Reservoirs within that State is hereby affirmed. Such reservation shall also apply to 50 per centum of any electric power produced at Libby Reregulating Dam if built. Electric power so reserved shall be sold at the rate or rates set pursuant to section 839e of this title.
[Northwest Power Act, §10(f), 94 Stat. 2735.]

### 839g(g). Rights of States to prohibit recovery of resource construction costs through retail rates

Nothing in this chapter shall be construed to affect or modify the right of any State to prohibit utilities regulated by the appropriate State regulatory body from recovering, through their retail rates, costs during any period of resource construction.
[Northwest Power Act, §10(g), 94 Stat. 2735.]

**839g(h). Water appropriations**

Nothing in this chapter shall be construed as authorizing the appropriation of water by any Federal, State, or local agency, Indian tribe, or any other entity or individual. Nor shall any provision of this chapter of any plan or program adopted pursuant to the chapter (1) affect the rights or jurisdictions of the United States, the States, Indian tribes, or other entities over waters of any river or stream or over any groundwater resource, (2) alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by the States, or (3) otherwise be construed to alter or establish the respective rights of States, the United States, Indian tribes, or any person with respect to any water or water-related right.

[Northwest Power Act, §10(h), 94 Stat. 2735.]

**839g(i). Existing Federal licenses, permits, and certificates**

Nothing in this chapter shall be construed to affect the validity of any existing license, permit, or certificate issued by any Federal agency pursuant to any other Federal law.

[Northwest Power Act, §10(i), 94 Stat. 2735.]

**839h. Separability of provisions**

If any provision of section 839b(a) through (c) of this title or any other provision of this chapter or the application thereof to any person, State, Indian tribe, entity, or circumstance is held invalid, neither the remainder of section 839b of this title or any other provisions of this chapter, nor the application of such provisions to other persons, States, Indian tribes, entities, or circumstances, shall be affected thereby.

[Northwest Power Act, §12, 94 Stat. 2735.]

| 96TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 96–<br>976, Part II |
|---|---|---|

ASSISTING THE ELECTRICAL CONSUMERS OF THE PACIFIC NORTHWEST THROUGH USE OF THE FEDERAL COLUMBIA RIVER POWER SYSTEM TO ACHIEVE COST-EFFECTIVE ENERGY CONSERVATION, TO ENCOURAGE THE DEVELOPMENT OF RENEWABLE ENERGY RESOURCES, TO ESTABLISH A REPRESENTATIVE REGIONAL POWER PLANNING PROCESS, TO ASSURE THE REGION OF AN EFFICIENT AND ADEQUATE POWER SUPPLY, AND FOR OTHER PURPOSES

SEPTEMBER 16, 1980.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

# REPORT

together with

## SUPPLEMENTAL, ADDITIONAL,

## SEPARATE, and DISSENTING VIEWS

[To accompany S. 885]

[Including the cost estimate of the Congressional Budget Office]

The Committee on Interior and Insular Affairs, to whom was referred the bill (S. 885) to assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River Power System to achieve cost-effective energy conservation, to encourage the development of renewable energy resources, to establish a representative regional power planning process, to assure the region of an efficient and adequate power supply, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 1, line 3, strike all after the enacting clause and insert the following:

Addendum
A-63

32

Many regional observers are of the opinion that the above-mentioned power planning and supply problems and the pending administrative/judicial battle over the allocation of the Federal hydroelectric resources in the Pacific Northwest can only be avoided through enactment of Federal legislation which: (1) lets the Congress decide which regional entities should have access to the Federal hydroelectricity marketed by BPA; (2) authorizes BPA to play a central role in the Pacific Northwest's electric energy decision making process; and (3) expands the authority of BPA to permit it to acquire additional resources on a long-term basis to meet the needs of the region. In addition, it is believed that such legislation can provide the institutional framework necessary for the implementation of effective, region-wide conservation programs, allow the residential and small farm consumers of the region's non-preference utilities to share in the economic benefits of the Federal hydroelectric resources without impinging upon the protections provided to existing or new preference customers of BPA by the preference clause of the Bonneville Project Act, establish a workable public planning process, and facilitate the protection, mitigation, and enhancement of the region's fish and wildlife resources. Finally, it is felt that these legislative goals can be accomplished without adversely affecting other regions of the nation.

The power planning and supply uncertainties presently facing the Pacific Northwest, if left unresolved, could eventually lead to severe economic, social, and environmental disruptions throughout the region. Most parties agree that this type of Federal legislation, although providing for the expansion of BPA's authorities, properly recognizes the unique Federal presence in the Pacific Northwest without creating precedents for other regions and offers the only viable solution to the region's electrical energy problems.

EXPLANATION OF S. 885, AS RECOMMENDED BY THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS

The Committee on Interior and Insular Affairs adopted one amendment to S. 885 striking all after the enacting clause and inserting in lieu thereof the text of a substitute bill. The following explanation is of this Committee substitute and all references to "the bill", "the legislation", or "S. 885" in the explanation are to this Committee substitute.

The substitute recommended by the Committee on Interior and Insular Affairs contains a variety of provisions designed to enable the Pacific Northwest to solve the electric power planning uncertainties presently facing it, including these basic features: (1) The establishment of a comprehensive public planning process; (2) a requirement that the Administrator of BPA offer new long-term power sale contracts to preference customers, Federal agencies, investor-owned utilities, and existing direct-service industrial customers of BPA; (3) a power exchange for the benefit of the region's residential and small farm consumers; (4) a grant of additional authority to the Administrator of BPA to require him to acquire on a long-term basis the resources necessary to meet his contractual requirements to his customers; (5) revised rate directives; (6) comprehensive energy conservation provisions; and (7) provisions for the

August 3, 1979     CONGRESSIONAL RECORD — SENATE     S 11585

## PACIFIC NORTHWEST ELECTRIC POWER PLANNING AND CONSERVATION

The PRESIDING OFFICER. The bill will be stated by title.

The legislative clerk read as follows:

A bill (S. 885) to assist the electrical consumers of the Pacific Northwest through use of the Federal Columbia River Power System to achieve cost-effective energy conservation, to encourage the development of renewable energy resources, to establish a representative regional power planning process, to assure the region of an efficient and adequate power supply, and for other purposes.

The Senate proceeded to consider the bill, which had been reported from the Committee on Energy and Natural Resources with an amendment to strike all after the enacting clause and insert the following:

That this Act may be cited as the "Pacific Northwest Electric Power Planning and Conservation Act".

### FINDINGS

Sec. 2. The Congress finds that—

(a) The Federal Columbia River Power System offers a unique opportunity to encourage policies of conservation and efficiency in the use of electric power within the Pacific Northwest.

(b) The participation and consultation of the Pacific Northwest States, local communities, ratepayers, the Administrator's customers, users of the Columbia River system (including fisheries agencies), and the public at large within the region are essential in development of regional plans and programs related to energy conservation, renewable resources, other generating resources and orderly planning of the Federal Columbia River Power System.

(c) The ratepayers of the Pacific Northwest should continue to pay all costs necessary to produce, transmit, and conserve electric power to meet the region's electric power requirements, including the amortization of the Federal investment in the Federal Columbia River Power System.

### DEFINITIONS

Sec. 3. As used in this Act—

(a) "Administrator" means the Administrator, Bonneville Power Administration.

(b) "Conservation" means any reduction in electric power consumption as a result of increases in the efficiency of energy use, production or distribution.

(c) A conservation measure or any resource is "cost effective" if it is forecast to be available within the time it is needed and if it is forecast to meet or reduce the electric power demand of the consumer at an estimated incremental system cost no greater than that of the least-cost similarly available alternative conservation measure or resource: Provided, That such cost estimates shall include estimates of all direct systems costs of the conservation measure or resource over its effective life, including, if applicable, the cost of distribution and transmission to the consumer, and, among other factors, waste disposal costs, end-of-cycle costs, and fuel costs, and such such quantifiable environmental and social costs and benefits as the Administrator determines, on the basis of a methodology developed by the Council as part of the plan, are directly attributable to the conservation measure or resource: Provided further, That

Addendum
A-65

421

S 11598          CONGRESSIONAL RECORD — SENATE          *August 3, 1979*

authorized under this section with the assistance of those departments or agencies of the Federal government whose responsibilities include negotiation of the type of contracts or agreements that would be necessary to facilitate an acquisition under this section.

(4) No later than January 1, 1981, and thereafter not less frequently than once each year, the Administrator shall submit to the Congress a report that outlines investigations undertaken pursuant to this section, together with the prospects for obtaining additional resources under the authority granted by this section.

(5) The authority granted in this section shall not diminish or abridge any other authority of the Administrator to carry out similar activities under this Act or other Acts.

Mr. MAGNUSON. Mr. President, the purpose of my amendment is to add to the power available in the Pacific Northwest by accelerating the development of renewable resources outside the region. This amendment could postpone or even eliminate the need for certain generating facilities inside the Pacific Northwest.

The Northwest Regional Power legislation gives strong support to conservation as a desirable power resource that can take the place of at least some generating facilities that would otherwise need to be built within the region. This amendment would authorize the administrator of BPA to identify and acquire another potential class of power resources that might postpone or even avoid the need for certain generating facilities inside the region: generating resources outside the region which would eventually be built in any event and that rely upon renewable resources.

I know that the distinguished chairman of the Energy and Natural Resources Committee has played a major role in the events that made similar resources available to the Northwest in the past. My distinguished colleague from Washington is familiar with the circumstances under which the Bonneville Power Administration now receives large quantities of power as the result of cooperative development between the United States and Canada of major hydroelectric facilities and storage reservoirs in British Columbia. These resources, whose development has been and will continue to be highly beneficial to the Canadians, were built as a result of the Canadian treaty. Most important, they are resources the Canadians would eventually have built themselves, but whose construction ahead of schedule has provided substantial power benefits to the northwest United States. These benefits include an adequate power supply, lower power costs, and avoidance of the need to construct additional thermal plants in the Pacific Northwest States. For their part, the Canadians have received a long-term power supply, lower imbedded costs, and the security of knowing that the resources will be available when Canadian loads require them.

I feel strongly that similar opportunities exists again for cooperative development with other regions. Unfortunately, little work appears to have been done in the recent past to determine whether additional projects, already in the planning stages outside the region, could be accel-

erated in order to help avert or minimize projected firm energy deficits inside the Pacific Northwest.

For instance, I understand that B. C. Hydro, the British Columbia power authority, has already identified several potential generating projects that may produce very substantial amounts of power. All of these projects would be located in British Columbia. Several very large hydroelectric projects appear to be among those that B. C. Hydro has investigated. Some of these projects may face insurmountable environmental or technical problems, but if any are eventually built, they will be built in order to meet anticipated Canadian demand.

Without having consulted B. C. Hydro, and without wishing to suggest that the United States has any entitlement to the United States as quickly as possible to see if the early development of one or more of these projects might not offer substantial benefits to the citizens of both countries. It is conceivable that there are opportunities for cooperation that would build upon the cooperative foundation already present in the existing treaty with Canada.

By mentioning the B. C. Hydro projects specifically, I do not mean to limit the potential projects outside the Northwest that should be considered. Many other projects in other areas may be worthy of consideration, depending upon advances in transmission technology or the existence of unexploited and relatively benign generation possibilities in other regions. Any project that relies on renewable resources, and could be built at an earlier rather than a later date, should be explored if it offers potential power benefit to the Pacific Northwest and the region in which the project itself would be located.

However, I want to make it clear, that this amendment is not intended to establish an inter-region electrical grid system.

Mr. President, this amendment would authorize and direct the administrator of the Bonneville Power Administration to investigate opportunities for adding to the region's power resources or reducing the region's power costs through the accelerated or cooperative development of resources located outside the region, if such resources are renewable resources, and if such resources have already been planned or considered for eventual development by the agencies or authorities that will or would own, sponsor, or otherwise develop them.

The administrator is directed to keep the council informed of such investigations as they progress, and seek from the council its advice as to the desirability of pursuing such investigations further.

The amendment would also authorize the administrator to acquire resources of the type that I have just discussed, and to enter into such contracts or agreements as may be necessary to facilitate such acquisitions, if the Administrator determines that the resources meet the the criteria I have discussed above and the acquisition of the resources will, in a cost-effective manner, add to the region's resources or reduce the region's power costs; provided, that such acquisitions are consistent with the plan.

This amendment also provides a procedure for the Administrator to acquire these resources when he determines that such acquisitions are inconsistent with the plan, or in the absence of a plan. Under these circumstances, the Administrator may acquire the resource if he determines, after compliance with section 6(c), that it is consistent with section 4(e). The amendment would also give the council the authority to review such determination, as outlined in section 4(d).

The amendment would also direct the Administrator to submit a report to Congress once each year that outlines his investigations undertaken pursuant to this amendment, together with the prospects for obtaining additional resources under the authority granted by this amendment.

I want to make it clear that power obtained in this manner is not likely to be cheap. All new power resources are expensive, and in the case of resources outside the region pricing policies are subject to decisionmaking over which we have little effective control. But, from a supply standpoint alone, such resources should be extremely beneficial to the Northwest; acceleration of an already-planned project represents, along with conservation, the best short-term and mid-term method of meeting Northwest power needs. The firm power deficits projected for the 1980's under critical water conditions cannot, at this late date, be met by any fresh start on new thermal resources inside the Northwest. Therefore, I urge the adoption of this amendment.

I have discussed this with my colleague, and I do not know whether the other Senators are familiar with it, but he is willing to accept the amendment.

Mr. JACKSON. Mr. President, will the Senator yield?

Mr. MAGNUSON. Yes.

Mr. JACKSON. I want to thank my friend and colleague from the State of Washington (Mr. MAGNUSON) for offering this most useful amendment to the Northwest Electric Power Planning and Conservation Act. Senator MAGNUSON and I have both been involved in the cooperative efforts between Northwest utilities and the Canadian Government to develop resources in Canada that benefit consumers in that country and the United States.

I agree with my good friend from the State of Washington that in the future there may be other renewable resource projects that are planned or under consideration outside the Pacific Northwest that could be accelerated. Clearly, the administrator of the Bonneville Power Administration should have the authority to investigate these projects to determine whether an accelerated construction schedule was in the best interest of all the parties involved.

In situations where the accelerated cooperative development of resources located outside the region would be cost effective and add to the region's power supply, the administrator would be able to acquire power from the resource if such acquisitions are consistent with the plan. If such acquisitions are not consistent with the plan or in the absence

Addendum
A-66