NO. 25-4278

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

NW ENERGY COALITION, IDAHO CONSERVATION LEAGUE,
MONTANA ENVIRONMENTAL INFORMATION CENTER,
OREGON CITIZENS' UTILITY BOARD, and SIERRA CLUB,

*Petitioners*,

v.

THE BONNEVILLE POWER ADMINISTRATION,

*Respondent*.

---

## PETITIONERS' REPLY BRIEF

---

JAIMINI PAREKH
JAN E. HASSELMAN
TODD D. TRUE
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
jparekh@earthjustice.org
ttrue@earthjustice.org
jhasselman@earthjustice.org

*Attorneys for Petitioners*

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................1

ARGUMENT ..........................................................................................1

    I.     PETITIONERS HAVE STANDING AND THE PETITION IS RIPE. ............................................................................................1

         A.  Bonneville's Actions Pursuant to the DAM Policy and ROD Injure Petitioners Economic and Environmental Interests. ...........2

             1.  NWEC is Injured by Rising Electric Power Rates. .............2

             2.  NWEC is harmed by risks to salmon survival......................4

         B.  NWEC's Injuries are Imminent and Fairly Traceable to Bonneville's DAM Policy and ROD. .............................................5

         C.  NWEC's Power Act Claim is Ripe. ...............................................7

    II.    THE DAM POLICY AND ROD VIOLATE THE NORTHWEST POWER ACT. ............................................................9

         A.  The Power Act requires Bonneville to ensure its DAM Policy/ROD are consistent with the Power Plan. ..........................9

             1.  The Plain Language of the Act Required a Consistency Determination.......................................................9

             2.  The Purpose and Context of the Statute Support Requiring Consistency With the Power Plan. ....................14

             3.  Prior Precedent of this Court is Inapposite.........................15

         B.  The DAM Policy is inconsistent with the Power Plan..................16

             1.  Bonneville Ignored its Obligation to Prioritize the Least Cost Resource............................................................17

             2.  Bonneville Violated the Power Act When It Ignored the Environmental Consequences of its Decision. .............21

ii

III. BONNEVILLE VIOLATED NEPA. ................................................... 22

    A. The DAM Policy and ROD Are the "Point of Commitment" for NEPA. ................................................................................. 22

    B. The DAM Policy and ROD Change the "Status Quo". ................. 25

    C. *Seven County Infrastructure* Does Not Allow Bonneville to Circumvent NEPA. ..................................................................... 27

    D. Bonneville's $40 Million Commitment Violated NEPA. ............. 29

IV. THE COURT SHOULD VACATE THE DAM POLICY AND ROD AND ORDER AN EIS. .......................................................... 30

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcoa v. Bonneville Power Admin.*,
   698 F.3d 774 (9th Cir. 2012) ..................................................................3

*Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*,
   467 U.S. 380 (1984)................................................................................14

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*
   *("BPA")*,
   733 F.3d 939 (9th Cir. 2013) ...............................................................2, 3

*Cal. Energy Comm'n v. BPA*,
   909 F.2d 1298 (9th Cir. 1990) (requiring Bonneville to recover
   costs through rates) ...............................................................................20

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
   631 F.3d 1072 (9th Cir. 2011) ...............................................................24

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...............................................................2, 5

*Carney v. Adams*,
   592 U.S. 53 (2020)....................................................................................5

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) .................................................................5

*Ctr. for Biological Diversity v. Ilano*,
   928 F.3d 774 (9th Cir. 2019) .................................................................27

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)...............................................................................5, 6

*Forelaws on Board v. Johnson*,
   743 F.2d 677, 682-83 (9th Cir. 1984)....................................................27

iv

*Friends of Southeast's Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ..................................................................23

*Idaho Conserv. League v. BPA*,
   826 F.3d 1173 (9th Cir. 2016) ..................................................................25

*Idaho Conservation League v. BPA*,
   83 F.4th 1182 (9th Cir. 2023) .....................................................................4

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024).............................................................................11, 16

*Mont. Wildlife Fed'n v. Haaland*,
   127 F.4th 1 (9th Cir. 2025) .......................................................................31

*Motor Vehicle Manufac. Ass'n v. State Farm*,
   463 U.S. 29 (1983)......................................................................................10

*Municipality of Anchorage v. United States*,
   980 F.2d 1320 (9th Cir. 1992) ....................................................................7

*Nat'l Res. Def. Council v. Hodel*,
   435 F. Supp. 590 (D. Or. 1977) ................................................................24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   2017 WL 1829588 (D. Or. Apr. 3, 2017) ..................................................30

*Northwest Environmental Defenders Coalition v. Bonneville*,
   117 F.3d 1520 (9th Cir. 1997) ..............................................................15, 16

*Nw. Env't Def. Ctr. v. BPA*,
   477 F.3d 668 (9th Cir. 2007) ....................................................................22

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Air Force*,
   128 F.4th 1089 (9th Cir. 2025) ...................................................................7

*Seven County Infrastructure Coalition v. Eagle Cnty.*,
   605 U.S. 168 (2025)..............................................................................27, 28

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1989)........................................................................8

*Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n ("SEIA"),*
80 F.4th 956 (9th Cir. 2023) ...................................................................4, 26, 27

*United States v. SCRAP,*
412 U.S. 669 (1973).................................................................................................2

*Upper Snake River Chapter of Trout Unlimited v. Hodel,*
921 F.2d 232 (9th Cir. 1990) ...............................................................................25

*WildWest Institute v. Bull,*
547 F.3d 1162 (9th Cir 2008) ...............................................................................29

**Statutes**

16 U.S.C. § 839a .............................................................. 13, 15, 17, 19-20

16 U.S.C. § 839b...............................................................................*passim*

16 U.S.C § 839d................................................................................*passim*

**Other Authorities**

40 C.F.R. § 1502.2(f) ....................................................................................29

40 C.F.R. § 1502.5 .........................................................................................24

**LIST OF ACRONYMS & ABREVIATIONS**

| | |
|---|---|
| APA | Administrative Power Act |
| BiOp | Biological Opinion for Operation and Maintenance of the Fourteen Multiple-Use Dam and Reservoir Projects in the Columbia River System |
| Bonneville | Bonneville Power Administration |
| Council | Northwest Power & Conservation Council |
| DAM | Day-Ahead Market |
| EDAM | Extended Day Ahead Market |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse gas |
| NEPA | National Environmental Policy Act |
| Power Act | Pacific Northwest Electric Power Planning & Conservation Act |
| Power Plan | 2021 Northwest Power Plan |
| ROD | Record of Decision |
| RTO | Regional Transmission Organization |
| SCL | Seattle City Light |
| SPP | Southwest Power Pool |
| WEIM | Western Energy Imbalance Market |

INTRODUCTION

Joining a day-ahead market will fundamentally change how Bonneville conducts its business, buys and sells power, and the cost of that power. In its DAM Policy & ROD, Bonneville made a final decision to choose Markets+ and take all steps necessary to participate in it. This is exactly the type of decision for which Congress sought cooperative regional planning between the Northwest Power Council and Bonneville pursuant to the Power Act. And, it is the type of major federal action that should undergo environmental review pursuant to NEPA. Here, however, Bonneville improperly skipped the requirements of both statutes. The Court should vacate the DAM Policy and ROD and remand them to Bonneville with direction to reach a final decision that complies with the Power Act and to prepare an environmental impact statement.

Given the substantial impact Bonneville's DAM Policy and ROD will have on regional power costs, and their potentially significant environmental impacts, Petitioners, NW Energy Coalition, *et al.* ("NWEC"), have standing to pursue their claims under the Power Act and NEPA and these claims are ripe for review.

ARGUMENT

I.    PETITIONERS HAVE STANDING AND THE PETITION IS RIPE.

Bonneville argues that NWEC lacks standing to pursue its Power Act claims because the DAM Policy and ROD do not yet formally commit it to participate in Markets+, and on that same basis argues the petition is not ripe. BPA at 27-32.

1

Bonneville's arguments should be rejected.[1]

> A. Bonneville's Actions Pursuant to the DAM Policy and ROD Injure Petitioners Economic and Environmental Interests.

"'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved[.]'" *United States v. SCRAP*, 412 U.S. 669, 690 n. 14 (1973). NWEC will be adversely affected by rising power costs, and risk of harm to salmon and wildlife in the Columbia River caused by Bonneville's decision to participate in Markets+.

> 1. *NWEC is Injured by Rising Electric Power Rates.*

Injuries of "only a few dollars" can establish standing. *California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018). This Court has held the risk of increased electric power rates is an economic injury that supports standing. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin. ("BPA")*, 733 F.3d 939, 944 (9th Cir. 2013) ("*APAC*").

Bonneville's decision to join Markets+ will increase power costs for the entire Northwest region, costs which are passed through to ratepayers. Jenks Decl. ¶ 13-23; *see also* Seattle City Light ("SCL") Amicus at 2 (Bonneville's decision is "likely" to cost Seattle ratepayers $21 million per year in increased power costs).

---

[1] Bonneville does not contest that the DAM Policy and ROD constitute a final agency action. Bonneville also does not challenge NWEC's standing to raise its NEPA claim, or the ripeness of that claim.

These increased costs will "particularly affect lower-income ratepayers, who at times must choose between keeping the lights on and buying food, or critically needed medicine." *Id.* ¶ 47. If Bonneville had decided to join EDAM, it could have saved Northwest ratepayers $400 million annually in power costs. OR/WA Amicus at 11. The loss of these benefits and the increased costs resulting from participation in Markets+ will lead to higher electricity rates that injure NWEC. *APAC*, 733 F.3d at 944.

Bonneville argues that NWEC cannot suffer harm from its choice of day-ahead market because foregoing revenue opportunities is not a cognizable injury. BPA at 29-30 (citing *Alcoa v. Bonneville Power Admin.*, 698 F.3d 774, 789 (9th Cir. 2012)). However, increased costs in Markets+ arise not just from foregone revenue but also from trading power across market seams. *Infra,* at 20-21. Further, the *Alcoa* Court dealt with a different section of the Power Act that did not require the agency to minimize costs. *Alcoa*, 698 F.3d at 789. Here, however, NWEC raises claims under §§ 839b(d)(2), and 839d(l) of the Power Act which require Bonneville to prioritize the least-cost resource. Moreover, Bonneville considered revenue from surplus sales when it evaluated the net costs of each alternative, conceding that revenue is an important part of the cost calculus. 1-ER-33-38.

3

2.      *NWEC is harmed by risks to salmon survival.*

NWEC also has shown the kinds of environmental harm that are sufficient to establish standing. Petitioners have standing when they assert "individual aesthetic and other interests in the fish populations . . . [and] [o]ngoing harm to these fish populations . . . inflicts an injury on petitioners' members." *Idaho Conservation League ("ICL") v. BPA*, 83 F.4th 1182, 1188 (9th Cir. 2023). NWEC has demonstrated just such injury from the increased generation of hydropower that will follow from Bonneville's actions. "Conducting hydroelectric operations to meet the needs of a new energy market will likely put further strain on the already extremely vulnerable salmon and steelhead" impacted by federal hydrosystem dams. Norton Decl. ¶ 14.

Bonneville does not contest these facts, but rather argues that compliance with a 2020 biological opinion ("BiOp") for dam operations is enough to avert harm. However, that BiOp has been challenged as legally inadequate. *Id*. ¶ 16. Moreover, Bonneville has "affirmative legal duties to recover and restore these species to a healthy and sustainable level[,]" which the 2020 BiOp does not even claim to achieve. *Id*.

Additionally, this Circuit has found standing to challenge policies that create "incentives" that "could shift the mix of power generation… away from renewable generation towards fossil-fuel generation." *Solar Energy Indus. Ass'n v. Fed.*

4

*Energy Regul. Comm'n*, 80 F.4th 956, 990 (9th Cir. 2023) ("*SEIA*"). NWEC indisputably has interests in protecting and promoting clean energy and is harmed by fossil fuel generation and its attendant pollution and risks. Norton Decl. ¶ 4, 11; Arthur Decl. ¶ 19. These environmental injuries are more than sufficient to confer standing.

> B.    NWEC's Injuries are Imminent and Fairly Traceable to Bonneville's DAM Policy and ROD.

Bonneville principally argues that the connection between any injury and the DAM Policy & ROD are too "hypothetical" for standing. BPA at 29. Some uncertainty, however, does not deprive NWEC of standing as long as there is a "reasonable probability" of injury. *Azar*, 911 F.3d at 571. Injury is "imminent" if it is likely to occur in the "reasonably foreseeable future[.]" *Carney v. Adams*, 592 U.S. 53, 58-59 (2020). Plaintiffs need not wait until an injury actually occurs before they can seek redress. *Azar*, 911 F.3d at 572. Further, injury need not directly result from an agency's action, but rather may include "causal chain links" where there is a "reasonable probability" harm will occur. *Id. at* 571; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (requiring only that the protected concrete interest be "threatened"). Bonneville argues that future action by itself or third parties breaks the chain of causation, BPA at 31, but establishing causation only requires showing "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("*FDA*") (quotation omitted).

NWEC easily meets this standard. The DAM Policy and ROD establish Bonneville's "business rationale" for entering into a contract to participate in Markets+ and "establish[] the scope for future implementation decisions related to Markets+." 1-ER-104. In its recent presentation to stakeholders, Bonneville carefully laid out a two-year timeline for initiating rate cases and tariff proceedings, making changes to its transmission business practices, amending its Provider of Choice agreements, negotiating "implementation agreements" with SPP, and leaving the WEIM. Supplemental Otto Decl., Ex. A at 6-9. Bonneville developed this schedule to ensure that it can "go live" with Markets+ by October 2028. *Id*. at 6-7. Bonneville makes clear that the rate and tariff proceedings are to account for "impacts resulting from Markets+ implementation[.]" *Id*. at 23. This two-year plan sets out a "predictable chain of events" leading from the DAM Policy and ROD to harm to NWEC. *FDA*, 602 U.S. at 385.

Further, Bonneville is incorrect that NWEC's injuries will only occur in the future when Bonneville formally joins Markets+ and "goes live" trading in it. Based on the DAM Policy and ROD, Bonneville is electing to exit the WEIM. Supplemental Otto Decl., Ex. A at 8 ("Future Workshop Topics and Dates … Western Energy Imbalance Market (WEIM) exit"). Leaving the WEIM will result in immediate cost and reliability harms to NWEC. Jenks Decl. ¶ 15.

6

C.     NWEC's Power Act Claim is Ripe.

Bonneville also argues that NWEC's Power Act claims are not ripe. When evaluating ripeness, a court considers (1) whether the issue would benefit from further factual development; (2) whether delaying review would cause hardship to plaintiffs; and (3) whether judicial intervention would inappropriately interfere with administrative action. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Air Force*, 128 F.4th 1089, 1113 (9th Cir. 2025). Each of these factors demonstrates this petition is ripe now. *See also Municipality of Anchorage v. United States*, 980 F.2d 1320, 1323 (9th Cir. 1992) (case is ripe if the issues are purely legal and the agency action is final).

First, the issues presented require no further factual development. Bonneville developed a lengthy record and decided to move forward with participating in Markets+. 1-ER-019; 1-ER-02 ("the release of this policy . . . concludes the policy-development phase of this effort and enables us to move forward with market implementation…"). The key questions—whether Bonneville's decision is consistent with the 2021 NW Power Plan, including whether it adequately considered the financial and environmental consequences of joining Markets+— will not undergo further factual development because Bonneville will not undertake any additional process to consider these impacts or alternatives. While Bonneville states it may undertake environmental review at some point in the

7

future, NWEC's claim is that Bonneville must analyze the environmental impacts of its decision now: that claim cannot get any riper.

Second, delaying review would cause hardship to NWEC because it would substantially prejudice, if not effectively deprive it of a challenge to Bonneville's choice of Markets+. Delaying review until Bonneville signs a contract to join Markets+ means waiting until Bonneville changes rates and tariffs, its business practices, and spends the next two years negotiating the terms of its participation in Markets+. These sunk costs would add bureaucratic momentum to joining Markets+, creating a steamroller effect that prejudices the outcome of any future assessment of whether Bonneville's decision complies with the Power Act. *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) ("Each of these events represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues.").

Lastly, judicial review now would not interfere with an administrative process as Bonneville has completed its process for the DAM Policy and ROD. Rather, judicial review now would make clear the scope and nature of Bonneville's obligations under the Power Act and its duty to consider the economic and environmental consequences of its actions.

8

II.  THE DAM POLICY AND ROD VIOLATE THE NORTHWEST POWER ACT.

Bonneville has a statutory obligation to ensure its DAM Policy & ROD are consistent with the 2021 Northwest Power Plan ("Power Plan"), 16-ER-4543-4681, adopted pursuant to the Power Act by prioritizing the least-cost resource and considering the environmental consequences of joining a day-ahead market. The Record demonstrates that Bonneville failed to comply with this mandate.

A.  The Power Act requires Bonneville to ensure its DAM Policy/ROD are consistent with the Power Plan.

Bonneville claims it has no duty to comply with the Power Act because its adoption of the DAM Policy and ROD are not "resource acquisitions" under the Act, but this argument conflicts with the plain language of both: (i) Section 839b(d)(2), which requires any action taken pursuant to § 839d to be consistent with the Power Plan regardless of whether that action constitutes a "resource acquisition," and (ii) Section 839d(l)(3), which requires that decisions to obtain an interregional exchange of power must be consistent with the Act.

1.  *The Plain Language of the Act Required a Consistency Determination.*

Even though the DAM Policy and ROD are not a final contract to join Markets+, they are final agency action wherein Bonneville considered day-ahead market alternatives and decided to commit to Markets+. Bonneville made this decision pursuant to § 839d(l), and the plain language of the Act requires actions

9

pursuant to § 839d to be consistent with the Power Plan. The Power Act is in clear in § 839b(d)(2): "*all* actions of the Administrator pursuant to section 839d of this title *shall be consistent* with the [Power Plan] and any amendment thereto[.]" Even though NWEC devoted an entire section of its opening brief to the scope of this consistency requirement, NWEC at 28-42, Bonneville never addresses it.

Bonneville asserted it has authority to join a day-ahead market pursuant to § 839d, specifically subsection (l):

> [P]articipation in the interregional Markets+ day-ahead market falls within the scope of [16 U.S.C. § 839d(l)] directives to investigate such markets and the resources exchanged therein, including to increase supplies of electric power produced by renewable resources.

1-ER-82. Bonneville stated that "[d]ay-ahead market participation would be akin to an interregional exchange of power[.]" 1-ER-81. Referencing the language in Section 839d(l)(2), which authorizes Bonneville to investigate "mutually beneficial interregional exchanges of electric power[,]" Bonneville explained that a day-ahead market would operate similar to a bilateral exchange of power, except that power exchanged will "flow among market participants[.]" 1-ER-81-82. Nowhere else does it refer to any other source of authority for its actions. 1-ER-75-85.[2] Since

---

[2] In briefing, Bonneville asserts a new statutory basis for its authority to join a day-ahead market, BPA at 33, which it did not rely on in the record, 1-ER-75-85. This Court "may not accept appellate counsel's *post hoc* rationalizations for agency action[.]" *Motor Vehicle Manufac. Ass'n v. State Farm*, 463 U.S. 29, 50, 103 (1983).

10

Bonneville plainly issued its DAM Policy and ROD pursuant to its § 839d(l) authority, the DAM Policy and ROD are actions "pursuant to Section 839d," and therefore must be consistent with the Power Plan. 16 U.S.C. § 839b(d)(b)(2).

Yet, Bonneville never evaluated consistency between its DAM Policy and the Power Plan, stating instead that it was "not required to make a determination regarding consistency of this policy direction with the Council's power plan[,]" because joining a day-ahead market is not a resource acquisition. 1-ER-275. But there is no exception to the consistency requirement of § 839b(d)(2) for actions taken pursuant to § 839d. Further, Bonneville concedes that "[t]he statutory requirements … attach when Bonneville proposes … a resource acquisition[.]" 1-ER-274-275. Here, the DAM Policy and ROD is a proposal to join Markets+, and a policy issued pursuant to section 839d.

Ignoring § 839b(d)(2), Bonneville argues that it has no obligation to ensure consistency with the Power Plan because joining a day-ahead market is not a resource acquisition. Bonneville argues that subsection 839d(l)(3), which requires a consistency determination, only applies to the acquisition of renewable power resources referred to in subsection 839d(l)(1) and not to interregional exchanges of power discussed in subsection 839d(l)(2). Bonneville's argument conflicts with the text and history of the Act. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 370 (2024) ("the interpretation of the meaning of statutes, as applied to justiciable

11

controversies" is "exclusively a judicial function.").

In subsection 839d(l)(1), the Act authorizes Bonneville to "investigate opportunities" for development of "out of region resources" provided those resources are renewable. Next, in subsection (l)(2), Congress authorized Bonneville to "investigate … opportunities" for mutually beneficial power exchanges. 16 U.S.C. § 839d(l)(2). Then in subsection (l)(3), the statute provides that Bonneville is "authorized to *acquire resources* consistent with such *investigations*" provided that its action is consistent with the Power Plan. 16 U.S.C. § 839d(l)(3) (emphasis added). The plural "investigations" plainly refers to investigations under both (d)(1) and (d)(2) or the plural would have been unnecessary.

If, as Bonneville argues, Congress had intended to only authorize acquisition of the renewable resources referred to in subsection (l)(1), Congress could have authorized Bonneville to acquire renewable resources in subsection (l)(1) itself. Instead, the text of the statute shows that Congress authorized investigations of both out of region renewable resources (subsection 839d(l)(1)) and interregional exchanges of power (subsection 839d(l)(2)) and in subsection 839d(l)(3) described when and how Bonneville can acquire these resources, i.e., if their acquisition is consistent with the Power Plan.

The legislative history supports this reading, reflecting parallel paragraph

12

construction and the plural use of "investigations," which indicates that the consistency requirement in subsection (l)(3), applies to both resources and exchanges. H.R. Rep. No. 96-976(l), at *68 (1980) (Addendum). The legislative history referenced by Bonneville does not prove the agency's point, because it only refers to the cooperative development of out-of-region renewable resources and does not discuss interregional exchanges at all. BPA Addendum at A-66.

Nor is the distinction between the terms "exchange" in subsection (l)(2), and "resource" in subsection (l)(3) meaningful. Bonneville points out language describing the benefits of exchanges as "reduc[ing] the need for additional generation or generating capacity[,]" as evidence that the term "resource" cannot encompass an interregional exchange of power. BPA at 41-42. However, the Power Act does not contain a separate definition for the term "exchange," and the term "resource," is defined broadly to include the type of power purchases and sales that would occur through a day-ahead market. Specifically, "resource" is defined by the Act as "actual ... electric power capability of generating facilities," regardless of whether that electric power is procured for the long-term or short-term. 16 U.S.C. § 839a(3), (19). Day-ahead market purchases by Bonneville fall within this definition, because they are short-term purchases of power that reduce the agency's power costs by pooling resources across the day-ahead market, and optimizing the dispatch of the lowest-cost resources. 1-ER-16-17.

Read together and in context, Bonneville is authorized to investigate interregional exchanges of power pursuant to subsection 839d(l)(2). Should Bonneville decide to acquire power through such exchanges, it may do so pursuant subsection 839d(l)(3), provided Bonneville ensures its decision is consistent with the Power Plan, or if no plan is in effect, the statutory priorities set out in § 839b(e).

2.      *The Purpose and Context of the Statute Support Requiring Consistency With the Power Plan.*

Both §§ 839b(d)(2) and 839d(l)(3) require Bonneville to ensure that its DAM Policy and ROD are consistent with the Power Plan because Congress sought to ensure collaboration in regional power planning and resource acquisition between Bonneville and the states. Prior to the Power Act, Bonneville did not have the authority to acquire new resources. *Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 386 (1984). As the Supreme Court explained, "[t]he Act provided for future cooperation in the region by establishing a mechanism for comprehensive federal/state power planning." *Id*. Through cooperative federalism, Congress sought to keep regional power costs low.

This sharing of power is prevalent throughout the Act. The Council, led by states, must develop the Power Plan, and Congress required that any action taken pursuant to § 839d—the section authorizing Bonneville to acquire new resources and participate in interregional exchanges —"shall be consistent with the plan[.]"

14

16 U.S.C. § 839b(d)(2). Throughout § 839d, Congress required that actions to acquire resources must be consistent with the Power Plan. *See* §§ 839d(a)(1) (acquisition of conservation resources), 839d(b) (acquisition of "resources"), 839d(c)(1)(D) (acquisition of major resources), 839d(f) ("development of renewable resources other than major resources"), 839d(l)(out-of-region resources). Requiring a consistency determination for a decision to join an interregional exchange under § 839d(l)(3) is fully consistent with this context and history.

### 3. *Prior Precedent of this Court is Inapposite.*

Bonneville relies on *Northwest Environmental Defenders Coalition v. Bonneville* ("*NEDC*") to argue that an interregional exchange is not a "resource" under the Act. BPA at 35-38 (citing 117 F.3d 1520 (9th Cir. 1997)). But *NEDC* is not so broad. There the Court considered whether purchasing long-term reservoir storage capacity from British Columbia constituted acquisition of a "major resource" under the Act and so was subject additional procedural requirements specific to "major resource" acquisitions. *NEDC*, 117 F.3d at 1535. The Court held that interregional exchanges of power, which the parties agreed covered the storage agreement, are not a *major* resource acquisition, deferring to a policy previously adopted by Bonneville. *Id.*

15

However, NWEC does not assert that joining a day-ahead market is a *major* resource acquisition. "Major resources" and "resources" are defined differently under the Power Act. 16 U.S.C. § 839a(12), (16). The Court never reached the question of whether interregional exchanges constitute a "resource," as defined by the Act. *NEDC*, 117 F.3d at 1535. Rather, the Court concluded that the definition of "major resource" is ambiguous as to whether it included interregional exchanges, and deferred to Bonneville's previously issued policy definition. *NEDC*, 117 F.3d at 1535. Here, in contrast, the Power Act explicitly describes interregional exchanges as a resource, *see supra* at 13-15. Bonneville cannot interpret the Power Act in a way that conflicts with its plain language. *Loper Bright*, 603 U.S. at 401-403 ("resolution of statutory ambiguities involves legal interpretation. … Courts interpret statutes, no matter the context[.]").[3]

B.     The DAM Policy is inconsistent with the Power Plan.

Bonneville claims it gave appropriate consideration to the economic and environmental consequences of its decision. But its decision to prioritize the "qualitative" and unquantifiable benefits of Markets+ governance over significant financial costs is contrary to the Power Plan's directives to prioritize the least-cost

---

[3] Bonneville points *post hoc* to its policy that distinguishes "exchange agreement," from "resource acquisition" to argue that interregional exchanges cannot constitute a resource. BPA at 40-42. However, Bonneville did not rely on this policy in the record, 1-ER-1-282, and cannot do so now for the first time in briefing.

resource, and Bonneville wholly ignored the environmental consequences of its decision. Bonneville's DAM Policy and ROD are therefore unlawful.

1. *Bonneville Ignored its Obligation to Prioritize the Least Cost Resource.*

The Power Act requires the Power Plan to prioritize the most "cost-effective resource." 16 U.S.C. § 839b(e)(1). Consistent with that directive, the Power Plan directs Bonneville to pursue the "least cost-option" when choosing a day-ahead market. NWEC at 29-30 (citing 16-ER-4648-49). Bonneville argues it "reasonably considered" the economic consequences of market participation, but the Power Act and the Power Plan are both clear: the duty to choose the "least cost" option is not satisfied by some consideration of costs. Instead, identifying the least-cost resource requires ensuring that the chosen alternative has an "incremental system cost *no greater than* that of the *least-cost* similarly reliable and available alternative measure or resource[.]" 16 U.S.C. § 839a(4) (emphasis added).

Bonneville conducted extensive economic analysis, and the outcome showed that EDAM would generate the greatest reduction in power costs for Bonneville's customers and the entire region. Bonneville found that EDAM "produces the highest net cost benefit in the cases studied[,]" and would lower costs by $166 million annually compared to Markets+. NWEC at 30. Lost monetary benefits to the region paint an even starker picture, "there is the opportunity to reduce customer costs by $4.4 billion if BPA selects EDAM[.]" NWEC at 32 (citing 16-

17

ER-4688).  In fact, Bonneville would be better off remaining in the WEIM and not joining a day-ahead market at all, thereby avoiding $130 million annually in costs. *Id.* at 31 (citing 1-ER-35).

Joining Markets+ will reduce grid reliability, because Bonneville can no longer make real-time power purchases with out-of-region power providers during times of peak energy demand. *See* 1-ER-93. Instead of "reductions in generation or generating capacity through exchanges," 16 U.S.C. § 839d(l)(5), joining Markets+ will require increased investment in "additional market procurements and/or additional reserves[,]" to account for the reduced reliability of the grid, *see* 1-ER-93.

Bonneville does not contest these findings but rather argues that the financial benefits of EDAM only resulted from foregone revenue opportunities, that Markets+ has the lowest cost to serve load, and that Bonneville is not required to "maximize profits. BPA at 45-46. This side steps NWEC's argument. Bonneville never engaged in the analysis required by the Act, to prioritize the least-cost resource, nor did it find that Markets+ is the least cost option.

Nor do the cost differences between Markets+ and EDAM result simply from surplus revenue, but also from the additional transactional cost of trading electricity across market seams. NWEC at 33-34; SCL Amicus at 21-26; OR/WA

18

Amicus at 20-21.[4] Going forward, Bonneville will have to trade across a market seam when transacting with its historic trade partners, like California power providers. *Id*. This will substantially increase power costs for Bonneville and the region and decrease reliability. *Id*.

In any event, Bonneville conceded that revenue along with costs to serve are both considered in cost production modeling when comparing the benefits of day-ahead market resource alternatives, and found that on balance, EDAM provides "produces the highest net cost benefit" of all alternatives. 1-ER-38. Under the Act, to move forward with Markets+, Bonneville would have to show that Markets+ has an "incremental system cost" no greater than EDAM, s*ee* 16 U.S.C. § 839a(4), but Bonneville never made this finding. Instead, it dismissed the outcomes of its own studies, arguing that these models "were projections, which were inherently limited[,]" BPA at 44-45, and prioritized the "qualitative benefits" of market governance over quantified financial benefits.

Instead of prioritizing the least-cost resource, as the Power Act requires, the record shows that Bonneville gave priority to the governance structure of the day-ahead market options. NWEC at 37-40. Bonneville defends its reliance on

---

[4] Seattle City Light did not waive its arguments related to the cost implications of Bonneville's day-ahead market choice, which were discussed extensively in NWEC's opening brief. NWEC at 25-42.

governance as the determining factor favoring Markets+, asserting that "governance was inherently a financial consideration[.]" BPA at 48. Unsurprisingly, it is unable to point to record citations that actually explain this assertion. If indeed governance is a financial consideration, Bonneville should have identified those costs and benefits. It did not. Instead, Bonneville stated that the "weight placed on governance is necessarily qualitative, and reasonable minds may differ on the appropriate weight to place on governance." 1-ER-151. It is not rational, let alone consistent with the Power Act, to forego as much as $166 million in annual benefits from lowered power costs, and $4.4 billion in regional benefits, based on an unexplained and unquantifiable assertion of Bonneville's preferred market governance structure. *See* 16 U.S.C. § 839a(4)(B) (defining cost effective as the "least-cost" resource).

Lastly, Bonneville dismisses the financial consequences of its choice of day-ahead market as just a small fraction of its operating budget, and so not important. *See* BPA at 46 (minimizing losses because "$150 million" is "well within BPA's typical metric for measuring revenue uncertainty"). However, it is ratepayers and consumers in the region, not Bonneville, that will ultimately pay for the financial consequences of Bonneville's choice. *Cal. Energy Comm'n v. BPA*, 909 F.2d 1298, 1303 (9th Cir. 1990) (requiring Bonneville to recover costs through rates). For ratepayers, a few dollars can mean the difference between keeping the house warm

20

in winter and a power shutoff. Jenks Decl. ¶ 21-22, 47. This is why the Power Act and the Power Plan require Bonneville to prioritize the least-cost resource. *See* 16 U.S.C. §§ 839b(d)(2), 839b(e)(1), 839d(l)(3).

2.     *Bonneville Violated the Power Act When It Ignored the Environmental Consequences of its Decision.*

The Power Plan, following the mandate of the Power Act, 16 U.S.C. § 839b(e)(2), also requires Bonneville to give "due consideration" to the environmental consequences of its actions. NWEC at 40-42. Bonneville again argues that it does not have to consider the Power Plan at all, and that it gave "rational" consideration to the environment anyway, pointing towards its NEPA argument. Neither point is persuasive.

Bonneville never gave any consideration to how its market choice would affect the environment, stating instead it would consider these impacts later. 1-ER-72. Yet, Bonneville considered how building transmission lines could increase the economic benefits of participating in Markets+. NWEC at 34. Bonneville considered how a low-water year, or extreme weather conditions, could affect the *price* of power or *costs* of market participation, and thus the operation of the federal hydropower system. NWEC at 34-36. Bonneville even found that it would likely need to invest in new generating resources, to account for the loss of real-time transfer capability with out-of-region market participants. 1-ER-93. Adding new transmission lines, changing hydro system operations, and building new

21

generating resources all have environmental consequences that Bonneville never disclosed or considered. NWEC at 40-42. Bonneville also considered how each market structured the financial cost of GHG attributes for renewable power, but did not consider how market participation could increase or decrease GHG emissions, frustrating state policies. *See* NWEC at 41; OR/WA Amicus at 27-32. Bonneville's refusal to give due consideration to these environmental impacts as required by the Power Plan is arbitrary and illegal. *Nw. Env't Def. Ctr. v. BPA*, 477 F.3d 668, 690 (9th Cir. 2007) (invalidating agency decision when there were "no findings and no analysis here to justify the choice made").

III.    BONNEVILLE VIOLATED NEPA.

There is no dispute that Bonneville failed to conduct *any* environmental analysis of its DAM Policy and ROD. In response, Bonneville argues that the DAM Policy and ROD are merely preliminary steps towards a future decision to join Markets+, and hence neither trigger NEPA nor have environmental effects. The record and NEPA caselaw belie this argument.

A.    The DAM Policy and ROD Are the "Point of Commitment" for NEPA.

Bonneville mostly ignores the question of whether the DAM Policy and ROD constitute "major federal action" subject to NEPA. NWEC at 49-51 (explaining why the Policy and ROD trigger NEPA). Instead, it argues that they are not the "point of commitment" to Markets+ for NEPA review. BPA at 62. At

best, this argument addresses the *timing* of NEPA compliance, not whether it applies to an action. Moreover, a promise to comply with NEPA in the future cannot cure an agency's failure to conduct NEPA analysis at the time it formulates a proposal for action. NWEC at 55-58. Under the governing law, that time is now.

Bonneville relies on *Friends of Southeast's Future v. Morrison* to argue that it can comply with NEPA later, 153 F.3d 1059 (9th Cir. 1998), but that case is inapposite. In *Morrison*, the Forest Service developed an initial "tentative" schedule for potential logging projects, stating that it was "subject to revision." *Id*. at 1061. Three years later it formalized its plan to move ahead with some projects and issued an EIS evaluating alternative project configurations and impacts. Conservation groups challenged both the EIS and the agency's failure to conduct a NEPA analysis for its earlier, tentative schedule. This Court rejected the argument that the agency violated NEPA with its tentative schedule, as the agency had not yet made an "irreversible and irretrievable commitment" of resources. *Id*. at 1063-64.

This case bears little resemblance to *Morrison*. As NWEC has explained, the DAM Policy and ROD are the decision point where Bonneville evaluated alternative day ahead markets and chose which one to pursue. It also has already made a $40 million commitment to Markets+, and continues to make financial and other commitments to that course of action. NWEC at 57-58. There is nothing

23

tentative about this choice. While a formal contract to join has not yet been signed, the Policy and ROD set in motion multiple concrete steps that are designed to culminate in a contract to join Markets+ two years from now. These steps include negotiating specific contracts, initiating necessary rate cases, and amending standards. *See supra* at 6-7. Importantly, there is no evidence that a future NEPA analysis will compare the impacts of alternative actions to participation in Markets+, such as joining EDAM or remaining in the WEIM. They are simply no longer on the table. 1-ER-222 (Bonneville's policy decision will "facilitate its entrance into Markets+, rather than EDAM").

Bonneville does not actually address the controlling cases or regulations, which emphasize preparation of an EIS "at the earliest possible time." NWEC at 55-58 (citing 40 C.F.R. § 1502.5). Nor does it mention *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, where the Department of Energy's designation of "energy corridors" was subject to NEPA even though the particular effects on the ground could not be determined until later, with implementation of specific projects. 631 F.3d 1072, 1098 (9th Cir. 2011), *see also Nat'l Res. Def. Council v. Hodel*, 435 F. Supp. 590 (D. Or. 1977) (Bonneville program subject to NEPA where it provides "specific plans for regional development, hammered out after long negotiations and embodied in published documents"); Mandelker, *NEPA Law & Litigation*, § 8:17 at 8-38 (EIS required where agencies have "adopted a national or regional

24

plan or program that has committed them to a specific course of action").

Bonneville's argument that NEPA compliance can happen later should be rejected.

### B. The DAM Policy and ROD Change the "Status Quo".

Bonneville next argues that NEPA does not apply because the DAM Policy and ROD will not "change the status quo" and hence do not trigger NEPA. BPA at 64. This argument is hard to square with the agency's own description of its decision as "momentous" and a "paradigm shift" for the region's energy future. 1-ER-222; 7-ER-1820. It too must be rejected.

Bonneville is correct that merely continuing to operate an ongoing project, within historical and authorized parameters, does not constitute "major federal action" for NEPA. *See Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990). That case, however, concerns entirely different circumstances. The facts here are more like *ICL v. BPA*, 826 F.3d 1173, 1176 (9th Cir. 2016), where the Court held that "the time for an EIS is when an agency undertakes a 'significant shift of direction in operating policy.'" Bonneville's decision to pursue participation in Markets+ is just such a "significant shift of direction." It will have a range of significant economic and environmental effects because it will change future development of the region's energy grid. NWEC at 14-18 (describing specific effects); OR/WA Amicus at 3-12 (choice of Markets+ will cost billions of dollars as compared to other alternatives).

25

Bonneville seeks to support its reliance on *Upper Snake* by focusing narrowly on operation of the federal hydrosystem, asserting that it would be operated within established boundaries. BPA at 64. Of course, hydrosystem operations are only one facet of the economic, energy and environmental consequences of choosing Markets+. NWEC at 14-18 (discussing how DAM Policy and ROD will influence the amount of generation from other renewable or fossil fuel sources). Bonneville's decision to pursue Markets+ is also a *separate* decision that could have significant consequences for hydrosystem operations by, for example, creating more "pressure" to favor hydropower generation over salmon protection. NWEC at 17. The purpose of NEPA is to make sure Bonneville's decision is based on a full understanding of *all* of its impacts *before* it commits to a course of action. *SEIA*, 80 F.4th at 994 (regulatory change will impact energy incentives that need to be assessed under NEPA).

Bonneville also asserts that the Ninth Circuit has approved federal actions that do not involve an EIS, environmental assessment, or categorical exclusion. BPA at 68-70 (citing *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774 (9th Cir. 2019)) (designation of landscapes at higher risk of disease not subject to NEPA until specific projects are proposed). Bonneville's reliance on *Ilano* is misplaced, as it simply confirms that actions that do not "change the status quo" are not "major federal actions." It does not stand for the proposition that agencies can

26

declare a major federal action that *does* change the status quo to have no significant effects without documenting such a conclusion under NEPA. NWEC at 51-55: *Forelaws on Board v. Johnson*, 743 F.2d 677, 682-83 (9th Cir. 1984) (rejecting Bonneville "environmental report" that did not meet NEPA standards).

The *Ilano* court distinguished its decision in *California Wilderness Coalition*, which held that the designation of transmission corridors was subject to NEPA, as a designation that "encourages, through incentives" the "siting of transmission facilities" in some places rather than others. *Ilano*, 928 F.3d at 781. *Cf.*, *SEIA*, 80 F.4th at 994 (distinguishing *Ilano* because agency could assess environmental impacts of policy change). As NWEC and *amici* have confirmed, choosing Markets+ will create incentives of many kinds for the region's energy generation and transmission, including more aggressive hydropower generation and greater reliance on fossil fuels. NWEC 14-18; 29-34.; OR/WA Amicus at 13-26. The consequences of such incentives must be assessed under NEPA *now*.

C.  <u>*Seven County Infrastructure* Does Not Allow Bonneville to Circumvent NEPA.</u>

Bonneville next argues that the Supreme Court's recent decision in S*even County Infrastructure Coalition v. Eagle Cnty*., 605 U.S. 168 (2025) ("*Seven County*"), precludes the NEPA review NWEC seek. *Seven County* involved a challenge to an EIS considering the impacts of an 88-mile rail line. Emphasizing that courts must defer to agencies' reasoned judgments about the scope of an EIS,

the Supreme Court upheld a decision to not consider the effects of "separate, independent projects" only indirectly related to the rail-line. *Id*. at 188.

*Seven County* is not useful to Bonneville. First, the Court emphasized deference to an agency's "reasonable" exercise of its expertise when it defines the scope of its EIS. *Id*. at 183. Here, Bonneville has not exercised any judgment about where to "draw the line" on the scope of NEPA review, but rather stated it will undertake environmental review later. 1-ER-72. There is nothing to defer to. Second, the environmental effects at issue are not "separate projects" distantly related to Bonneville's decision to participate in Markets+. *Seven Cnty., 605 U.S.* at 188. Instead, Bonneville is the key player in the western electricity market and grid, controlling approximately 75% of the transmission system on which every power supplier and user in the region relies. Its decisions directly influence how that market operates and will develop and Bonneville itself will very likely develop resources and upgrade transmission as part of its response to joining Markets+, actions with attendant impacts to air pollution, greenhouse gas emissions, waste management, and river flows. NWEC at 14-18. Bonneville already considered building new transmission to improve the economic benefits of Markets+. NWEC at 34. These are not the kind of proximally distant "separate projects" at issue in *Seven County*.

28

D.      Bonneville's $40 Million Commitment Violated NEPA.

Finally, Bonneville offers a confused response to NWEC's argument that its commitment of $40 million to Markets+ *before* it issued its DAM Policy and ROD compounded its NEPA violation by creating financial incentives to select a particular alternative. NWEC at 58-60. Bonneville ignores virtually all of the controlling regulations and caselaw on this issue, instead claiming that NEPA's prohibition on irretrievable commitments only applies to "natural" resources, not financial ones. Not so.

Bonneville relies on *WildWest Institute v. Bull*, which held that "pre-marking" trees for logging prior to the conclusion of the NEPA process was not an "irreversible and irretrievable commitment of resources[.]" 547 F.3d 1162, 1166-68 (9th Cir 2008). While the decision focused on the commitment of "natural" resources, the Court recognized that "financial commitments" can constitute an "irretrievable commitment" in violation of NEPA if they would limit the choice of reasonable alternatives. *Id*. at 1169. Likewise, the governing NEPA regulations prohibit agencies from making commitments that would "prejudice" the ultimate selection of an alternative. NWEC 58-60; 40 C.F.R. § 1502.2(f).

Though the *Ilano* Court held that $208,000 would not influence the agency's decision to allow logging, Bonneville's $40 million commitment is a different

29

story.[5] Bonneville will forfeit $40 million if it does not join Markets+, a fact affirmed by FERC. 1-SER-14 ("Funding Participant who defaults or withdraws" must pay the collateral obligation). Bonneville is unlikely to take the required impartial "hard look" at alternatives once it has yoked itself financially to Markets+ with such a commitment. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2017 WL 1829588, at *14 (D. Or. Apr. 3, 2017) (spending even a few million dollars on one alternative can "create a significant risk of bias in the NEPA process").

Moreover, as NWEC has explained elsewhere, the DAM Policy and ROD set in motion a number of additional steps, like amending contracts and instituting new rate and tariff proceedings, that will require additional financial resources and create further momentum towards the inevitable finalization of its Markets+ decision. Such steps, prior to completion of an EIS, violate NEPA.

IV.   THE COURT SHOULD VACATE THE DAM POLICY AND ROD AND ORDER AN EIS.

As NWEC explained in its opening brief, the appropriate remedy for Bonneville's failure to comply with the Power Act and NEPA is vacatur of the DAM Policy and ROD and a remand for Bonneville to prepare an EIS. NWEC at

---

[5] The $40 million that is committed to Markets+ constitutes 0.8% of Bonneville's total budget, not 0.008% as Bonneville claims.

30

61-66. Bonneville does not address this point except to ask for "further briefing." BPA at 73. There is no need for further briefing. Vacatur "is the default remedy under the APA," even if a court retains equitable discretion in "limited circumstances"—none of which apply here (nor does Bonneville argue otherwise)—to remand a decision without vacatur. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). As NWEC has emphasized, Bonneville is now implementing numerous steps to "go live" in Markets+ in October, 2028. Every additional step towards that date without vacatur and a remand order will make a fair and candid look at alternatives less likely. The Court has everything it needs to vacate the DAM Policy and ROD and remand for preparation of an EIS.

CONCLUSION

For all of the foregoing reasons, the Court should grant NWEC's petition and find that Bonneville has violated the Northwest Power Act and NEPA in its DAM Policy and ROD, vacate these actions and remand them to Bonneville to prepare an EIS under NEPA and comply with the requirements of the Power Act.

Respectfully submitted this 20th day of February, 2026.

*s/Jaimini Parekh*
JAIMINI PAREKH
TODD D. TRUE
JAN E. HASSELMAN
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340

31

jparekh@earthjustice.org
ttrue@earthjustice.org
jhasselman@earthjustice.org

*Attorneys for Petitioners*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-4278_____

I am the attorney or self-represented party.

**This brief contains 6,981 words,** including **0 words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ **X** ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Jaimini Parekh*_____ **Date** February 20, 2026
 *(use "s/[typed name]" to sign electronically-filed documents)*

33

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I electronically filed the foregoing Petitioners' Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 20, 2026.

*s/ Jaimini Parekh*
JAIMINI PAREKH

34

# ADDENDUM

**Addendum**

H.R. Rep. No. 96-976(I), 96th Congr., 2d Sess. (1980) (excerpt),
pages 1, 43-44 ................................................................................................A-1

H.R. REP. 96-976(I), H.R. REP. 96-976, H.R. Rep. No. 976(I), 96TH Cong.,
2ND Sess. 1980, 1980 U.S.C.C.A.N. 5989, 1980 WL 12944 (Leg.Hist.)
P.L. 96-501, PACIFIC NORTHWEST ELECTRIC POWER PLANNING AND CONSERVATION ACT
SEE PAGE 94 STAT. 2697
SENATE REPORT (ENERGY AND NATURAL RESOURCES COMMITTEE)
NO. 96-272, JULY 30, 1979 (TO ACCOMPANY S. 885)
HOUSE REPORT (INTERSTATE AND FOREIGN COMMERCE COMMITTEE)
NO. 96-976(I), MAY 15, 1980 (TO ACCOMPANY S. 885)
HOUSE REPORT (INTERIOR AND INSULAR AFFAIRS COMMITTEE)
NO. 976(II), SEPT. 16, 1980 (TO ACCOMPANY S. 885)
CONG. RECORD VOL. 125 (1979)
CONG. RECORD VOL. 126 (1980)
DATES OF CONSIDERATION AND PASSAGE
SENATE AUGUST 3, 1979; NOVEMBER 19, 1980
HOUSE NOVEMBER 17, 1980
THE HOUSE REPORT (PARTS I AND II) IS SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 96-976(I)

MAY 15, 1980

**\*1  \*\*5989**  THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, TO WHOM WAS REFERRED THE BILL (S. 885) TO ASSIST THE ELECTRICAL CONSUMERS OF THE PACIFIC NORTHWEST THROUGH USE OF THE FEDERAL COLUMBIA RIVER POWER SYSTEM TO ACHIEVE COST-EFFECTIVE ENERGY CONSERVATION, TO ENCOURAGE THE DEVELOPMENT OF RENEWABLE ENERGY RESOURCES, TO ESTABLISH A REPRESENTATIVE REGIONAL POWER PLANNING PROCESS, TO ASSURE THE REGION OF AN EFFICIENT AND ADEQUATE POWER SUPPLY, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMENDS THAT THE BILL AS AMENDED DO PASS.

\* \* \* \*

**\*23**  BACKGROUND AND NEED

THE BONNEVILLE POWER ADMINISTRATION (BPA) WAS ESTABLISHED IN 1937 BY THE ACT OF AUGUST 20, 1937, GENERALLY REFERRED TO AS THE BONNEVILLE PROJECT ACT (16 U.S.C. 832, ET SEQ.). SECTION 2(A) OF THE 1937 ACT PROVIDES THAT THE BPA SHALL DISPOSE OF ELECTRIC ENERGY GENERATED IN THE OPERATION OF THE BONNEVILLE PROJECT CONSTRUCTED AND OPERATED BY THE CORPS OF ENGINEERS. SECTION 2(B) OF THE ACT ALSO STATES:

IN ORDER TO ENCOURAGE THE WIDEST POSSIBLE USE OF ALL ELECTRIC ENERGY THAT CAN BE GENERATED AND MARKETED AND TO PROVIDE REASONABLE OUTLETS THEREFOR, AND TO PREVENT THE MONOPOLIZATION THEREOF BY LIMITED GROUPS, THE ADMINISTRATOR IS AUTHORIZED AND DIRECTED TO PROVIDE, CONSTRUCT, OPERATE, MAINTAIN, AND IMPROVE SUCH ELECTRIC TRANSMISSION LINES AND SUBSTATIONS, AND FACILITIES AND STRUCTURES APPURTENANT THERETO, AS HE FINDS NECESSARY, DESIRABLE, OR APPROPRIATE FOR  **\*24  \*\*5990**  THE PURPOSE OF TRANSMITTING ELECTRIC ENERGY, AVAILABLE FOR SALE, FROM THE BONNEVILLE PROJECT TO EXISTING AND POTENTIAL MARKETS, AND FOR THE PURPOSE OF INTERCHANGE OF ELECTRIC ENERGY, TO INTERCONNECT THE BONNEVILLE

THE PLAN TO ACQUIRE THE RESOURCE OR MANDATE THE CONSERVATION PROGRAM. THE COMMITTEE ALSO VIEWS PARTICIPATION SHARES IN A JOINTLY-OWNED OR OPERATED RESOURCE AS CREDITABLE RESOURCES OF THE PARTICIPANT, IF THEY MEET THE REQUIREMENTS OF THIS SUBSECTION. THERE IS ALSO SIGNIFICANT VALUE TO THE ADMINISTRATOR'S **67** CUSTOMERS IN KNOWING WHETHER OR NOT THEIR RESOURCES WILL RECEIVE CREDITS, AND THUS THE COMMITTEE INTENDS THAT DISCRETIONARY ELIGIBILITY STANDARDS AND CALCULATION OF ACTUAL CREDITS WILL FOLLOW THE GENERAL ELIGIBILITY CONDITIONS FOR THE MANDATORY CREDITS. THE EXACT SIZE OF THE CREDIT WILL GIVE INDIVIDUAL UTILITIES AMPLE INCENTIVE FOR LOCAL INVESTMENTS WHILE PRESERVING FOR OTHER CUSTOMERS OF THE ADMINISTRATOR THE RATES AND COSTS THEY WOULD HAVE PAID IN THE ABSENCE OF THE INDIVIDUAL UTILITIES' ACTION.

THE AMOUNT OF THE CREDITS IS DETERMINED BY DIFFERENT FORMULAS SET FORTH IN THE SUBSECTION. CONSERVATION CREDITS ARE TO BE SET AT THE LEVEL AT WHICH THE RATE IMPACT TO THE ADMINISTRATOR'S OTHER CUSTOMERS IS THE SAME AS THE RATE IMPACT SUCH CUSTOMERS WOULD HAVE EXPERIENCED IF THE ADMINISTRATOR HAD ACQUIRED RESOURCES IN THE SAME AMOUNT. RESOURCE CREDITS ARE TO BE BASED ON THE NET COSTS ACTUALLY INCURRED BY THE UTILITY IN ACQUIRING THE RESOURCE BY THE CREDIT MAY NOT BE GREATER THAN THE COST OF RESOURCE ACQUIRED BY BPA FROM OTHER RESOURCES.

RETAIL RATE STRUCTURES VOLUNTARILY IMPLEMENTED BY A CUSTOMER WHICH INDUCE CONSERVATION, OR INSTALLATION OF CONSUMER OWNED RENEWABLE RESOURCES WILL QUALIFY FOR BILLING CREDITS IF THEY MEET THE SAME TYPE OF PERFORMANCE STANDARDS AS ARE REQUIRED FROM OTHER CONSERVATION OR RESOURCE ACTIVITIES UNDER THIS SUBSECTION THESE RATE FORMS ARE NOT LIMITED TO THOSE STUDIED BY THE COUNCIL PURSUANT TO SECTION 9(I)(1).

BEFORE GRANTING ANY CREDIT, THE ADMINISTRATOR MUST NOTIFY CUSTOMERS AND THE COUNCIL, EXPLAIN THE METHOD HE PROPOSES TO USE IN DETERMINING THE AMOUNT OF THE CREDIT, AND PERMIT THEM A REASONABLE TIME TO EXPRESS THEIR VIEWS. ALL MAJOR RESOURCE CREDITS MUST FOLLOW SECTION 6(C).

SECTION 6(I) REQUIRES THE ADMINISTRATOR TO INCLUDE IN BPA CONTRACTS ENFORCEABLE TERMS AND CONDITIONS WHICH WILL ALLOW IT TO EXERCISE EFFECTIVE OVERSIGHT FOR ALL RESOURCES IT ACQUIRES, INCLUDING CONSERVATION ACTIVITIES FOR WHICH IT PROVIDES BILLING CREDITS. SUCH TERMS AND CONDITIONS MAY VARY DEPENDING ON THE PARTICULAR RESOURCE, AND ITS POTENTIAL IMPACTS ON BPA RATEPAYERS.

THIS PROVISION WAS STRENGTHENED SIGNIFICANTLY AS A RESULT OF THE SUBCOMMITTEE'S INVESTIGATION OF THE NET BILLED PLANTS WITH THE HELP OF THE GAO. THE COMMITTEE EXPECTS THAT BPA WILL EXERCISE RESPONSIBILITIES BY BPA IN SUCH A WAY THAT COST OVERRUNS SUCH AS THOSE EXPERIENCED AT THE NET BILLED PLANTS WILL BE MINIMIZED OR AVOIDED. IT IS INTENDED THAT THE BPA WILL HAVE AN ACTIVE ROLE IN MONITORING THE BUILDING AND OPERATION CONCERNING SUCH RESOURCES. TO DO THIS, BPA WILL HAVE TO EXPAND ITS CAPABILITY TO OVERSEE SUCH ACTIVITIES.

SECTION 6(J) MAKES IT EXPLICIT THAT THE ACT DOES NOT AUTHORIZE ANY FORM OF 'FEDERAL GUARANTEE' FOR BONDS SOLD TO FINANCE RESOURCES ACQUIRED BY THE ADMINISTRATOR. ALL CONTRACTURAL AND OTHER OBLIGATIONS REQUIRED OF THE ADMINISTRATOR UNDER THE ACT ARE SECURED SOLELY BY BONNEVILLE'S REVENUES. THE FULL FORCE AND CREDIT OF THE UNITED STATES IS NOT PLEDGED. IN ADDITION, ALL OFFERINGS AND PROMOTIONAL MATERIAL FOR RESOURCES ACQUIRED BY THE ADMINISTRATOR UNDER THIS ACT MUST SPECIFICALLY STATE THAT THE OBLIGATIONS ARE NOT

GUARANTEED BY THE FEDERAL GOVERNMENT. THE COMMITTEE WILL WATCH BPA'S ACTIVITIES UNDER SECTION 6(I) AND (J).

*68 SECTION 6(K) REQUIRES THAT FINANCIAL ASSISTANCE, BILLING CREDITS AND OTHER BENEFITS BE DISTRIBUTED EQUITABLY TO EACH CLASS OF CUSTOMER THROUGHOUT THE REGION.

SECTION 6(I) DIRECTS THE ADMINISTRATOR TO INVESTIGATE OPPORTUNITIES FOR ADDING TO THE REGION'S RESOURCES THROUGH THE ACCELERATED OR COOPERATIVE DEVELOPMENT OF RENEWABLE RESOURCES LOCATED OUTSIDE THE REGION AND OPPORTUNITIES FOR MUTUALLY-BENEFICIAL INTERREGIONAL EXCHANGES OF POWER THAT REDUCE THE NEED FOR ADDITIONAL GENERATION OR GENERATING CAPACITY IN THE PACIFIC NORTHWEST AND REGIONS WITH WHICH SUCH EXCHANGES MAY OCCUR.

PARAGRAPH (2) OF SUBSECTION (1) AUTHORIZES AND DIRECTS THE ADMINISTRATOR PERIODICALLY TO INVESTIGATE OPPORTUNITIES FOR MUTUALLY BENEFICIAL INTERREGIONAL EXCHANGES OF ELECTRIC POWER THAT REDUCE THE NEED FOR ADDITIONAL GENERATION OR GENERATING CAPACITY, WITH EMPHASIS UPON REDUCTION OF ADDITIONAL GENERATION IN THE PACIFIC NORTHWEST AND THE REGIONS WITH WHICH SUCH EXCHANGES MAY OCCUR. SIMILAR EXCHANGES IMPLEMENTED IN THE PAST HAVE DEMONSTRATED THE MUTUAL BENEFITS THAT REGIONAL EXCHANGES CAN ACHIEVE. THE COUNCIL IS REQUIRED TO CONSIDER SUCH INVESTIGATIONS AND INTERREGIONAL EXCHANGES IN FORMULATING THE REGIONAL CONSERVATION AND ELECTRIC POWER PLAN MANDATED BY SECTION 4.

PARAGRAPH (3) AUTHORIZES THE ADMINISTRATOR TO ACQUIRE RESOURCES CONSISTENT WITH SUCH INVESTIGATIONS AND CONSISTENT WITH THE PLAN OR, IF NO PLAN IS IN EFFECT, WITH THE PRIORITIES OF SECTION 4(E)(1) AND THE CONSIDERATIONS OF SECTION 4(E)(2).

SECTION 6(M) REQUIRES THE ADMINISTRATOR TO DETERMINE THAT A REASONABLE SHARE OF THE RESOURCE TO BE ACQUIRED, OR A REASONABLE EQUIVALENT, HAS BEEN OFFERED TO EACH PACIFIC NORTHWEST UTILITY FOR OWNERSHIP, PARTICIPATION, OR OTHER SPONSORSHIP. THIS PROVISION IS IMPORTANT BECAUSE UNDER SECTION 5(E) EACH UTILITY'S ENTITLEMENT WILL INCLUDE THOSE ADDITIONAL RESOURCES THE UTILITY HAS SOLD TO THE ADMINISTRATOR UNDER SECTION 6.


SECTION 7. RATES

SECTION 7(A) REQUIRES THAT THE ADMINISTRATOR PERIODICALLY REVIEW AND SET BPA RATES TO RECOVER THE ADMINISTRATOR'S TOTAL COSTS, INCLUDING AMORTIZATION OF THE FEDERAL INVESTMENT IN THE FEDERAL COLUMBIA RIVER POWER SYSTEM AND SPECIFIES THE APPLICABLE LAWS UPON WHICH FERC SHALL APPROVE AND CONFIRM THE ADMINISTRATOR'S PERIODIC RATE FILINGS, INCLUDING THE RATES PAID BY BPA FOR PURCHASED POWER. AS RECOMMENDED BY FERC, THESE LAWS INCLUDE THE FLOOD CONTROL ACT OF 1944. THE COSTS INCLUDE THOSE INCURRED UNDER SECTION 4(H) OF THE COMMITTEE AMENDMENT, BUT THEY DO NOT INCLUDE, AS RECOMMENDED BY FERC, AN 'ALLOWANCE FOR CONTINGENCIES'.

SECTION 7(B) ESTABLISHES THE RATES FOR POWER SOLD TO MEET THE GENERAL REQUIREMENTS OF PUBLIC BODIES, COOPERATIVES, AND FEDERAL AGENCY CUSTOMERS WITHIN THE PACIFIC NORTHWEST, AND FOR SALES UNDER THE 5(C) EXCHANGE. THIS RATE WILL BE THE ADMINISTRATOR'S LOWEST FIRM POWER RATE. SECTION 7(B)(2) ESTABLISHES A 'RATE CEILING' FOR PREFERENCE CUSTOMERS THAT SEEKS TO ASSURE THESE CUSTOMERS THAT THEIR RATES WILL BE NO HIGHER THAN THEY WOULD HAVE BEEN HAD THE ADMINISTRATOR NOT BEEN REQUIRED TO PARTICIPATE IN POWER SALES OR